UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL


| | |
|---|---|
| STATE OF CALIFORNIA, )<br>                    )<br>        Plaintiff, )<br>                    )<br>    vs.             )<br>                    )<br>PICAYUNE RANCHERIA OF )<br>CHUKCHANSI INDIANS OF )<br>CALIFORNIA, A FEDERALLY )<br>RECOGNIZED INDIAN )<br>TRIBE, )<br>                    )<br>        Defendant. )<br>_____) | 1:14-cv-01593 LJO<br><br>HEARING RE TEMPORARY<br>INJUNCTION ISSUES |

Fresno, California          Wednesday, October 15, 2014


REPORTER'S TRANSCRIPT OF PROCEEDINGS


REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

APPEARANCES OF COUNSEL:

For the Plaintiff:            OFFICE OF THE ATTORNEY GENERAL
                             1300 I Street, Suite 125
                             P.O. Box 944255
                             Sacramento, CA  94244-2550
                             BY:  **WILLIAM P. TORNGREN,**
                                  **Deputy Attorney General**

For the Defendant:           ROSETTE, LLP
                             193 Blue Ravine Rd., Suite 255
                             Folsom, California 95630
                             BY:  **ROBERT A. ROSETTE**
                                  **GEOFFREY M. HASH**
                                  **RICHARD VERRI**

For Reid Tribal Council, et al.:

                             FREDERICKS PEEBLES & MORGAN LLP
                             2020 L Street, Suite 250
                             Sacramento, CA 95811
                             BY:  **JOHN M. PEEBLES**

For McDonald Tribal Council:

                             RAPPORT AND MARSTON
                             405 West Perkins Street
                             Ukiah, California 95482
                             BY:  **LESTER J. MARSTON**

For Picayune Rancheria Tribal Gaming Commission, Chaired by
Dyann Eckstein:

                             TILDEN, MCCOY & DILWEG, LLP
                             4151 Redwood Avenue, Unit 307
                             Los Angeles, CA  90066
                             BY:  **RORY E. DILWEG**

For Picayune Rancheria Tribal Gaming Commission, Chaired by
Andrew Hofstetter:

                             VASQUEZ ESTRADA & CONWAY LLP
                             Courthouse Square
                             1000 Fourth Street, Suite 700
                             San Rafael, CA 94901
                             BY:  **THOMAS WEATHERS**

1  Wednesday, October 15, 2014              Fresno, California

2  1:30 p.m.

3          (The following proceedings were had in open court, to

4  wit.)

5          THE COURT:  Good afternoon.  Please be seated.

6          Let us now call the case of State of California

7  versus Picayune Rancheria of Chukchansi Indians of California,

8  Action Number 14-cv-1593.

9          Could I have your appearances?  And for the record,

10  if you have more than one counsel from a particular law firm,

11  I don't think I need to hear from everyone.  I just need to

12  hear from the counsel that is making the primary appearance.

13          MR. TORNGREN:  Your Honor, Bill Torngren, Deputy

14  Attorney General, on behalf of the State of California.

15          MR. MARSTON:  Good morning, your Honor.  Lester

16  Marston with law firm of Rapport and Marston, on behalf of the

17  Tex McDonald Tribal Council.

18          Your Honor, I have two of my clients, and they were

19  not allowed to come into the courtroom.  And I would ask that

20  they be allowed to come in so I could have access to them.

21          THE COURT:  Where are they?

22          MR. MARSTON:  They were put into one of the other

23  rooms, your Honor.

24          THE COURT:  Where would you suggest we put them?

25  Just so you know, when you say "the other rooms," there is a

1   live feed going into the courtroom next door to us, so it is

2   not as though they can't hear you and they can't hear everyone

3   who is speaking.

4          MR. MARSTON:  I would like to be able to communicate

5   with them.

6          THE COURT:  Well, if you want them to come in and

7   stand in the back.  How many are there?

8          MR. MARSTON:  Two, your Honor.

9          THE COURT:  Why don't you have them come on in and

10   stand in the back, and if you need to speak with them for any

11   reason, let me know.

12          MR. MARSTON:  That would be appreciated.

13          MR. PEEBLES:  Your Honor, my name is John Peebles.

14   I'm with the law firm of Fredericks Peebles & Morgan, and we

15   are here on behalf of Morris Reid, Dora Jones, et al.

16          Thank you.

17          THE COURT:  All right.

18          MR. ROSETTE:  Your Honor, my name is Robert Rosette.

19   I'm an attorney with the Rosette firm, LLP.

20          I represent the 2010 Tribal Council, as recognized by

21   the United States as the last uncontested recognized body of

22   the Tribe; the 2011-2012 Council, whose election was

23   recognized by the United States; the 2013 Council, and the

24   2014 Unification Council, on behalf of the Tribal Members of

25   the Picayune Rancheria of Chukchansi Indians.

1          MR. DILWEG:  Your Honor, my name is Rory Dilweg.  I'm

2     here representing the Picayune Rancheria Tribal Gaming

3     Commission, as chaired by Dyann Eckstein.

4          MR. WEATHERS:  Your Honor, Thomas Weathers, Vasquez,

5     Estrada & Conway.  I represent the Picayune Rancheria Tribal

6     Gaming Commission, chaired by Andrew Hofstetter.

7          THE COURT:  Anyone else?

8          MR. ROSETTE:  Your Honor, really quick, I have two

9     witnesses from FTI Consulting.  They are here on behalf of

10     Wells Fargo, the Tribe's Trustee, and the note holders from

11     New York.  They are currently excluded.

12          Is there any chance they could watch the proceeding

13     so that they could testify with regard to what they are

14     witnessing, or would you like to keep them excluded?

15          THE COURT:  I'm not aware that anybody is excluded.

16     I have made no such order.

17          MR. ROSETTE:  Okay.  Can we bring them back in?

18          THE COURT:  "We," who?  Okay.

19          Anybody else, appearances?

20          All right.  Let me make a prefatory statement.  This

21     way, I think that people can then understand what the view of

22     the Court is as far as facts that are before me, what I

23     believe to be the issues, legal issues before this Court, and

24     then we will move forward.

25          At the center of this dispute is the operation of the

1   Chukchansi Gold Resort and Casino in Coarsegold.

2           There are multiple factions who claim, or who

3   should -- as far as who should constitute the Tribal

4   government.

5           And from my reading of the documents that have been

6   submitted to me, there appear to be three Tribal factions.

7   One, I will refer to as the "McDonald faction," another as the

8   "Lewis/Ayala faction," and the third as the "Reid faction."

9           There was more than one faction, or there is more

10  than one faction that apparently armed themselves with

11  firearms for the purpose of intimidation and establishing

12  outright control of the casino and casino property.

13          All of this was done October 9, last week, when

14  customers of the casino, guests of the hotel, and employees of

15  both, placed themselves innocently, of course, in harm's way,

16  not knowing that this was going to happen, and just simply

17  being there at the time.

18          I don't think anybody is disputing that the element

19  of public health and safety was involved and was invoked.

20          The plaintiff, the State of California, entered into

21  a Class III Gaming Compact in September of 1999, with the

22  Rancheria.  And sections 8.1.2 and 10.1 require insurance of,

23  quote, "the physical safety of gaming operations, patrons and

24  employees, and other persons while in the gaming facility,"

25  end of quote.

1          The October 9 incident involved the use of firearms,

2    Tasers, physical violence, and the use of different factions,

3    security forces, either to attain a takeover or to prevent one

4    from occurring, depending, of course, on which side of the

5    dispute one is on.

6          This prompted an emergency evacuation of the casino

7    and hotel, requiring emergency responses from the Madera

8    County Sheriff and the California Highway Patrol.

9          This Court issued a temporary restraining order on

10   October 10, at the request of the State of California, under

11   the immediate supervision of the Governor of this State.

12         The issue in any federal Court, the first issue and

13   primary issue, is jurisdiction.  The claimed jurisdiction by

14   the Petitioner/Plaintiff State of California is the Indian

15   Regulatory Gaming Act, specifically at 25 United States Code

16   section 2710(d)(7)(A)(iii); also 28 United States Code section

17   1331.

18         The federal courts, as most people recognize, are

19   courts of limited jurisdiction in every case.  And the Court

20   is provided jurisdiction in one of two ways:  Either by

21   statute passed by the United States Congress, or the United

22   States Constitution.

23         The Picayune Rancheria, the McDonald Council, they

24   have filed papers attacking the jurisdiction of this Court,

25   claiming that the statutes relied upon by the State are

1   tangential at best and absent at worst.

2           So my first question is, which must be in every

3   federal case -- I know what the position of the McDonald

4   Council is -- what is the government's response to that

5   position?

6           MR. TORNGREN:  Do you want me at the podium?

7           THE COURT:  Whatever is easiest for you.

8           MR. TORNGREN:  Quickly, the response to the

9   jurisdiction is that this Court has jurisdiction under 28

10  U.S.C. section 1331 because the State's claim arises under

11  federal statutes and federal common law.

12          The case of *Cabazon Band of Mission Indians vs.*

13  *Wilson*, 124 Fed.3d 1050, and the jump cite is 1055 to -56, and

14  that's a Ninth Circuit case from 1997.  And in that court, we,

15  the State, asserted that the Court lacked jurisdiction because

16  the dispute was purely contractual because it arose out of the

17  Compact.

18          The Ninth Circuit rejected that argument.  And I will

19  quote from the opinion:

20          "The State's obligation to the Bands thus originates

21              in the Compacts.  The Compacts quite clearly are a

22              creation of federal law.  Moreover, IGRA," I-G-R-A,

23              which is the Indian Gaming Regulation Act,

24              "prescribes the permissible scope of the Compacts.

25              We conclude that the Bands' claim to enforce the

1          Compacts arises under federal law and thus we have

2          jurisdiction pursuant to 28 U.S.C. section 1333."

3          The State would view that as dispositive of that

4     issue.

5          Additionally, the *Cabazon* Court addressed

6     jurisdiction under 25 U.S.C. section 2710(d)(7)(A)(ii), and

7     there it held that:

8          "IGRA necessarily confers jurisdictions onto federal

9          courts to enforce Tribal-State Compacts and

10          agreements contained therein."

11          Our action is for breach of Compact and an injunction

12     to essentially enforce the Compact.  Consequently, we submit

13     that the Court has subject matter jurisdiction.

14          THE COURT:  Mr. Marston, how do you distinguish the

15     *Cabazon* case?

16          MR. MARSTON:  Easily, your Honor.  Should I go to the

17     podium?

18          THE COURT:  Whatever you are comfortable doing.

19          MR. MARSTON:  First of all, the *Cabazon* case is

20     consistent with our line of reasoning.  In *Cabazon*, what was

21     at issue there was the playing of OTB, off-track betting, and

22     the payment of the licensing fee associated with the playing

23     of that game.

24          And so the -- if you look at the grant of

25     jurisdiction under the IGRA, it is a grant of jurisdiction to

1   you, your Honor, to enjoin a Class III gaming activity

2   conducted in violation of the Compact.  That is, how the game

3   is played, whether there are crooks playing the game.  You

4   know, is the game being played in accordance with minimum

5   internal control standards.

6          And that was one of the issues that was at issue in

7   the *Cabazon* case, the actual playing of the off-track betting,

8   and whether the tribes had a right to play that game.

9          So that's consistent with our line of reasoning.

10         The Ninth Circuit has made it clear in *Round Valley*

11  *Indian Housing Authority vs. Hunter*, the mere fact that a

12  federal statute authorizes parties to come in and enter into

13  an agreement does not confer federal court jurisdiction on the

14  federal courts to resolve a breach of that contract.

15         It is merely a breach of contract dispute.  It

16  doesn't arise under the Constitution, laws or treaties of the

17  United States, and, therefore, there is no 1331 jurisdiction.

18         So the State has to point to a specific federal

19  statute that grants you jurisdiction, and our position is that

20  2710 isn't that grant of jurisdiction because it doesn't

21  involve the actual playing of the games.

22         And that's consistent with the legislative history of

23  the statute and also with the Supreme Court precedent that

24  statutes passed for the benefit of Indians have to be strictly

25  construed in favor of the Indians.  The courts always presume

1  that when Congress enacts legislation pertaining to Indians,

2  they are doing it as a trustee in a beneficial means, and it

3  recognizes tribal sovereignty.

4  So statutes have to be construed as to limit what

5  sovereignty is taken away from an Indian Tribe, including the

6  right of the Tribe to adjudicate disputes in its own tribal

7  court.

8  And so Congress was very careful.  It left to the

9  parties, to the State and to the Tribes, to negotiate in their

10  agreement specifically what courts would have jurisdiction and

11  how those disputes would be resolved.  And if you go to the

12  Compact and look at the Compact, what the Compact calls for is

13  arbitration.

14  And then there is a provision in there that says,

15  well, if the parties go to federal court, and the federal

16  courts determine that they don't have jurisdiction, then they

17  can go to state court.

18  So there is a remedy that's available to the State.

19  That's number one.

20  And number two, this isn't a situation where the

21  federal regulatory agencies haven't acted.  I'm sure the Court

22  is aware of the fact that the National Indian Gaming

23  Commission has issued a closure order of the casino.

24  THE COURT:  I have it.

25  MR. MARSTON:  If anybody were to violate that NIGC

1   order, the U.S. Attorney would be coming in and enforcing that

2   in probably your Court, your Honor, and clearly you would then

3   have jurisdiction.

4        So the issue is kind of moot.  The NIGC has already

5   taken action, has already issued the closure order.  The

6   issuance of the temporary restraining order really isn't

7   necessary at this point.

8        THE COURT:  That's a different issue from the one I

9   just addressed.

10       MR. MARSTON:  It is a different issue.  You are

11  right, your Honor.

12       So our position is this is just a breach of contract

13  action.  The only grant of jurisdiction is 2710.  If you look

14  at the -- the only real court of appeals decision addressing

15  this specific issue as to what that phrase, "enjoining a Class

16  III gaming activity in violation of the Compact," was the

17  Seventh Circuit's decision, Judge Posner's decision in

18  *Ho-Chunk Nation vs. State of Wisconsin*.

19       And, basically, what the Court said was you can put

20  anything into a Compact.  That doesn't mean that it arises to

21  a federal question or a federal action.  Okay.

22       There has to be a specific grant of jurisdiction, and

23  that grant of jurisdiction is limited to the wording in the

24  statute.

25       And there is a definition for Class III gaming in the

1    statute.  It specifically defines the games as any games that

2    are not Class I and Class II; that's basically slot machines

3    and house bank games.

4           The term "activity" is not defined, but if you go to

5    the ordinary dictionary definition, which the Ninth Circuit

6    has said in *Rumsey vs. Wilson* you have to do, and you talk

7    about an activity, it is literally defined as the playing of

8    the games or activities involving the actual conducting of the

9    games.

10          So, your Honor, you simply don't have any

11   jurisdiction.  And if you have any doubt as to the meaning of

12   that phrase, the Supreme Court has absolutely made it clear.

13   You have to resolve that ambiguity in favor of the Tribes and

14   in upholding tribal rights and limiting the State.

15          Thank you, your Honor.

16          THE COURT:  Does the government wish to reply?

17          MR. TORNGREN:  Very briefly, your Honor.

18          First, with respect to *Cabazon*, that was an action

19   brought against the State for breach of Compact, which I would

20   suggest is on all fours with this case.  The only difference

21   is that the parties are reversed.

22          Second, with respect to the waiver of sovereignty,

23   there is a provision in the Compact for a limited waiver of

24   sovereignty.  Plus, 25 U.S.C. 2710(d)(7)(A)(ii) constitutes a

25   constitutional waiver of tribal sovereign immunity.

1      That was basically the issue in the *Michigan vs. Bay*

2  *Hills* case, 134 S. Ct. 2014, which was decided this year.

3      And finally, with respect to gaming activity, the

4  Eastern District has determined that gaming activity is not

5  limited to the actual playing or providing of games, and

6  includes, and I will quote, "the necessary conduct associated

7  with playing or providing the games."  And that was in *County*

8  *of Madera vs. Picayune Rancheria of Chukchansi Indians,* 467

9  F.Supp.2d 993.  The jump cite is 1002.  And that's an Eastern

10  District decision from 2006.

11      Consequently, we submit that, one, the Tribe has

12  waived sovereign immunity.  Congress has waived sovereign

13  immunity.  And the State, this Court has jurisdiction over

14  this breach of Compact action.

15      THE COURT:  Does anybody else wish to be heard on the

16  issue of jurisdiction other than a joinder?  For the purposes

17  of this case in this hearing, the Court will assume that each

18  party has joined.  Anyone?

19      MR. PEEBLES:  None, your Honor.

20      MR. ROSETTE:  None from me, your Honor.

21      THE COURT:  All right.  Matter submitted?

22      MR. MARSTON:  Just briefly, your Honor, if I could.

23  Just quick reply.

24      And that is, we don't dispute that there is a waiver

25  of sovereign immunity.  The federal statute itself waives that

1  immunity.

2         Our only argument is that it is a very limited

3  waiver.  The waiver is limited to enforcement of a violation

4  of the Compact that relates to the playing of the games, and

5  that's it.  And the public safety issue doesn't go to that

6  issue.

7         Submit it, your Honor.

8         THE COURT:  All right.  The Court finds that it does

9  have jurisdiction.  A clear and reasonable reading of 25 of

10  United States Code section 2710 and the appropriate

11  subdivisions, in this Court's view, based on the language of

12  the statute itself, fully encompasses the issue at bench.

13         The suggestion, I believe, that it is so -- should be

14  so narrowly read is not reasonable based on the language of

15  the case; and, therefore, the ruling.

16         The next issue is whether or not the temporary

17  restraining order is needed; in other words, was the Gaming

18  Commission's Order or the Notice of Violation and Temporary

19  Closure Order of October 10 of 2014, did that trump the

20  necessity for a temporary restraining order?

21         Does the government wish to be heard in response to

22  the McDonald argument?

23         MR. TORNGREN:  Very quickly, your Honor.  The NIGC

24  order does not trump this Court's order.  In particular,

25  one --

1     THE COURT:  Trump is one issue, but also the other

2  issue is the necessity.

3     MR. TORNGREN:  I understand that, your Honor, and I

4  will get there.

5     The necessity of the temporary restraining order is

6  to preserve the public peace in accordance with the Compact.

7  The State has an undoubted public interest in maintaining the

8  safety of citizens, patrons, employees and Tribal members, as

9  well as law enforcement.  The TRO covers more than just the

10  shutdown of the casino.

11     THE COURT:  See, that's the real issue to me, is the

12  breadth of the temporary restraining order is much broader

13  than the order by the Commission.

14     Do you disagree?

15     MR. MARSTON:  Oh, I think the temporary restraining

16  order is much broader than the order issued by the Commission.

17  But having said that, the Commission has shut down the casino.

18     There is an adequate administrative remedy available

19  to the State.  The Sheriff has criminal jurisdiction under

20  Public Law 280 to enforce all of the State's Penal Code.  So

21  he already has a grant from Congress to maintain and keep the

22  peace.

23     If he needs any additional assistance, all he needs

24  to do is make the request to the U.S. Attorney for that

25  assistance, and the U.S. Attorney, in turn, can request that

1  from the NIGC, and can file an action in this court to enforce

2  the NIGC's temporary closure order and broaden it, and get

3  from this Court an order specifically defining what people can

4  and cannot do on the site.  So.

5          THE COURT:  Well, if you agree that the temporary

6  restraining order is broader than the Commission's order, then

7  why would you be suggesting that it is necessary to go through

8  the steps you've just outlined, to ultimately have a problem,

9  and then come back to this Court for another order?

10         MR. MARSTON:  Well, because I have been defending

11  tribal sovereignty for 37 years.  And, therefore, any

12  limitation on that sovereignty, unless it's been expressly

13  provided by the Congress of the United States, shouldn't be

14  granted to either the United States Government or to the

15  States.

16         Congress has limited the Tribe's sovereignty.  They

17  have done it in the IGRA.  And they have given to the National

18  Indian Gaming Commission the explicit authority to oversee the

19  regulation of tribal casinos and given it the authority to

20  issue temporary and permanent closure orders.

21         And that's what it's done in this case.  The

22  administrative agency has acted.  And if the administrative

23  agency feels that there is going to be any violation of that

24  order, the administrative agency can authorize the U.S.

25  Attorney to come into you, your Honor, and get the specific

1    order it needs.

2         The reason I differ with the State is because, A, as

3    I told you already, although the Court has already ruled, I

4    don't think you have jurisdiction.  But more importantly --

5         THE COURT:  That horse is gone.

6         MR. MARSTON:  Yeah, I know it is.

7         But more importantly, I just think the State is

8    overstepping its boundaries here.  It's going -- it's in the

9    wrong forum, I believe, and it is overstepping its boundaries.

10        So my position is, it is -- if the National Indian

11   Gaming Commission had done nothing, then I think it would be

12   appropriate, assuming this is the appropriate court, and you

13   have said it is the appropriate court, then it would be

14   appropriate for this Court to act.

15        THE COURT:  Okay.  Let's stop there for just a

16   second.  If the Commission in their order has done nothing in

17   certain aspects of what is required for the purposes of health

18   and safety, then isn't that tantamount to the Commission's

19   having done nothing?

20        MR. MARSTON:  But it has done something; it's issued

21   a closure order.

22        THE COURT:  I understand, but it didn't go nearly as

23   far, in this Court's view, as a temporary restraining order

24   did.  And that's because the temporary restraining order

25   was -- the additional matters that the temporary restraining

1  order addresses was necessary for the purposes of health and

2  safety.

3       So what I'm asking you is for the part that the

4  Commission's order did not address, isn't that tantamount to,

5  at least in that area, where there is no overlap, but there is

6  an expansion in the TRO because it is necessary for it to

7  occur to preserve health and safety, isn't that nonoverlapping

8  area of these two orders as though the Commission did not act

9  at all in that particular area?

10      MR. MARSTON:  Your Honor --

11      THE COURT:  And if so, why aren't you arguing in

12  favor of this instead of against it?

13      MR. MARSTON:  Because, again, you are making the

14  decision as to what the regulatory agency, the regulatory

15  agency established by Congress, and vested with the authority

16  to regulate, you are making the decision as to what you think

17  is best for maintaining the public safety.

18      THE COURT:  No, not "is best."  That's incorrect.

19  What is necessary.

20      MR. MARSTON:  Okay.  What is necessary.

21      THE COURT:  That's a different concept.

22      MR. MARSTON:  What is necessary.

23      And the NIGC, it's the agency that deals with these

24  kinds of issues every day.  That's its sole purpose and

25  function, is to regulate casinos.

1          Maybe it would craft the order a little bit

2    differently so that it doesn't infringe so much on the Tribe's

3    sovereignty.  Maybe it would craft the order a little bit

4    differently to make sure that the Sheriffs got a clear line of

5    authority but make sure that that authority isn't

6    overreaching.

7          It's the agency that has the expertise.  And with all

8    due respect, your Honor, you are a federal district court

9    judge, but you don't deal every single day -- maybe because of

10   this case you have been dealing with it a lot more -- but you

11   are not dealing every single day with these issues.

12         THE COURT:  Well, "these issues," if you are talking

13   about guns, I certainly am.  And I'm not seeing that there is

14   a great deal that is addressed in the Commission's order on

15   arming and disarming and guns.  Do you?

16         MR. MARSTON:  I do not.  But you have to remember, at

17   the time that the Commission issued the order, it was aware of

18   the fact that -- I'm pretty sure it was aware of the fact --

19         THE COURT:  Counsel, may I just interrupt for one

20   second?  Will you pull that microphone over?  The reason

21   being, the people in the next courtroom need you to speak in

22   the microphone so they can hear clearly, and we don't want

23   them not to be able to hear.

24         MR. MARSTON:  The NIGC was aware of the fact that the

25   Court had issued its order, or that the State was going to

1  come and in apply for this order.

2        THE COURT:  I don't know that to be true.  Do you?

3        MR. MARSTON:  Well, yes.  I mean I do know that there

4  were communications that took place.  And I will leave it up

5  to the State Attorney General, but I'm pretty sure the Deputy

6  Attorney General was in constant communication with the NIGC

7  and informed the NIGC what he was going to do.

8        I'm confident that if the -- if you were not to issue

9  the temporary restraining order in this case and the National

10  Indian Gaming Commission thought that there was going to be

11  any threat to the public safety, they most certainly would

12  authorize the U.S. Attorney to come in and seek an order.

13        And then they would be in a position to determine

14  exactly the breadth and the scope of that order, and could

15  fashion it and tailor it to accommodate both the State's

16  interests and the Tribe's interests.

17        THE COURT:  As I read this order that you are talking

18  about, the National Indian Gaming Commission Order, it is

19  ordering that there be -- that the respondents in this case

20  cease and desist from all gaming activity at Chukchansi.

21        Is that how you read it as well?

22        MR. MARSTON:  I don't have it in front of me, so I

23  will take your word for it.

24        THE COURT:  Well, I'm reading directly from the

25  language, so it is accurate.

1        That is a much different statement from closing down
2   the facility, as in locking it up, not allowing anyone in it.

3        Part of the problem factually here that I think you
4   are ignoring in your argument is that the people that are
5   still in, that are still inside the dwelling -- there are two,
6   at least, factions that I have been made aware of based on the
7   filings -- those are the people that were armed, and those
8   people are still not being ordered not to be in the facility.

9        MR. MARSTON:  You have been given misinformation,
10  your Honor.  And I will defer to the Sheriff on this, but
11  anybody that's been armed is now out of the casino.  There is
12  no armed people in the casino.

13       THE COURT:  No, I'm not suggesting they are still
14  armed, because that was part of my order.  I would know if
15  they were armed.  I am saying that the factions are still in
16  there.

17       You are arguing as though nobody is in there.  The
18  people who are not in there are the customers.

19       My understanding is that there are still faction
20  members in two different areas of the casino area in that
21  building, and my understanding is there are some, not all by
22  any means, but some employees.

23       MR. MARSTON:  Well, and again, my understanding is
24  that you are absolutely right.  On the 11th floor of the
25  hotel, there are members of the Ayala or Unification Council

1  faction.

2          There are also, as I understand it, Giffen Tan, the

3  General Manager of the casino, has some employees in the

4  casino.  And the reason for that is under federal law, there

5  are certain things that have to be done in the casino in order

6  to shut it down.

7          THE COURT:  I am not being critical of the fact that

8  people are there.  What I am saying is the Commission Order

9  doesn't touch any of that.

10          And it's the -- many of the people in the factions,

11  at least, if not the individual people, I don't know that, but

12  the factions, at least, that caused the trouble here that

13  brings us all here.

14          Now, I'm not saying who are the troublemakers, who

15  are not.  That's not my function.

16          My function is to make sure that whatever we do, we

17  make sure that people are safe.

18          MR. MARSTON:  Understood.  I'm with you a hundred

19  percent, your Honor.

20          THE COURT:  See, I think that there are some people

21  who have the misunderstanding of what my function is here.  My

22  function is not to start running the business.  I am not a

23  person who is becoming a CEO.  And I am not going to be the

24  one who makes the determination of who is the owner.

25          MR. MARSTON:  You can't.  The courts of appeal have

1  said you can't.  You don't have jurisdiction to do that.

2          THE COURT:  I think you and I are on the same track

3  for once.  We agree.

4          MR. MARSTON:  But we are also on the same track that

5  I want to see the public safety maintained.  Don't get me

6  wrong.

7          THE COURT:  I'm not suggesting you are not.

8          But what I am saying is the entire reason that the

9  TRO is necessary is because the Commission's order doesn't

10  even come close to ordering what is necessary, required to

11  make sure that the public health and safety is intact.  That's

12  what I am saying.

13          Now, I understand that there are a lot of people

14  here, and maybe some counsel included, that want me to

15  acknowledge some things that I think are obvious, such as the

16  fact that this shut down is causing enormous strife and

17  hardship to employees, to their families, to people who are

18  required to work to live, to pay their bills.  I know that it

19  is harming many, many collateral businesses in the community.

20  I'm aware of that.

21          MR. MARSTON:  Including the bond holders.

22          THE COURT:  Certainly including the bond holders,

23  including whoever should be the owners.  The profits are not

24  coming in when there are no customers or clients coming in the

25  door.  I know that.

1        That is not -- that is a collateral response to what

2   I am required to do, and that is to pay attention to the

3   health and safety.

4        And the fact that there are factions who are doing

5   what they are doing to cause me to act because it caused the

6   State to come into the court to get an order, that's where the

7   focus must be.

8        And the -- one of the biggest problems here is I

9   suspect that there are -- there is a majority here that would

10  like me to take up the TRO, cancel it, rescind it, and say,

11  "Everybody go back to work.  Let the clients come in.  Let the

12  money come in, the profits, and, therefore, the money to pay

13  the salaries."

14       The problem is a couple of things.  One, today's

15  hearing is intended for a status hearing to see if there have

16  been changes.

17       Two, to set dates for briefing.

18       And, three, to find out whether or not there is

19  something of an urgent nature that must be decided before

20  counsel and parties all have an opportunity to be heard by way

21  of briefing and hearing.

22       So I think that if people have come here assuming

23  that I am in a position to make a decision on the continued

24  TRO or make a decision on the ultimate question, and that is

25  an injunction, they are going to be disappointed.

1    Because I have not been provided, unless somebody has

2    seen something I haven't been provided, I have not seen, for

3    instance, a meet and confer statement.  I have not been

4    provided an agreement, certainly, among the factions.  I have

5    not been provided even a plan or a proposal where somebody has

6    an idea of where people should go from here.

7        What I am being provided is a clear, unequivocal

8    statement that we have factions who disagree on ownership, and

9    believe, some, that they can take the law in their own hands,

10   whether it be Indian law or whether it be federal law, and put

11   the public at jeopardy by doing it.

12       And some of that can be not just coming in for the

13   takeover, but defending the takeover.  I don't think a person

14   who happens to be there as a customer or a client or an

15   employee could care less where the bullet came from if they

16   get shot.

17       So for me, it is a simpler, much, much more narrow

18   issue than I think most people here believe my function is.

19       MR. MARSTON:  Well, it sounds like to me, your Honor,

20   that you are going to err on the side of public safety and

21   keep the TRO in effect.

22       THE COURT:  I don't consider that to be an error.

23       MR. MARSTON:  Well, all right.  You are going to keep

24   the TRO in effect.  And the only issue is, does some of the

25   language in the TRO need to be modified so that the law

1   enforcement agencies are clear about what people can and
2   cannot do.

3        And if that's the case, your Honor, the only thing
4   that I would say is you clearly do not have jurisdiction to
5   decide who the lawful governing body of the Tribe is.

6        THE COURT:  I understand you think that.

7        MR. MARSTON:  So in issuing the TRO, I would argue
8   you don't favor any faction.  You either let us all in or you
9   exclude them all.  And --

10       THE COURT:  I'm not getting your point.  What are you
11  suggesting?

12       MR. MARSTON:  Just as your Honor said, there is still
13  part of the faction that's up on the 11th floor of the hotel
14  that's in possession there.

15       And what I am saying is that all of the factions
16  ought to be excluded from the hotel and the casino so the
17  Sheriff has clear direction as to what he is supposed to do.

18       THE COURT:  My understanding, based on what you are
19  suggesting as a modification for the temporary restraining
20  order, would have consequences based on what has been filed
21  that are extraordinary.

22       In other words, you are suggesting that everything be
23  shut down, that there be nobody there, no faction allowed in
24  there.

25       And then, of course, we have to start defining

1   exactly who is in the faction, who is not.  If somebody hired

2   somebody, are they a faction's agent, and therefore, a part of

3   the faction?

4           The only way to do what you are suggesting, I

5   believe, is to shut it down completely, not allow anyone in

6   there, turn off all machines, and wait until we have an

7   evidentiary hearing.

8           MR. MARSTON:  That's not what I said, your Honor.

9   You misunderstood.

10          THE COURT:  No, I didn't say you said that.  I said

11  that that is what I believe you are asking for, by

12  inferentially, you are.

13          MR. MARSTON:  That's not what I'm asking for.

14          By law, there are certain things that have to be done

15  in the casino.  The money has to be counted.

16          THE COURT:  By whom?

17          MR. MARSTON:  Well, there is a general manager, and

18  he has employees.

19          THE COURT:  And do you think that for one minute that

20  some faction is not going to say, "We don't want that person

21  in there.  We don't want that general manager.  That's

22  somebody else's person, and therefore, that's an agent of a

23  faction, and therefore, part of a faction"?  You don't see

24  that argument coming?

25          MR. MARSTON:  Well, the argument may be coming, your

1 Honor, but then what's the alternative?  Then you are going to

2 be in the business of deciding which faction stays in the

3 casino, which faction oversees that work.

4      THE COURT:  That's what you are asking me to do.

5      MR. MARSTON:  No, I'm not.  I'm asking to you do just

6 the opposite.  What I'm saying is I think you should issue an

7 order excluding the political factions, keeping them out of

8 the casino.

9      THE COURT:  Well, we are back to what I was just

10 saying, and that's what you are suggesting I should not do.

11 And if we leave anybody in there, whose "anybody" is it?  Who

12 hired these people that you think should be in there?

13      My guess is it might be your clients.  No?

14      MR. MARSTON:  Once again, your Honor, there is a

15 general manager who can be instructed to do what the law

16 requires be done --

17      THE COURT:  Instructed by whom?

18      MR. MARSTON:  -- in order for there to be a closure

19 of the casino.  By "closure," I mean simply that it is not

20 open to the general public.

21      THE COURT:  That's there now.

22      MR. MARSTON:  Well, understood.

23      So there is, you know, there is food that has to make

24 sure it is not tainted.  There is money that has to be

25 counted; it has to be accounted for.  There has to be entries

1   into the books.  Those things still need to be done.

2         But there is no need to have the Ayala Quorum

3   Council, Security Force, or the McDonald's Gaming Commission,

4   or the Morris-Reid faction's Gaming Commission inside the

5   casino or the hotel doing anything.

6         THE COURT:  Isn't this a matter more for the

7   Commission than this Court?

8         MR. MARSTON:  By "Commission," you mean the National

9   Indian Gaming Commission?

10         THE COURT:  Yes.

11         MR. MARSTON:  Well, except for the Sheriff needs some

12   instruction as to who he is going to allow to go in and out of

13   the casino.

14         THE COURT:  What do you think is being done now that

15   is damaging to either side or any side?

16         MR. MARSTON:  I don't know, because I don't know --

17         THE COURT:  That's the problem.

18         MR. MARSTON:  I don't know exactly who is in there

19   and what they are doing, and that's what concerns me.

20         THE COURT:  All right.  Anybody else?

21         MR. PEEBLES:  Your Honor, I think -- and I may have a

22   little different perspective than Mr. Marston.

23         Quite frankly, if you go back and look at the law,

24   the law requires that the Tribe, through its governing body

25   that's recognized by the government, operate the casino.

1  That's not being done.

2         This isn't so much an issue of tribal sovereignty,

3  but stopping anarchy, as which group is king of the hill, who

4  comes in and throws the other out.

5         THE COURT:  What are you suggesting this Court should

6  be doing versus the Commission?

7         MR. PEEBLES:  I think, quite frankly, the Commission

8  order doesn't go as far as it could, and we believe that the

9  temporary restraining order that the Court has entered needs

10 some definition.

11        But, quite frankly, I think it is broader than the

12 NIGC's order and, consequently, is not only needed, but it is

13 necessary.

14        THE COURT:  What are you suggesting, how do you

15 suggest that it be changed, the temporary restraining order be

16 changed, one?

17        And, two, why do you believe that it should be this

18 Court that changes its order instead of the Commission

19 changing its order?

20        MR. PEEBLES:  I will answer the last first:  Because

21 we are here today, as just a matter of expediency and the

22 issues being resolved, and we need something done fairly

23 quickly.

24        Getting something done through NIGC, we, quite

25 frankly, don't know how long that will take.

1          Second of all, how should it be done?  I think there

2     needs to be some definition given to, what, first of all, an

3     attempt to take control, possess or control of the casino.

4          I think we need some definition of what constitutes

5     who should be there and what sort of firearms, that are any,

6     they can have.  I think that's an issue that's not been

7     resolved.  Some people thinks that Tasers are proper.  Some

8     people think that knives are proper, and other people think

9     there shouldn't be.

10         I think there needs to be some definition in that

11    respect.  And we suggest that there be no firearms unless it

12    be some federal or state-authorized employee that carries

13    those guns.  That there would be no one from the Tribal side

14    that would be able to authorize any type of weapon whatsoever.

15         Second of all, we are talking about possession of the

16    assets of the casino.  The videotapes that I have seen that

17    has been provided to this Court show that people are trying to

18    take documents out of the casino.

19         THE COURT:  I don't think that they are now.

20         MR. PEEBLES:  I hope not.  But I think that, quite

21    frankly, that's only part of what should stay in the casino.

22         I think everything ought to stay there, and that

23    includes the cash, because what is happening now, and what I

24    think is the difficulty that I think other counsel can

25    address, is that if one group is there that is controlling the

1   cash, they are going to dole it out to their various

2   respective supporters and then utilize what are Tribal assets

3   for their own personal gain.  We think that that should be

4   stopped.

5           Other than that, ultimately, though, your Honor, I

6   think Mr. Marston is correct, that this is a Tribal problem

7   and it has to be resolved by the Tribe.

8           And to the extent that the Court's order can be

9   evenhanded and not favor any faction, and those factions told

10  to go back and figure it out, that's where the responsibility

11  lies.

12          And if the facility is closed until they figure it

13  out, I think this Court sends a clear signal to go do it, and

14  it's in the Tribe's hands, and I think that is the ultimate

15  expression of tribal sovereignty.  And if the Tribe doesn't

16  want to do it or can't do it, then that's what the Tribe has

17  done, and I will respect that.  But I think that sends a clear

18  message to them.

19          THE COURT:  Does anybody else wish?

20          MR. ROSETTE:  Yes, your Honor.  First of all, with

21  regard to a statement that cash is being doled out, there is

22  nothing in the record that would support that.  That's

23  completely improper to make in front of you.

24          THE COURT:  Then it sounds like you wouldn't mind an

25  amendment to the temporary restraining order that any cash,

1  any documents, anything that is in there is not to be tampered

2  with nor removed, because it wouldn't make any difference to

3  you if it's not being done anyway.  Is that a correct

4  statement?

5        MR. ROSETTE:  Your Honor --

6        THE COURT:  Yes or no?

7        MR. ROSETTE:  Well, I wanted to get into the

8  modification of the order because we have to clarify what that

9  means specifically.

10        THE COURT:  That's what my question deals with, is

11  the modification of the order.

12        MR. ROSETTE:  Yes.  I think that --

13        THE COURT:  What is your answer to my question,

14  first?

15        MR. ROSETTE:  I think the casino should move cash,

16  whether it is open or closed, with regard to how the indenture

17  with the note holders and Wells Fargo allows it to.

18        The issue --

19        THE COURT:  Wait a minute.  That is not a doable

20  solution at this point.  Don't you agree with that?

21        MR. ROSETTE:  Yes, I would agree with that.

22        THE COURT:  Okay.

23        MR. ROSETTE:  Okay.  But the issue of how money is

24  moved goes exactly to the issue that these two are trying to

25  lead you down.

1          THE COURT:  No, wait a minute.

2          The issue that I'm addressing is that the cash,

3   whether it be cash, whether it be documents, whether it be any

4   property whatsoever at the facility, is not to be moved -- not

5   is to be moved and in what direction -- it is not to be moved.

6   It is not to be touched, it is not to be tampered with.  It is

7   to be secure.  That's it.  The building is secure.

8          MR. ROSETTE:  Your Honor, I agree with that.

9          THE COURT:  Good.  Next question.

10          MR. ROSETTE:  And the documents should be returned.

11          Now, what I want --

12          THE COURT:  Wait, wait.  The documents should be

13   returned?

14          MR. ROSETTE:  I'm sorry.  Let me get -- let me answer

15   the question, since you asked.

16          When the violent attempted takeover took place from

17   the McDonald faction, during that period, they had taken

18   documents from the Gaming Commission Offices, which include

19   sensitive employee data, birth certificates, Social Security

20   cards, those types of things.

21          THE COURT:  I may not be aware of that.  What I was

22   aware of was that somebody was attempting to take documents

23   out, and the Sheriff stopped them and --

24          MR. ROSETTE:  That is incorrect.  We caught them, but

25   they had already, prior, taken several boxes of sensitive

1    employee files with them.  These files are personal files,

2    with birth certificates, Social Security numbers, very

3    personal data; in some cases, status of medical records and

4    such.

5              We think that, and this is some of what I wanted to

6    discuss with you with regard to modifying the TRO, is to

7    really capture a notion of status quo in the Order as to how

8    the facility existed before the violent takeover occurred.

9              With regard to these factions, I think that you are

10   getting the flavor, but one thing is clear.

11             We also have an NIGC closure order.  The NIGC has

12   stated that in order for their closure order to be removed,

13   that they will have to enter into a reopening agreement with

14   the Tribe, and when they sign that reopening agreement, the

15   United States needs to guarantee that the Tribal leader that

16   is signing that agreement is the recognized chairperson of the

17   Tribe.

18             So opposing counsel will have their opportunity in

19   that forum to talk about which faction is in control or should

20   be in control or whether their clients are the appropriate

21   one.

22             I agree with you with regard to paying attention with

23   regard to this hearing to the health and safety issues at the

24   casino.

25             Our client, my client, the Tribe, recognizes the

1    importance of injunctive relief.  We recognize that we need a
2    restraining order with regard to no weapons.

3         Your Honor, I was not able to submit this in my
4    brief, but I can either under testimony or submit an affidavit
5    to you, but one significant change is the Tribal Council,
6    which controls the Gaming Commission in control of the casino
7    and controls the manager managing the casino -- and they both
8    do a good job, and I will get to that in a minute -- have
9    passed as a matter of Tribal law, a complete weapons ban on
10   the reservation.  No firearms, nothing.

11        The only people allowed to carry weapons of any kind
12   is law enforcement:  The Sheriff, Highway Patrol, whomever.

13        But as far as any Tribal security or casino security
14   or anybody else, there is a complete weapons ban in place now
15   over all Tribal property.

16        We think that we still need specifically your
17   restraining order and your injunctive relief so that if
18   somebody comes onto the reservation with a weapon, then we can
19   use the auspices of your order to have that person removed or
20   arrested from the reservation.

21        We also think that we need your restraining order
22   from the attacking party, from the McDonald faction.

23        What we are asking for is that the Court order be
24   modified to really preserve the status quo as it existed
25   before that violent takeover took place.

1    Now, with regard to what we are asking, I think that

2    the Honorable Mueller in Sacramento, this Court, looked at

3    that very issue with regard to the Paskenta Tribe.

4    At that Tribe, there was two factions.  One faction

5    was in control of the casino, one faction was not.  They

6    assembled 46 men with firearms on them.

7    THE COURT:  I read that.

8    MR. ROSETTE:  Okay, great.  So you understood there

9    that that casino was able to continue operating with the

10   restraining order in place.  The restraining order is actually

11   the biggest change of circumstances to protect the health and

12   safety.  So the facts of that case could be applied here.

13   Now, when I talk about status quo, and --

14   THE COURT:  Well, you are asking for something

15   that -- let's talk about that for just a minute.

16   You are wanting me to back it up until early last

17   week and to basically say what was going on last week,

18   business as usual, it should go on now.

19   The problem with that is that we have a, frankly, an

20   explosive keg that, what you are suggesting, all it does is it

21   forces the cap onto that keg temporarily.  And that was the

22   exact circumstance, the very exact emotional circumstance that

23   existed immediately before the keg blew.  That's the problem.

24   Because by issuing an order in that way, I would

25   necessarily be indicating who should be running the casino,

1   how it should be run, and if there was embezzlement going

2   on -- I don't know whether there was or wasn't -- but that

3   would be fertile to allow it to continue.

4          If there was proper management, fine.  If there was

5   improper management, I'm allowing that to occur as well.

6          But I'm doing absolutely nothing to calm the emotions

7   of this dangerous situation, and I don't think that that is

8   the appropriate way to proceed.

9          Now, what -- what would I like to have happen?  And

10  this is just a voluntary collateral statement on my part.  I

11  would like the same thing that happens in many, many business

12  disputes across this Nation every day.  It is not unusual for

13  people to be in a business together and have people then get

14  to a point where they don't trust one another, and even get to

15  a point of hate for a different faction within that business.

16         But most people who are smart figure it out, that

17  that gets you nowhere.  To move along and not destroy the

18  business, destroy the profits, destroy the employees, and

19  ultimately have nothing left when you skip away thinking you

20  may have won.  That is the most ridiculous scenario in the

21  world.

22         The problem, of course, in these cases, these cases

23  where there is so much emotion, even if it is a business case,

24  it is much more analogous to a family law case, where there is

25  so much hate that people will argue and spend a thousand

1   dollars to get back that clothespin.

2          And that's the fear I have, is that we have factions

3   here who, no matter what I say, no matter what I do, will

4   ultimately say, "Well, he -- those other people are still

5   completely wrong, and I'm still completely right."

6          That sort of an attitude never moves forward to a

7   compromise that is doable from a business standpoint.  It may

8   allow you to be angry and get your anger out, but it also

9   destroys livelihoods, your own included, often.

10          MR. ROSETTE:  Right.

11          THE COURT:  So would I like something to happen?

12   Absolutely.  I would like there to be mediation.  I would like

13   there to be people who came to the table who were smart enough

14   to realize that all-or-nothing scenarios are oftentimes

15   nothing.  So.

16          MR. ROSETTE:  Your Honor, can I address that?

17          THE COURT:  Sure.

18          MR. ROSETTE:  First of all, those are very good

19   words.

20          What we are requesting with regard to modifying this

21   order to clarify what the status quo is does not allow this

22   party to skip away saying they won.  It does not allow a

23   casino to reopen, because the NIGC closure order is lurking,

24   and they are very clear that that order will not be removed

25   until the United States recognizes a faction.

1    The concern is making sure that the managers of the

2    facility can keep the casino ready to reopen and that the

3    regulatory agencies can do their job within the cage.

4    THE COURT:  Well, then let's go back to the issue I

5    was addressing over here, and that is, what manager?  What

6    management?  And whose management?

7    And when we start going down that road, we have a

8    situation where probably two-thirds, two of the three factions

9    are saying, "It is not our manager.  We don't know what they

10   are doing.  We suspect we do, and that's terrible."

11   I mean this is not -- I know that people come to the

12   courts for the perfect solution, but there is not a perfect

13   solution when you have as many factions that don't trust

14   anybody, they don't trust one another, and no matter what is

15   done, people are going to not trust and continue with the

16   emotion, and when they continue with the emotion, they

17   continue down the road of explosion.  And when they do that,

18   that's where the Court is involved again.

19   I would like nothing better than to be out of this

20   dispute, but that's not -- it doesn't appear as though that's

21   going to happen any time soon because we have people who are

22   not willing to come to the table and work it out, which, as

23   you point out correctly, is going to happen one way or the

24   other, or the business is going to go under and it's going to

25   be over.

1          MR. ROSETTE:  Correct.

2          THE COURT:  I cannot imagine that anybody in this

3     room thinks that that is a wonderful solution.

4          MR. ROSETTE:  Can I -- I have here just because I

5     understand everything you are saying, and that goes right to

6     the heart of the Tribal government's issues and a recognized

7     governmental body, can I introduce FTI Consulting, who has

8     been sent here by the note holders?  We have $270 million of

9     debt.

10         THE COURT:  If I'm not mistaken, I read a declaration

11    from him.

12         MR. ROSETTE:  Okay.  And the reason we submitted that

13    was to demonstrate that the casino, at the very least, while

14    the issues you are explaining at hand is in good hands with

15    regard to keeping the business operable, clean, to

16    Mr. Marston's point that there is no rotting food, that money

17    is not secured, those issues which are very important.

18         THE COURT:  There is nothing that I'm going to say or

19    do today that is going to preclude the factions, through

20    counsel, or however else representation is had, that is going

21    to preclude a meet and confer and a decision, a mutual,

22    agreeable decision on who can manage what is left.

23         MR. PEEBLES:  Your Honor, if I could?

24         That's exactly where I was going with my comments to

25    the Court, is that if it's put back with the three factions

1  and ordered to come back here next week with a "yes" or "no,"

2  and to go talk with each other and get in the room and figure

3  it out, I think it is the best solution that we have.

4        THE COURT:  I agree with that.

5        MR. PEEBLES:  And, quite frankly, and I think what

6  Mr. Marston is asking, is the Court not enter any order that

7  would favor one faction over the other as Mr. Rosette

8  suggests, because what happened at Paskenta is this --

9        THE COURT:  Wait, wait.

10        MR. PEEBLES:  Well, that's irrelevant.

11        THE COURT:  Wait a minute.  I'm missing something.  I

12  don't plan on favoring anybody.  That usually means that

13  everybody leaves mad at me, but that's the way it goes.

14        MR. PEEBLES:  Well, your Honor --

15        THE COURT:  What I'm suggesting to you is that I am

16  not following what you are saying, that -- I haven't heard

17  anybody suggest that something be ordered by me.

18        (Addressing a member of the audience) Sir, if you are

19  not a lawyer and your faction is represented, I can't call on

20  you anyway, so you might as well put your hand down.

21        So what I'm saying is unless -- I'm just missing

22  something here.  I'm not hearing anybody anywhere tell me that

23  they want me to issue an order that's going to favor somebody.

24        MR. PEEBLES:  No, no.  Then we are all -- then -- if

25  that's not happening, there is nothing to discuss because we

1   are totally in agreement.

2          I do want to clarify a couple things though.  We did

3   have a conversation amongst ourselves early this morning in

4   the United States Attorney's Office dealing with this issue.

5          THE COURT:  "We," who?

6          MR. PEEBLES:  The lawyers that are in front of you

7   today.

8          THE COURT:  The three factions were there?

9          MR. PEEBLES:  Mr. Rosette, myself, Mr. Levitan,

10  Mr. Marston.

11          There was representatives, the attorneys for the

12  National Indian Gaming Commission, the State of California --

13          THE COURT:  Slow down just a bit.

14          MR. PEEBLES:  The United States Department of

15  Justice, The Bureau of Indian Affairs, and the Department of

16  the Interior Solicitor's office in Sacramento, the Governor's

17  Office, the Attorney General's office, the United States

18  Attorney.

19          And we had a conversation on the phone, and there

20  were people from the Bureau of Indian Affairs and from the

21  National Indian Gaming Commission.  And a specific question

22  was put to the National Indian Gaming Commission:  Would they

23  require a resolution of the governing issues prior to entry

24  lifting the order of closure?

25          And there was no commitment to that, and they were

1   pushed on the issue, and we couldn't get an answer.

2           So to the extent that there is a representation that

3   they are going to require a reopening agreement executed by a

4   governing body, I think in a lot of our minds, is very

5   unclear.  And we --

6           THE COURT:  Whose decision is that?

7           MR. PEEBLES:  That would be the National Indian

8   Gaming Commission.

9           THE COURT:   Who is representing them?

10          MR. PEEBLES:  They are not here.  They were on the

11  phone.  They are not a party to the action.

12          THE COURT:  Who is on the phone that represents that

13  Commission?

14          MR. TORNGREN:  Your Honor, Bill Torngren.  The NIGC

15  was on the phone conversation that we had -- or this

16  morning --

17          THE COURT:  Oh, I'm sorry.  I misunderstood.  I

18  thought he meant -- because there are people on the phone

19  here.

20          MR. MARSTON:  They are not represented in this

21  proceeding, your Honor.  They are not present.

22          THE COURT:  Got it.

23          MR. PEEBLES:  Your Honor, it is unclear as to what it

24  would take from NIGC to open this facility, is my point.  And

25  I don't think it is as clear as Mr. Rosette represented it to

1    be.  I left the meeting very unclear as to what it actually

2    would take for NIGC to open this or not.

3         THE COURT:  Well, it may be that you had the wrong

4    person on the phone.  You know, that does happen.  I'm not

5    being --

6         MR. PEEBLES:  No, I understand, it may very well be.

7    And quite frankly, it was a meeting we had for an hour and a

8    half, and we didn't have time to follow up in getting back

9    with the entire Commission and the Chairman and the like.

10        But I agree with you that we need to resolve this

11   issue.

12        MR. MARSTON:  Your Honor, if I may.  You are going to

13   issue a temporary restraining order, and we want a restraining

14   order that's going to be clear, that the Sheriff knows exactly

15   what he is supposed to do and what he is supposed to enforce.

16        I have had an opportunity to talk to my clients.  I

17   just want to let you know what our position is, and that is,

18   first of all, we are in total agreement, all weapons, nobody

19   should be coming within 150 yards of that hotel or casino

20   carrying any kind of a weapon, whether it is a knife, a gun,

21   or anything else.

22        THE COURT:  Stop there.  Does anybody disagree?

23        MR. ROSETTE:  No.

24        MR. PEEBLES:  No.

25        MR. TORNGREN:  And the State is fully in support of

1   that, your Honor.

2          THE COURT:  Okay.  Well, everybody agrees that if it

3   is necessary, based on the wording of the temporary

4   restraining order as it currently exists, it is now amended to

5   include that statement.

6          Next.

7          MR. MARSTON:  Number two, nothing should be removed

8   from the casino that's there.  Nothing should be taken out or

9   removed, including money that is currently in bank accounts

10  for the casino, that none of that money should be removed as

11  well.

12         THE COURT:  Those are two different statements.

13  Let's take the first statement first, and that is anything

14  physically there on the premises should not be removed.

15         Does anybody disagree with that statement?

16         MR. PEEBLES:  No, your Honor.

17         MR. ROSETTE:  Yes, your Honor.  I know that that's a

18  little bit inconsistent with what I was saying earlier, but

19  the casino has bills to pay.  They have note holders to pay.

20  They have slot machine companies to pay.  They have a payroll.

21  Their bank accounts are going to dwindle relatively quickly.

22         They also -- and I can let Rory speak to this.  The

23  floor needs to be dropped, what they called "dropped," so that

24  they can take the count for that day.

25         We need to move that money.  I think this is in the

1    public interest, which is some of what we wanted to seek from

2    you.  It is -- there is probably around $10 million in that

3    casino in cash.

4           We would like to call armored car services and have

5    them move that cash out of the casino and into the depository

6    bank that all of the parties have agreed to, including the New

7    York bond holders as well as our trustee.

8           And then we would like to allow, as we currently do

9    in the New York litigation with the exact same issues there,

10   frankly, for the general manager to pay those bills.

11          THE COURT:  Okay.  Let's hang on just a second.

12          Number one, who is it you are suggesting count the

13   money?

14          Number two, who is it that you are suggesting

15   retrieve the money?

16          Number three, to which bank account are you

17   suggesting that that money be deposited and held?

18          MR. ROSETTE:  Very good questions.

19          THE COURT:  Thank you.

20          MR. ROSETTE:  Again, it goes to the status quo.  And

21   if there is one certainty that you do have in front of you, it

22   has been the same general manager over the last few years that

23   has managed the facility.  That's also in the FTI declaration.

24          THE COURT:  Let me ask you a question in that regard.

25   As to that manager, are any of the factions taking the

1  position that they do not trust the manager?

2       SPECTATOR:  Yes.

3       MR. MARSTON:  Well, yes.

4       THE COURT:  Okay, stop.  That's my problem with that

5  suggestion.

6       Now, if the factions, through counsel, because

7  everybody is represented, can meet and confer and agree that

8  somebody can come in who is considered to be neutral, then I

9  suggest that you do that, because that would seem to me to be

10 the obvious solution.

11      It is not as though anybody is, I don't think,

12 requesting that I include in the temporary restraining order

13 that they run in and get as much money as they can and run

14 back out.

15      MR. ROSETTE:  Your Honor, there is a standing order

16 of the New York Court.  The trustee and the note holders had

17 sued the Tribe, and there is an order from the New York Court

18 that allows Giffen Tan to deposit that money, as required

19 under the indenture, in the depository bank account.

20      That bank account has been in place since the

21 restructuring of the Tribe's debt, when there was no friction.

22 And specifically, that account which is governed by that

23 indenture, the only signer to that account is Giffen Tan, and

24 only with regard to paying casino bills.

25      THE COURT:  That answers the third question, but it

1   does not answer the first two.  And the first two are the

2   trust issues, the real trust issues as to who would go in, who

3   would count, and who would be responsible for actually

4   depositing it into the account.

5          Once it gets to the account, it doesn't sound as

6   though there is a problem.

7          MR. MARSTON:  I was trying to work down that list

8   because I was going to raise everything that you are raising

9   now.

10          THE COURT:  Hold your list because maybe I will take

11   care of it all.

12          MR. ROSETTE:  I thought what I heard was he didn't

13   want any money moved.

14          But the casino is a very highly regulated

15   environment.  And I can turn it over to the Gaming

16   Commission's attorney to explain to you the handling of that

17   cash and that Brinks would move the money.

18          THE COURT:  Okay.  I'm beginning to feel like I am

19   counting money with green visor on.  And truly, what I'm

20   trying to do here is not expand my jurisdiction.  That's not

21   what I'm trying to do.  Mr. Marston gets excited when we even

22   talk about the word.

23          But the bottom line here is I'm trying to be

24   practical as well.  And I can't ignore some of these issues

25   and just simply say, "Oh, no, everybody be safe, and that's

1  the order."  That doesn't work.

2      So we are trying to be practical here, which is why

3  I'm spending the time to do this.

4      MR. ROSETTE:  Right.

5      THE COURT:  But I can guarantee you one thing for

6  sure, that I have been doing this long enough, and I suspect

7  most of counsel have been doing it long enough, where you know

8  that without meet and confer and without some type of a

9  reasonable representation and reasonable decision, that all we

10  are going to do here is generate more litigation.

11      And the people who are going to get the short end of

12  that stick are going to be the eventual owners, all of the

13  employees, all of the collateral people who are waiting and

14  wanting this business to reopen, if we don't have meet and

15  confer with reasonable minds.

16      If you can't agree, then, of course, that's what the

17  courts are for, and that prompts more litigation which,

18  frankly, is just ludicrous.

19      MR. MARSTON:  Let me just say something, your Honor,

20  just quickly.

21      Mr. Rosette is absolutely right.  There is a New York

22  court order in place.  And so our objection -- we have no

23  objection to Mr. Tan keeping his casino employees -- our

24  casino employees in the casino to do the drop, to count the

25  money, to enter their books and records of account, and to pay

1   the casino operating expenses, whatever the casino's -- those

2   vendors need to be paid.

3           THE COURT:  Does anybody disagree with the position

4   you are talking?

5           MR. TORNGREN:  No.

6           MR. ROSETTE:  We don't disagree with that position,

7   but Giffen Tan is unable to do that without the close

8   supervision of the Tribal Gaming Commission.  That's required

9   under federal law, the minimum internal control standards, the

10  Indian Gaming Regulatory Act.

11          THE COURT:  Wait.  What are you disagreeing with?

12  I'm not hearing you disagree with --

13          MR. ROSETTE:  I don't disagree with that.

14          MR. MARSTON:  The Gaming Commission doesn't need to

15  be there for Giffen Tan to pay the operating expenses of the

16  casino.  He pays the operating expenses --

17          THE COURT:  Well, I really don't need to get into

18  that detail.

19          MR. MARSTON:  Just so you know, there is a -- the New

20  York court order provides -- it gives Giffen Tan access to a

21  bank account maintained at Rabobank for the sole purpose --

22  and the New York court order orders Mr. Tan to take all of the

23  casino revenue, except for what's necessary to hold in the

24  cage to pay, you know, jackpots and prizes, the -- as required

25  by law, requires them to take all of the operating cash from

1　the casino and deposit it into this casino operating account,

2　and then to pay the operating expenses of the casino.

3　　　　And when he -- but before he pays those operating

4　expenses under the New York court order, the attorneys for the

5　casino, Fred Petti and Patty Briones, who I think are here

6　somewhere, they have to send out a list to all of the parties

7　stating this is who we are going to pay.

8　　　　And any of the parties has the right to file an

9　objection to that payment.  And then if they object, then it

10　goes to a court referee to resolve the issue.

11　　　　So there is already a mechanism in place to protect

12　all of the interests of the party that are here at the table.

13　　　　So again, we don't have any opposition to the casino

14　employees who normally do their business, to go to do just

15　that, to go back into the casino, make sure the food doesn't

16　spoil, you know, to count -- do the drop, count the cash,

17　enter in the books and records of account and have the

18　operating expenses of the casino paid.

19　　　　THE COURT:  Here is my suggestion.

20　　　　MR. MARSTON:  And that's it.

21　　　　THE COURT:  Okay.  Here is my suggestion.  I think

22　just the flavor of this discussion -- and I'm not hearing

23　anybody who I'm thinking I need to work on -- I think

24　everybody is there already.

25　　　　MR. ROSETTE:  Your Honor --

1           THE COURT:  Oh, I found somebody I have to work on.

2           MR. ROSETTE:  You have to work on me.  Because first

3   of all, the process that he just explained has been challenged

4   by the National Indian Gaming Commission, NIGC, for any

5   management contract.

6           Secondly, though --

7           THE COURT:  I don't need to get involved in that.

8           MR. ROSETTE:  Let me get to the higher level of why

9   you would need to work on us.

10          What we have here is the McDonald faction coming to

11  you with unclean hands.  But for their violent attack, this

12  casino is not closed.

13          And so they are posturing to use their violent attack

14  in your restraining order and closure order to get a seat at

15  the table to bargain and negotiate for their own benefit.

16          What we are seeking is a status quo so that we can

17  address the NIGC issues.  This casino won't be opened unless

18  the internal government issues are resolved, which we are

19  capable of doing, you are correct.

20          But we need, as he said, with regard to the food not

21  rotting, the money being counted, there are capable people in

22  this casino that need those jobs that can do that while we

23  work with the NIGC on those issues.

24          They are here with unclean hands, with their own

25  wrongdoing, begging favor of this Court.

1          With regard to John Peebles and his client, two

2   Tribal members that consist of the Tribal Councils that I

3   represent, they are anti-majoritarian factions.

4          They are recalcitrant because they get outvoted only.

5   They are members of the 2010 Council, two members.  Those

6   votes, I admit to you, come down five to two.

7          With regard to the 2013 Council, which one of those

8   members are, I agree, he gets outvoted six to one.

9          I sit in front of you with a Unification Council with

10  every elected governing body of this Tribe, with two letters

11  from the United States of America, one that says that the last

12  uncontested body of the Tribe that can serve as the interim

13  governing body while the Tribe fixes itself in order to watch

14  the casino is the 2010 Council, because --

15          MR. MARSTON:  If the Court --

16          THE COURT:  Wait.  One at a time.

17          MR. ROSETTE:  -- because that is the last uncontested

18  recognized body of the Tribe when there were no disputes.

19          I also have a letter from the United States of

20  America that did recognize the 2012 election that occurred.

21  This used to be Les Marston's client.

22          There used to be two factions.  It is these two

23  letters from the United States that created the dispute.

24          This letter, the BIA believes so much with regard to

25  this letter that this was the last uncontested governing body

1   of the Tribe, when you read it, the Assistant Secretary filed

2   with the Interior Board of Indian Appeals to make it effective

3   immediately so it could not be appealed.  So it could go into

4   effect immediately.

5        That IBIA judge found for Les Marston on two bases,

6   and I will share that Opinion with you.  The first is there is

7   no threat of violence; that's what Tex McDonald promised to

8   the judge.

9        And the second is, we don't need government money

10  because we have a casino to pay all of our bills.  Okay.

11       Both of those are wrong because of the Tex McDonald

12  faction's actions.

13       And I sit here with United States recognition in a

14  Unification Council, a majority of every Council up to date,

15  to move this casino ahead.

16       Their only goal -- and I can share that Agreement

17  with you -- is to turn the Tribe back to the people in a clean

18  slate election.

19       Both of their clients get to run in that election.

20  There can be zero suspensions, zero disenrollments.

21       That's the opportunity that we are looking for to

22  deal with in the proper forum.  That's the NIGC.  Those are

23  the issues and debates that are going on as we speak at the

24  federal government level.

25       Read the BIA documentation.  For this Court to allow

1    these people to cause this violence and get an equal seat at

2    the table and require us to mediate with them, is a complete

3    travesty of justice to what this Tribe is going through.

4         I agree what you say with regard to the thousand jobs

5    and the health care that goes to those people in this

6    community, but as you know and as I wrote, that casino is a

7    portal, it is a destination resort.  Those dollars come in.

8    There is a multiplier effect.  They change hands five to seven

9    times.  We are talking about a massive hit on this economy.

10        And this Unification Council, I will tell you, it is

11   misnamed.  This bunch is not unified.  You think you have

12   three factions?  This Unification Council of every elected

13   body since 2010, there is four factions that sit at that

14   table, but they are sitting at that table making decisions

15   with respect to their membership for the benefit of their

16   membership to get to a clean slate election.

17        THE COURT:  Mr. Rosette, be specific in answering my

18   question.

19        MR. ROSETTE:  Okay.

20        THE COURT:  What is it you want this Court to do

21   today?

22        MR. ROSETTE:  We are looking for your order to affirm

23   the status quo so that, at a minimum, those slot machines can

24   stay turned on.  Not open the doors, but that those slot

25   machines can stay turned on.

1          Can I explain why?  If you unplug a slot machine --

2          THE COURT:  No, I read that.

3          MR. ROSETTE:  Okay.  If we can't keep those slot

4   machines on, two things happen.  You look at six months to

5   reopen and there are mass layoffs, okay.

6          We have to figure out a way to keep that intact, at a

7   minimum, to keep that casino management in place, keep all of

8   the employees hired, and keep those machines turned on, at a

9   minimum.  Your restraining order can do that with the people

10  in play there.

11         What we need to do, which you recognize --

12         THE COURT:  I don't remember my restraining order

13  ordering you to unplug the machines.

14         MR. ROSETTE:  Well, the restraining order, and part

15  of the issue is here, is, well, what does the status quo mean?

16  You know, who has access into the casino and the nitty-gritty

17  details that you are getting to?

18         And what we are saying is, you know, let the people

19  who have been running the casino for several years continue to

20  make those decisions in the best interests of the Tribe.

21         Their attorneys are here, Giffen Tan's attorneys, and

22  the Gaming Commission's attorney are here.  They will say that

23  they don't care who the faction that's taking leadership is

24  either.

25         The reason that they are recognizing my client is

1    because I have legal opinions from the Gaming Commission's

2    attorney that recognize the United States' positions, okay.

3    That's why the Tribe that's recognized is in that casino

4    currently.

5         What we have to do is focus on making sure that all

6    the jobs are in place, that the machines are turned on, that

7    it is business as usual, at least for the GM and the Gaming

8    Commission, and then we can go to D.C. and sort this out at

9    the NIGC.

10        Now, I'm going to tell you something.  They don't

11   want that.  They have a terrific fear of going back to

12   Washington, given that the writing is on the wall, and having

13   that debate in the proper forum.

14        They want to sit here, create this situation, where

15   this Court gets involved from their own bad acts and then make

16   me go mediate with them.  That's completely an injustice.

17        THE COURT:  Two things.  One, I am not going to make

18   anybody mediate.  That is a complete waste of effort and a

19   ridiculous court order.  When somebody says, "I don't want

20   to," there is no sense in going.

21        MR. ROSETTE:  Right.  You asked if there was a

22   problem, and I wanted to make sure that was clear.

23        THE COURT:  I understand.

24        Let me ask the government, what is wrong with the

25   suggestion that's being made?

1          MR. TORNGREN:  In terms of?

2          THE COURT:  In other words, having the Court have its

3    temporary restraining order in effect, but adding to it by

4    indicating that status quo is appropriate?

5          In other words, I understand what the argument is

6    that things are moving along, people are employed, and instead

7    of going a legal way to find out who owns it, who should be

8    operating it, there is an armed attempted takeover, and why

9    would somebody be rewarded for that activity by then getting a

10   seat at the table?

11         I understand that argument.  You do too, I'm

12   assuming.

13         MR. TORNGREN:  Certainly, your Honor.

14         THE COURT:  Okay.  Then the argument or the

15   suggestion that's being made is that status quo should occur,

16   and "status quo," by definition, means what was happening the

17   day before the takeover and, of course, the other matters of

18   the temporary restraining order remain in full force and

19   effect, specifically, and most prominently, because of -- or a

20   preclusion of weapons.

21         MR. TORNGREN:  Your Honor, the government is --

22         THE COURT:  And then, of course, one last thing, and

23   that is this Court is not obviously affecting, nor can it

24   affect by jurisdiction, the order of the Commission.

25         MR. TORNGREN:  Your Honor, we fully understand that.

1 | And our position is that the temporary restraining order was

2 | at the time absolutely necessary.  The only issue --

3 | THE COURT:  I'm talking an amendment now.  I'm not

4 | talking about what was.

5 | MR. TORNGREN:  Okay.  Amendment wise, if it is all

6 | weapons off the property, we have no problem, we fully support

7 | that.

8 | If it is nothing is removed from the casino, we have

9 | no problem with that.

10 | THE COURT:  Well, wait a minute.  That's not what's

11 | being suggested.

12 | MR. TORNGREN:  What's being suggested is proper

13 | accounting for the cash, taking out the drop, keeping the

14 | machines on, but not operating.

15 | THE COURT:  Continuing to pay bills, which, of

16 | course, is taking --

17 | MR. TORNGREN:  We are totally in support of that,

18 | your Honor.

19 | We are trying -- in this, this was an extraordinary

20 | set of events and, in my opinion, unprecedented in the State

21 | of California or in the gaming industry in the State of

22 | California.

23 | And under those circumstances, when you have

24 | extraordinary events, you have to take extraordinary action.

25 | And in this case, I believe, and the State believes, that the

1   order as it exists, with modifications for all weapons off,

2   nothing removed except cash, the drop, maintaining the cage,

3   doing what's necessary, one, to protect the assets of the

4   entity and, two, to make reopening easier once they meet the

5   conditions that the Court imposed in item number 4, and they

6   satisfy the NIGC, we are fine.

7        At the earlier meeting today, the State agreed that

8   we would do whatever was necessary, including stipulations,

9   expedited orders, to get the casino operating again as long as

10  the standards here, which are, it is established to the Court

11  that the public health/safety of casino patrons, employees and

12  Tribal members can be adequately protected.

13       That is what we are interested in this case.  That is

14  what they have agreed to do under the Compact.  And,

15  therefore, we are in agreement with those factors.

16       MR. DILWEG:  Your Honor, if I might interject

17  something.  I have been sitting quietly over here.  I want to

18  interject one little thing, and that is if -- in all of the

19  documents from the federal government to the Tribe -- you

20  know, Mr. Rosette talked about the 2010, 2012 Elected

21  Bodies -- the most recent documents from the federal

22  government to the Tribe are addressed to the Tribal

23  Chairperson, and it doesn't identify who that is.

24       I'm talking about the Notices of Violation and

25  Temporary Closure Order, and they are addressed to my client,

1   Khammy Chhom, who is the Executive Director of the Gaming

2   Commission, and to Giffen Tan, as the General Manager of the

3   facility.

4          And so I would put out there that those are the

5   people who should be monitoring what's going on in the casino,

6   making sure that the money is counted correctly.  Thank you.

7          THE COURT:  Anything else?

8          MR. PEEBLES:  Yes, your Honor, if I could.  I would

9   ask the Court to seriously look at the documents Mr. Rosette

10  referred to.  Quite frankly, the Superintendent's letter that

11  recognized one Tribal Council was vacated by the --

12         THE COURT:  Obviously, you know I don't need to get

13  into this.

14         MR. PEEBLES:  Okay.  The point of it is this.  If we

15  would have an evidentiary clearing as to who has clean hands

16  or not, we would love to do that.  Because, quite frankly --

17  and Mr. Rosette's characterization of my clients is totally

18  inaccurate.  It is wrong.

19         In fact, it was his clients that refused to seat four

20  of my clients, which my clients would have then had a

21  four-three split and a completely different issue.

22         So to the extent there is factual representations as

23  to clean hands, Mr. Rosette's argument is simply this:  The

24  last guy to take the hill wins.  If somebody takes it back,

25  then they have unclean hands.

1          But quite frankly, it is Mr. Rosette's client that, a

2    few months before, did the same thing that they are alleging

3    that Mr. McDonald did.

4          MR. ROSETTE:  Your Honor --

5          THE COURT:  Just a second.

6          MR. PEEBLES:  And that's what we have a problem with.

7    That gets back to the original statements I made to you.  Your

8    Honor, this is an exercise in anarchy.  And that the way to

9    deal with this is to send it back to the Tribe and say, "You

10   guys figure it out."

11         THE COURT:  Yes, I understand what, under the best of

12   circumstances, where everybody just freezes, they don't

13   breathe, and we send it back for a decision, and by the time

14   they get the decision, then you can take your next breath.  I

15   understand that that's the best way to do it.

16         But I understand also that it is not reality.  We

17   have got a bunch of people, real, live human beings, that are

18   terribly affected by what's going on here.

19         MR. PEEBLES:  I think that's my point, your Honor.

20   I'm not suggesting that this be an open-ended issue.  That we

21   meet and confer, and we do that and get back to you by Monday,

22   your Honor.

23         MR. ROSETTE:  Your Honor --

24         THE COURT:  Wait.

25         MR. PEEBLES:  I don't know if that will work, but,

1   your Honor, I think that at least has the potential of solving

2   the problem.  This facility is not going to be opened by

3   Monday anyway.

4           THE COURT:  As I said, nothing that I say or do today

5   is going to affect the ability of factions, all or some,

6   meeting and conferring and attempting to work things out, as

7   good business people do.

8           MR. PEEBLES:  I think a suggestion from this Court

9   that they do that would go a long way.

10          THE COURT:  Well, I always suggest that people meet

11  and confer, but I'm not going to force them to meet and

12  confer.

13          MR. PEEBLES:  I understand.

14          THE COURT:  That is up to good, smart advocates to

15  do.

16          MR. ROSETTE:  Your Honor --

17          MR. MARSTON:  Your Honor, we started this process

18  with me going down my list and I never got to finish my list.

19  I would like to go through and just tell you --

20          THE COURT:  I will get back to you, honest.

21          MR. MARSTON:  -- what the position of my clients are.

22  I'm going to start from the top again.

23          One, is no weapons, and I think everybody is in

24  agreement with that.

25          THE COURT:  They are, and we have taken care of that.

1        MR. MARSTON:  Number two, nothing removed from the

2   casino or from the casino's bank accounts.

3        I never got to the next step.  Except we have no

4   problem with the employees, who have been working there for

5   quite sometime, going in and doing what is necessary in

6   accordance with the law for -- for lack of a better term, put

7   the casino in a proper order to be maintained in the hopes

8   that, you know, the casino can be reopened, or in the event

9   that it can't, that it can be shut down.

10        And that means going in, doing the drop, counting the

11   money, making the entries, keeping the slot machines on.  They

12   can do that.

13        And any bills that need to be paid can be paid out of

14   what funds are currently in the Rabobank casino operating

15   account or that the casino has accrued in cash and that are

16   available to pay.  That can be done.

17        Number three, is everybody be -- the factions be

18   excluded from the casino.

19        What Mr. Rosette wants you to do, he wants you to

20   maintain the status quo.  And by doing that, basically what he

21   wants you to do is keep his Gaming Commission that's under the

22   control of his Council in the casino, regulating the casino.

23        And that's exactly what the courts are clear about,

24   that you don't have the authority.  You don't have the

25   authority to decide the inter-Tribal governmental dispute.

1    Otherwise, my clients are the lawful governing body

2   of the Tribe.  We have got a Gaming Commission.

3    THE COURT:  Okay.  We don't want to go there.

4    MR. MARSTON:  Yeah, you don't want to go there.

5    We think everybody should be excluded.  That will

6   also help maintain the peace because it won't create a

7   volatile situation where somebody is angry or mad because

8   their side didn't get to keep their Gaming Commission or their

9   regulators in the casino.

10    The last thing is there are -- under the indenture,

11   there are certain payments that are normally made to the

12   Gaming Commission and to the CEDA Board and to the Tribal

13   Government.

14    Those payments should not be made to any faction.  To

15   authorize or allow the General Manager to make those payments

16   to any faction would favor one faction over the other and

17   basically give one faction a war chest which it could use to

18   wage war against the other.

19    So the Court should not allow that to happen.  And if

20   any money was removed during this dispute for the purposes of

21   making an excluded asset payment, that money should be

22   returned to the casino.

23    So, you know, that's our position.

24    My clients are more than willing to go and mediate.

25   If the Court issued an order requiring a mandatory settlement

1  conference, which I think is clearly within the authority of

2  the Court to do, I think the parties would benefit from the

3  use of a magistrate as a mandatory settlement judge, and I

4  think the parties would benefit from the mediation services of

5  the federal court.

6          MR. ROSETTE:  Your Honor, can I respond to that?

7          THE COURT:  Yes.

8          MR. ROSETTE:  Very clearly, first of all, every event

9  that Mr. Peebles talked about occurred after this 2010

10  recognized Council.  That's why in fact the United States

11  recognized that Council.  That decision came down in 2014.  So

12  I just want to make that clear.

13         With regard to the modification that we are looking

14  for, obviously, no weapons.  I have demonstrated, and I have

15  showed you tribal laws that prohibit that as well, and it is

16  consistent.

17         Second, Management and the Gaming Commission can

18  continue at the casino to ensure that the casino is ready to

19  reopen, to keep the facility functioning.

20         You can't have a manager there without somebody

21  regulating the manager and watching.

22         THE COURT:  I understand that.

23         MR. ROSETTE:  Finally, with regard to the Tribal

24  Offices, there is a Tribal Office.  This is where the

25  Unification Council, the 2010 Council, and this is their

1   Manager and their Gaming Commission, their offices are on the

2   11th floor.

3           You know, again, you've got the McDonald faction who

4   closed the casino that's now coming into this court and saying

5   that not only were they successful in closing the casino, but

6   you are going to evict --

7           THE COURT:  I understand your argument.

8           MR. ROSETTE:  And that -- and exactly is what he says

9   you wouldn't do; you would do.  You would be making a

10  statement that this is not a recognized government, which

11  isn't your job, and that's not the issue before you.

12          We are not asking that they be evicted from the

13  buildings that they are in, which are within that 1,000

14  sphere.  That goes right to the status quo and right to the

15  order.  It says that you cannot repossess or take control of.

16          We can't repossess or take control of their

17  buildings, and they should not be able to repossess or take

18  control of our Tribal buildings and offices as well.

19          The Gaming Commission needs the -- the Tribal

20  government needs money to function.  Part of that is to keep

21  the casino open with regard to funding the Commission from

22  regulatory activities.  That keeps us in compliance with the

23  NIGC.

24          THE COURT:  Okay.

25          MR. ROSETTE:  So the things he is asking you to do is

1   to punish this Tribe for something -- a restraining order that

2   they did not create.  His client created it.  His client

3   created the violence.

4           So I just ask you to consider those points when

5   modifying your order.  Thank you, your Honor.

6           THE COURT:  All right.

7           MR. ROSETTE:  Your Honor, one more thing.  I'm sorry.

8   We need the return of those sensitive documents.

9           THE COURT:  I got it.

10          MR. ROSETTE:  Okay.

11          THE COURT:  When can the government file its

12  documents with regard to an injunctive hearing?

13          MR. TORNGREN:  We can file it, what, today is

14  Wednesday.  Preference would be Monday, but if your Honor

15  desires it sooner, we will make it happen.  But no earlier

16  than Friday.  Prefer having the weekend.

17          THE COURT:  Okay.  By noon, on Monday, October 20,

18  the government must file its motions and documents for

19  injunctive relief.

20          How much time does the opposition need?

21          MR. MARSTON:  Seven days, your Honor.

22          THE COURT:  That's a lot when we are talking about

23  shutting people down.

24          MR. ROSETTE:  How about three days, your Honor?

25          THE COURT:  Then by Thursday, 4:00 p.m.  That's

1    Thursday, October 23rd, 4:00 p.m.

2              State's reply?

3              MR. TORNGREN:  We will do it in 24 hours, your Honor.

4    We will have it to you by Friday.

5              THE COURT:  Friday, October 24, at 4:00 p.m.

6              And -- hang on just a second.

7              (The Court and the courtroom deputy conferred off the

8    record.)

9              THE COURT:  Hearing on Wednesday, October 29,

10   9:00 a.m.  Those are the dates.

11             With regard to the only other thing that is left, and

12   that is the temporary restraining order modification, it does

13   modify, if it needs modification; in other words, if somebody

14   is reading it with any ambiguity, there are to be no weapons

15   of any nature or sort on the property in question.

16             That, of course, excludes any law enforcement officer

17   from the County of Madera, the FBI, the United States Marshal,

18   or any other law enforcement that is requested for mutual aid

19   by any of those agencies for any reason to ensure the public

20   safety on that land.

21             MR. TORNGREN:  And that includes, obviously, your

22   Honor, the CHP and the Bureau of Gambling Control?

23             THE COURT:  Absolutely it does.

24             MR. TORNGREN:  Thank you.

25             THE COURT:  Secondly, with regard to the ongoing

1   business, the Court, it would be a futile act, of course, to

2   indicate that the casino can open because there is an

3   ancillary collateral order by the Commission indicating that

4   it cannot and until certain things are met by them.

5          Therefore, that will be unaffected, except to

6   indicate that should the Commission, the Tribal Commission

7   order that the casino may be opened, nobody needs to come back

8   to this Court.  That will be an automatic authorization from

9   this Court.  Their order saying it may open will be this

10  Court's order saying it may open.

11         MR. DILWEG:  Your Honor, you mean the National Indian

12  Gaming Commission?

13         THE COURT:  That's what I'm talking about.

14         MR. TORNGREN:  Your Honor, so as I understand that,

15  then if the NIGC determines that the conduct of the gambling

16  operation does not endanger the public health, safety and

17  welfare, then item number 4 is automatically gone.

18         THE COURT:  Correct.

19         MR. TORNGREN:  But if the State disagrees with that

20  and is still -- and there is still a violation of the Compact

21  with respect to that, we are not precluded from coming back;

22  is that correct, your Honor?

23         THE COURT:  That's correct.  And I think that the

24  practical solution to that is within one-half court day after

25  the Commission issues such an order, you have to -- you have

1  that time to petition this Court for a change of or a

2  modification of the temporary restraining order as I'm

3  modifying it now.

4          MR. TORNGREN:  Thank you, your Honor.

5          THE COURT:  Thirdly, the Court finds that it is good

6  cause to now define "status quo."

7          The purpose with regard to business of a temporary

8  restraining order is generally a status quo.  And the Court is

9  going to order that status quo, as of the afternoon of

10  October 8, 2014, before any action was taken, that business

11  that was being run, except, of course, the business of

12  customers, that that is to return as was, with the same

13  factions involved, the same management involved, and with the

14  same authority that they had as of the afternoon of October 8,

15  2014, to conduct business, other than opening the doors to the

16  public.

17          Finally, documents that were taken out at any time

18  after the morning of October 9 of 2014, immediately before the

19  issue that brought this Court into the fray, documents taken

20  out, or property taken out, is to be returned forthwith.

21          Anything else, Counsel?

22          MR. PEEBLES:  Yes, your Honor.  With regard to the

23  cash that's in the casino and in the bank accounts, outside of

24  paying the bills?

25          THE COURT:  That is encompassed in the modification

1   that I just made with regard to the ability of the management

2   company to conduct business as they did the day before the

3   event occurred.

4          MR. PEEBLES:  Your Honor, that, I believe, allows the

5   management company to pay one of the various factions.

6          THE COURT:  Thank you for that.  Excluding that

7   issue, because this Court is not making a ruling as to

8   whatever factions are owed any amount of money.  That's

9   excluded.  Employees are included, that they can be paid.

10          MR. PEEBLES:  No faction.

11          THE COURT:  Factions.  That is to be held aside.  And

12   it is certainly easy enough from an accounting standpoint to

13   take care of.

14          MR. MARSTON:  Your Honor, just to be clear.  So

15   because normally, the general manager would have the authority

16   to make a $1 million excluded asset payment to a Tribal

17   governmental entity, so that is out, he does not have the

18   authority to do it.

19          Also, he would have the authority to make a

20   approximately 400- or $450,000 payment to one of the Tribal

21   faction's CEDA Board.  That's out as well.

22          MR. ROSETTE:  Your Honor --

23          MR. MARSTON:  Let me just finish.

24          And number three, is there is an excluded asset

25   payment for the Tribal Gaming Commission.  Is that also out as

1    well?

2          MR. ROSETTE:  Yes.  And that goes to the status quo.

3    The casino and the management staff cannot perform their jobs

4    without the regulating environment, the surveillance.  The

5    Commission must be operable.  That's required under the Indian

6    Gaming Regulatory Act.  The Gaming Commission needs to be

7    funded.

8          With regard to CEDA, that's the Chukchansi Economic

9    Development Authority, they serve in their role as overseeing

10   management and the operation of the casino.  It is a much

11   smaller budget.

12         They, among other things, deal with the note holders,

13   the bond holder, the banks, et cetera.  They direct both

14   management and the Gaming Commission.  So it is critically

15   important that those stay alive in order for the casino to

16   continue to have the employees in it.

17         MR. MARSTON:  Now what you are doing is making a

18   decision about who the lawful Gaming Commission is and who the

19   lawful CEDA Board is, and your order is going to be --

20         (Interruption from the galley.)

21         THE COURT:  Ah, ah, ah.

22         MR. MARSTON:  -- authorizing those entities to be

23   funded.

24         And so, your Honor, first of all, to do what needs to

25   be done at the casino, the Gaming Commission doesn't need to

1   be there.  They don't.

2           MR. ROSETTE:  Your Honor --

3           MR. MARSTON:  The general manager can go ahead and

4   authorize his casino employees to count the cash, to do those

5   entries in the books and records of account and do what's

6   required under the New York court order, which is to take all

7   of that cash and deposit it into the Rabobank account and use

8   it solely for the purpose of paying the vendors or the

9   operating expenses of the casino.

10          MR. DILWEG:  Your Honor, as attorney for the Gaming

11  Commission, I would argue with Mr. Marston's idea that nothing

12  has to be watched or investigated while casino employees are

13  counting cash.

14          THE COURT:  You don't need to address that.  They do.

15          MR. DILWEG:  And to the extent that, you know, Gaming

16  Commission is tied in with one faction or another, there are

17  professional employees of the Gaming Commission that have to

18  be paid in order to do their jobs.

19          THE COURT:  I understand that.

20          MR. PEEBLES:  Your Honor, I think one other point is

21  the CEDA Board is the Tribal Council.  They are one in the

22  same.  So by paying one CEDA Board, you pay one Tribal

23  Council.

24          It was the Chukchansi Economic Development Authority

25  that was set up to operate the casino.  That is in fact -- and

1    the way it was set up, that is in fact the Tribal Council.

2            And, quite frankly, there are three Councils here,

3    people who claim to be in that position.

4            Mr. Rosette has asked that his Council be paid and

5    the rest, not.

6            MR. ROSETTE:  Your Honor, it goes right back to the

7    status quo argument that we worked through.

8            They are not in the casino.  They do not control this

9    Gaming Commission.  They do not control this management team.

10           Those are issues to be resolved at the NIGC level.

11           THE COURT:  Let me ask you --

12           MR. ROSETTE:  They come here, they shut the casino

13   down violently.

14           THE COURT:  Hang on.  I got that.  I understand that

15   part.

16           MR. MARSTON:  Let me clarify something, your Honor.

17   I wasn't advocating that there shouldn't be.  There is.  There

18   is professional Gaming Commission staff that can be in there

19   and be reviewing and overseeing that process, and they should

20   be paid.

21           What I'm talking about is a $400,000 payment that

22   normally comes to the Gaming Commission, okay, as a licensing

23   fee.  I don't think that that payment should be made.

24           There is a fundamental difference in having a

25   regulator in the casino overseeing the counting of the money

1    and the entry of the books, and a full Gaming Commission on

2    staff.  Because there is no games being played, there is no

3    one applying for gaming licenses whose licenses have to be

4    reviewed or that hearings have to be held.

5           All of those functions that the Gaming Commission as

6    a board or as an entity, all of those functions, they don't

7    have to occur.

8           And so to fund one of the Gaming Commissions over the

9    other one is choosing sides, is empowering one over the other.

10          THE COURT:  What about the obligation that the Gaming

11   Commission has to oversee the money issues?

12          MR. MARSTON:  Well, again --

13          MR. ROSETTE:  Your Honor --

14          MR. MARSTON:  They have staff.  There is Gaming

15   Commission staff that performs those day-to-day functions.

16          THE COURT:  Who pays them?

17          MR. MARSTON:  They receive a licensing fee payment.

18   It is called an "excluded asset payment."  And they already

19   got that payment or should have gotten that payment --

20          THE COURT:  One at a time, one at a time.

21          MR. MARSTON:  So there should be already -- they

22   should already have sufficient funds to carry out their duties

23   for the rest of this month to do what Mr. Rosette wants to see

24   done and what we want to see done, which is to basically bring

25   the casino to a level of non-operation to the general public.

1      THE COURT:  Okay.  What?

2      MR. DILWEG:  I was just going to say that I don't

3  believe the Gaming Commission licensing payment is an excluded

4  asset under the New York court order, not that it really

5  matters.  It is a mandated payment under the indenture

6  agreement.

7      MR. ROSETTE:  That's correct.

8      THE COURT:  All right.  Let me ask one question of

9  you, Mr. Rosette, and that is, suppose, as a hypothetical, the

10  appropriate authorities on the Indian legal side make a

11  decision that the people who are now in control -- and I'm not

12  suggesting they will or won't -- so we don't need to go down

13  that road.  I'm saying I want you to assume this:  They make a

14  decision that the people who are now in control are not the

15  true owners.

16      What happens to the money that is paid to that

17  faction between now and when that decision is made if the

18  monies are paid out?

19      I think we both know that it's going to be impossible

20  to get back, do we not?

21      MR. ROSETTE:  Your Honor, that issue has been

22  happening over the last year and a half.  That issue occurred

23  in the *Paskenta* case as well.

24      THE COURT:  I understand.

25      MR. ROSETTE:  The money that the Tribe uses is

1    governed by what's called a "Revenue Allocation Plan."

2         THE COURT:  Why can't that money be put into a trust

3    account and, if it's due them, they will get it?

4         (Applause from the galley.)

5         THE COURT:  Wait, wait, wait.  Thank you.

6         MR. ROSETTE:  There is a Revenue Allocation Plan

7    where the money is designated.

8         I think with regard to specific items in the Tribal

9    budget that would need to be paid, such as elder care, health

10   care, medical, the housing authority for people's homes and

11   then their per capita payment, it is a living assistance of

12   about $400 per member, that all of those ought to still be

13   paid and distributed to the entire Tribal membership,

14   including Tex McDonald and every other Tribal member in this

15   room.

16        With regard to any discretionary funding, I agree 100

17   percent with you, but there are legitimate government programs

18   and legitimate government needs that need to be paid from the

19   casino.

20        If there is anything discretionary, I agree 100

21   percent.

22        MR. PEEBLES:  Your Honor, that's happened one time in

23   the last year.

24        THE COURT:  "That," what?

25        MR. MARSTON:  The Tex McDonald Tribal Council has

1    been making those payments for over a year.  They are the ones

2    that have been doing that.

3          We have been getting the excluded asset payment of

4    $1 million paid to the Tribal government and we have been a

5    operating the Tribal government.  We have been making the

6    elder care payments.  We have been making the per capita

7    payments.  It has been the Tex McDonald Council that's been

8    doing that.

9          The other side, Mr. Rosette's clients, they came in

10   and they forcibly took over the casino and took over the

11   Gaming Commission office, and then there was a dispute between

12   the Tex McDonald Council and their Council, the Unification

13   Council, regarding who the excluded asset payment then should

14   be made to, the $1 million.

15         And Mr. Giffen Tan then chose to recognize the

16   Reunification Council and make the excluded asset payment to

17   them.

18         So for one month, they took that excluded asset

19   payment and they made per capita payments, and I'm assuming,

20   but I don't know whether they made any other payments.

21         I can give you a precise and complete accounting and

22   breakdown of how the Tex McDonald Council spent every dime of

23   that million dollars.  And it was all used to provide

24   essential governmental services to the members of the Picayune

25   Rancheria Chukchansi Indians.

1          MR. PEEBLES:  Your Honor, my client has had one

2     payment in the last three years.  And point of fact of it is

3     that there are different Tribal members lists for different

4     Tribal Councils.

5          So when Mr. Rosette talks about his Tribal members,

6     it is different than when Mr. Levitan speaks of his Tribal

7     Council.  Who gets the money --

8          MR. ROSETTE:  Your Honor --

9          MR. PEEBLES:  I think the point of it is I think it

10    is best it just not be made unless there is some agreement who

11    gets it all because some people aren't getting it.

12         MR. ROSETTE:  Your Honor, I can answer that.

13         THE COURT:  All right.

14         MR. ROSETTE:  The people who will get the money is

15    every single Tribal member that was a recognized member in

16    2010, which includes all of them.

17         That was the whole -- that's -- this -- the Council

18    that's recognized by the Bureau of Indian Affairs didn't

19    happen by accident.  There were legal opinions drafted as to

20    who the proper governing body is.

21         One reason that the Gaming Commission, which is the

22    same Gaming Commission that worked for Tex McDonald, which

23    used to be known as the McDonald/Ayala faction, and Ayala is

24    now per quorum Council part of this Council, is to make sure

25    that they make the Tribe whole.

1          Tex McDonald says every time I see a quote about

2    disenrollments and suspensions and so on and so forth.  That's

3    exactly the root of the problems that you are talking about,

4    your Honor.

5          The 2010 Council that's recognized by the Bureau of

6    Indian Affairs has already passed Resolutions that said every

7    single Tribal member in 2010 is a member in good standing.

8    They all get a Tribal benefit.  They all can have candidacy

9    for an upcoming election, and all of their families can vote

10   for them in those elections to restore the Democratic

11   principles of the transcribe.

12         That is the very purpose of what the government is

13   doing.  We can honor that in your Order.

14         MR. PEEBLES:  Your Honor, that's exactly the point we

15   are trying to make.  What happens there then, though, is now a

16   court order is authorizing one Council over the others to make

17   payments, and that they will then -- that's what they are

18   trying to go with regard to incurring political favor of the

19   Tribe --

20         MR. ROSETTE:  Your Honor, I don't --

21         THE COURT:  Wait, wait, wait.

22         MR. PEEBLES:  -- and they are asking this Court to

23   put its imprimatur on that.

24         MR. ROSETTE:  Your Honor --

25         MR. PEEBLES:  If there would be an order that the

1  2010 membership list shall in fact receive, all receive equal

2  distributions from the Tribe who -- and that be paid out of

3  the assets as part of whoever is required to do that, I think

4  that would be agreeable.

5         But, however, to give that authority to one Council

6  as opposed to another, without a Court order, I think then

7  gives advantage to one over the other.

8         MR. MARSTON:  And your Honor, this dispute --

9         THE COURT:  Wait.  One at a time.

10        You, you, and then I'm done.  Okay.

11        MR. MARSTON:  I just want to say this dispute

12  originally arose because Mr. Rosette's clients would not agree

13  to a forensic audit to account for where the money went that

14  their clients spent.

15        THE COURT:  Okay.  Everybody is bad, everybody is

16  good.  Got it.

17        Now, what?

18        MR. MARSTON:  That's number one.

19        Number two, is I agree a hundred percent with what

20  Mr. Peebles just said.  If you fund one Tribal faction over

21  the other, you are now getting yourself involved in the

22  internal Tribal dispute.

23        THE COURT:  I feel it.

24        MR. MARSTON:  Yeah.  You are deciding which Tribal

25  government is going to be recognized for purposes of receiving

1    funds to be able to take and spend that any way that they want

2    so that they can garner favor with their membership.

3          Finally, the statements have been made a number of

4    times, and I want to correct the record.  The Superintendent

5    of the Bureau of Indian Affairs, Troy Burdick, made an initial

6    decision to recognize the 2013, December 2013 Tribal Council.

7          That decision was overturned by the Regional

8    Director, who decided to recognize the 2010 Council.

9          That issue is now up on appeal to the Interior Board

10   of Indian Appeals, who sits in the place of the Assistant

11   Secretary for Indian affairs.

12          And the moment that notice of appeal was filed, it

13   voided out the -- Ms. Dutschke's decision.

14          So there has been no final decision made by the

15   United States Government Bureau of Indian Affairs as to who

16   the lawful governing body of this Tribe is.

17          MR. ROSETTE:  Your Honor, again, I'm just going back

18   to status quo, but there is a couple of things you should

19   know.

20          First of all, the two Councils that fought to void

21   that order are now working together.  That's the good news.

22   That's the whole point of the Unification Council, to work

23   together, to be recognized by the BIA.  We have grounds to go

24   to the BIA now to do that.

25          Second, John Peebles' clients are -- the two clients

1    he represents, Morris Reid and Dora Jones, are on that 2010

2    Council.  They are represented, they are Tribal leaders.  They

3    do have the ability to participate in tribal government.

4            THE COURT:  And are you suggesting that the -- if

5    there were to be the 2010 list distribution, that they would

6    be in equal amounts?

7            MR. ROSETTE:  Absolutely.  And your Honor, again, it

8    goes back to the status quo notion to keep the casino in a

9    good condition and the Tribe in a good condition so that we

10   can focus on appeasing the federal government's concerns where

11   they can adequately and, in the right manner, make their

12   arguments.

13           THE COURT:  Okay.  I'm ready to rule.

14           MR. TORNGREN:  Your Honor, I have one statement, your

15   Honor.

16           THE COURT:  Are you still here?

17           MR. TORNGREN:  Yes, I know.  Actually, I do have one

18   issue, and I don't know if the three parts here can agree to

19   it.

20           At one point, somebody mentioned mandatory settlement

21   conference.  Is that something that you want to consider?  And

22   maybe they might agree.  I know that when I spent an hour and

23   a half in a room with them, I had marginal success getting

24   agreement, but your Honor, you are wearing the robe.

25           THE COURT:  I wouldn't be the settlement conference

1  judge, if that's what you are saying.

2          MR. TORNGREN:  Oh, no.  I'm not sure I would want to

3  wish this on some poor magistrate either, but.

4          THE COURT:  I would.

5          MR. TORNGREN:  Thank you.

6          THE COURT:  Okay.  I will get to that in just a

7  moment.

8          All right, with regard to the disbursements, the

9  mandatory fees on the Gaming Commission, they would be a part

10 of what would have to be paid.

11         Discretionary funds, no.  Discretionary funds to any

12 of the factions, no.  Except for the 2010 list, in equal

13 amounts, yes.

14         Now, that's the order.

15         Now, the last issue is the mandatory settlement

16 conference.  Should it be mandatory, should I set a settlement

17 conference?

18         MR. MARSTON:  I want some clarification.  When you

19 say "equal payments," are you saying that payments are to be

20 made to the -- to my clients, the Morris-Reid clients, and

21 the --

22         THE COURT:  Whoever is on the 2010 list, in equal

23 amounts.

24         MR. MARSTON:  You are talking about per capita

25 payments to be made to Tribal members?

1          THE COURT:  Yes, that's correct.  Now, does anybody

2     object to a mandatory settlement conference in this case?

3          MR. PEEBLES:  No, your Honor.

4          MR. DILWEG:  No, your Honor.

5          MR. ROSETTE:  No, your Honor.

6          THE COURT:  Then here's the order with regard to

7     that.  By the end of -- strike that.

8          By Friday, at noon, counsel are to meet and confer by

9     telephone, if you wish.  You can do it now actually, since you

10    are all here, and decide when you can come back for a

11    mandatory settlement conference before one of the magistrate

12    judges.

13         Depending on what date, what time you give us, you

14    call the Clerk of this Court, Irma Munoz, who is sitting right

15    here, in these chambers.  You give her the date and the time.

16         We will then take it upon ourselves to contact the

17    magistrate judges, find out what magistrate judge is

18    available, and we will assign the mandatory settlement

19    conference to that magistrate judge.

20         We will immediately then issue a minute order

21    indicating the date and the time, which will be, of course,

22    you will already know, but the location as well, which you

23    will not know.

24         That's the order of the Court.

25         MR. MARSTON:  Two things, your Honor, I want to make

1   sure -- I apologize.  But when you say that none of the

2   discretionary funds are going to be paid, that's none of the

3   funds to the Tribal government nor to the CEDA Boards,

4   correct?

5          MR. ROSETTE:  What we were asking for, CEDA needs to

6   be funded in order to run the Gaming Commission and casino

7   management.  What --

8          (Noise from the galley.)

9          THE COURT:  Wait a minute.  Just a minute, I

10   appreciate your input, but I think I probably know what it is

11   already.

12          MR. ROSETTE:  With regard to the government funds, we

13   were asking for the housing authority money to go for the

14   homes, the elder programs, those types of programs to still be

15   put in place.

16          Again, status quo for the benefit of the 2010

17   membership.

18          If there is anything discretionary left in that

19   budget, and there are discretionary funds, those should be put

20   into a escrow for a later purpose.

21          But the whole point is to benefit the entire Tribal

22   membership and their programs, as stated in 2010, which

23   specifically includes their clients.

24          MR. MARSTON:  Your Honor, if you are going to do

25   that, then it should be tit for tat.  If you are going to fund

1   their Gaming Commission because they are on site and in the

2   casino, regulating, then you need to fund our CEDA Board and

3   our Tribal government.

4           And I will tell you why.  Because we are in the

5   Tribal governmental compound and buildings.  We have been

6   operating the Tribal governmental programs.  We have been

7   doing it for over a year.

8           So if anybody is entitled to receive the CEDA money

9   to provide oversight to the General Manager and any Tribal

10  government that's entitled to receive the money, it should be

11  the Tribal government that's on site, been running the

12  programs and providing the services.

13          MR. ROSETTE:  That is untrue.  We have been

14  administering those programs for over a year.

15          (Noise from the galley.)

16          THE COURT:  Just a minute, just a minute.  The answer

17  is, not included.  You cannot pay those.  And, of course, that

18  can be trumped by a settlement conference, by a meet and

19  confer, by an agreement.

20          It seems to me that without that type of a meet and

21  confer and some type of agreement, you are hurting an awful

22  lot of people.

23          So take your jobs seriously and get it done.  This

24  Court is in recess.

25          (The proceedings were concluded at 3:33 p.m.)

1          I, PEGGY J. CRAWFORD, Official Reporter, do hereby

2     certify the foregoing transcript as true and correct.

3

4   Dated:  October 17, 2014              /s/ Peggy J. Crawford
                                          PEGGY J. CRAWFORD, RDR-CRR
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25