# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>PICAYUNE RANCHERIA OF CHUKCHANSI INDIANS OF CALIFORNIA, A FEDERALLY RECOGNIZED INIDAN TRIBE,<br><br>　　　　Defendant, | CASE NO. 1:14-CV-01593-LJO-SAB<br><br>PRELIMINARY INJUNCTION ORDER |

## I. INTRODUCTION

The Picayune Rancheria of Chukchansi Indians of California ("Tribe") operates the Chukchansi Gold Resort and Casino ("Casino"), in Madera County, California pursuant to a class III gaming compact with the State of California ("State"). An intra-tribal dispute exists among various Tribal members, which has led to three or more separate groups claiming leadership rights over the Tribe and rights to control the Casino. On October 9, 2014, this intra-tribal dispute led to an armed conflict on the grounds of the Casino. As a result, on October 10, 2014, the State petitioned for, and this Court issued, a temporary restraining order ("TRO"), restraining and enjoining, among other things, the operation of the Casino, any further attempts to repossess or take control of the Casino, and/or the deployment of armed personnel of any nature (other than State, County, or federal law enforcement) within 1000 yards of the Casino and nearby properties. Doc. 5. The TRO was modified slightly in open Court at an October 15, 2014 hearing to permit certain Casino operations to move forward, including those required to secure cash from the Casino floor. *See* Docs 16 & 21.

Plaintiff, the State of California, now moves for a preliminary injunction to extend the terms of the TRO. The Court has received and reviewed the motion, the response of the Tribal faction led by

Nancy Ayala and Reggie Lewis ("Ayala/Lewis Faction"), represented by Robert A. Rosette, Esq., as well as the late-filed opposition of the Tribal faction led by Tex McDonald ("McDonald Faction"), represented by Lester J. Marston, Esq. Doc. 33. A hearing took place on October 29, 2014, at which time oral argument was heard from numerous parties, and the matter submitted for decision. Having considered the parties' pleadings and arguments, the Court makes the following findings of fact and conclusions of law.

## II. **FACTUAL BACKGROUND**

1. The State of California (State) and the Picayune Rancheria of Chukchansi Indians of California (Tribe) entered into a class III gaming compact ("Compact") on September 10, 1999. Compl., Ex. A, Doc. 1-2. Pursuant to the Compact, the Tribe operates the Casino.

2. The Compact includes provisions to protect public health and safety. Under section 8.1.2 of the Compact, the Tribe agreed to ensure "the physical safety of Gaming Operation patrons and employees, and any other person while in the Gaming Facility." Section 10.1 of the Compact provides: "The Tribe will not conduct Class III gaming in a manner that endangers the public health, safety, or welfare . . . ."

3. It is undisputed that an intra-tribal dispute exists between at least three groups within the Tribe, including: the McDonald Faction, the Ayala/Lewis Faction, and a third Faction, led by Morris Reid ("Reid Faction"). *See* Doc. 25 at n.1. Each group claims to be the Tribe's duly constituted leadership and to have the right and power to control the Tribe's gaming activities.

4. Prior to October 9, 2014, the Ayala/Lewis Faction was in *de facto* control of the Casino floor and associated business activities. *See, e.g.*, Declaration of John Oliveira, Doc. 35 ("Oliveira Decl."), at ¶ 7.

5. On the evening of October 9, 2014, the armed security forces of the Ayala/Lewis Faction and the McDonald Faction were involved in a confrontation. At approximately 6:00 pm, Tex McDonald, the leader of the McDonald Faction, along with his head security person (John Olivera) and approximately twenty-five additional security personnel executed a takeover of the Casino. Firearms

and/or other weapons were drawn by both sides. *See id*. at ¶¶ 12-25; *see also* Declaration of Leonard Rosson, Doc. 10-6, Ex. A.

6. As the incident unfolded, Casino patrons and employees were evacuated. Some, but not all, of the patrons of the adjoining hotels were also evacuated. Oliveira Decl. at ¶¶ 36-38; *see also* Declaration of Giffen Tan, Doc. 10-4 ("TanDecl."), at ¶ 4. The Madera County Sherriff's Office arrived on scene at approximately 7:20 pm, and secured the Casino and surrounding property. *See Oliveira Decl.* at ¶¶ 25, 36.

7. The State filed this lawsuit on October 10, 2014, alleging that the actions taken by the various factions resulted in a breach of the Compact's public health, safety, and welfare provisions. Doc. 1. On the same day, the Court entered a TRO that created a 1,000-yard weapons-free buffer zone around the Casino and nearby properties, and prohibited operation of the Casino unless and until the parties satisfy the Court that the public health and safety of Casino patrons, employees, and tribal members could be adequately protected. Doc. 5.

8. Also on October 10, 2014, the National Indian Gaming Commission ("NIGC") issued a Notice of Violation and Temporary Closure Order ("NIGC Order"). Doc. 9-1, Ex. A; Doc. 10-3, Ex. A. In the NIGC Order, the NIGC found that the Tribe was in "substantial violation" of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2710(b)(2)(E), NIGC regulations, and the Tribe's own Gaming Ordinance. Doc. 9-1 at 1. As a result, the NIGC Order required the tribe to "cease and desist from all gaming activity" in the Casino, effective immediately. *Id*.

9. The NIGC Order made the following factual findings:

> 1. The Chukchansi Tribe is a federally recognized Indian nation with tribal headquarters in Coarsegold, California.
>
> 2. The Chukchansi Tribe operates the Chukchansi Gold Resort & Casino in Coarsegold, California, on land held in trust for its benefit by the United States.
>
> 3. The Chukchansi Tribe has had an on-going internal governmental dispute over its leadership.
>
> 4. On October 9, 2014, one faction of the Chukchansi Tribal government

> forcibly asserted control over the Chukchansi Gold Resort & Casino, disarming and handcuffing on-site security personnel.
>
> 5. Each faction's gaming commission reports the other faction having personnel who are carrying weapons within the Chukchansi Gold Resort & Casino.
>
> 6. One faction's gaming commission reports the other faction using an electric stun gun on-site security personnel.
>
> 7. Each faction's gaming commission, along with local law enforcement, reports that employees exited the Chukchansi Gold Resort & Casino the evening of October 9, 2014, after a fire alarm. The majority of the employees have not returned to work.
>
> 8. Members of separate factions remain in the Chukchansi Gold Resort & Casino, each asserting authority over the facility.
>
> 9. As of October 9, 2014, according to the law enforcement officials and each faction's gaming commission, the situation remains tense and volatile, creating genuine concerns for public health and safety.
>
> 10. Furthermore, imminent jeopardy exists because of the real and immediate threat to human health and well-being, which if uncorrected, could result in serious harm or death.

*Id.* at 4.

10. On October 15, 2014, after a hearing on the TRO, this Court modified its TRO and established an expedited briefing schedule for the present motion. As modified, the TRO reinstated the pre-October 9, 2014 status quo as to certain ongoing Casino operations, maintained the 1,000 yard weapons-free buffer zone around the Casino, and continued the prohibition against operating the Casino unless and until the parties satisfied the Court that the public health and safety of Casino patrons, employees, and tribal members would be adequately protected from violence. The modified TRO permitted the Tribe to re-open the Casino if the NIGC lifted its closure order, while providing the State with a half-day to object to any such re-opening. Docs. 16 & 21.

11. The vying factions have presented competing evidence of their own right to govern the Tribe. The Lewis/Ayala Faction presents correspondence from the Bureau of Indian Affairs ("BIA") reflecting the BIA's determination to conduct business with the "last uncontested Tribal Council" elected in December 2010, which the Lewis/Ayala Faction claims to represent. Doc. 10-1. The

4

McDonald Faction likewise presents evidence purporting to establish that it is the duly elected governing body of the tribe. Doc. 33 at 9-10. All parties and the Court itself agree that this Court does not have jurisdiction to adjudicate this governance dispute.

### III. STANDARD OF DECISION

12.     In order to secure injunctive relief prior to a full adjudication on the merits, a plaintiff must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id*. at 22.

### IV. DISCUSSION

**A.     Likelihood of Success on the Merits.**

   **1.     Jurisdiction.**

13.     Jurisdiction exists in this case pursuant to 25 U.S.C. § 2710(d)(7)(A)(ii), a provision of the IGRA, which provides in pertinent part that the "United States district courts shall have jurisdiction over ... any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact...." Here, the State alleges that the Tribe is operating class III gaming activities in the Casino in violation of the Compact, triggering 25 U.S.C. § 2710(d)(7)(A)(ii).

14.     The McDonald Faction objects to a finding of jurisdiction under this provision on the ground that the failure of the Tribe to provide adequate security to maintain public safety is not a "Class III gaming activity," insofar as the asserted violations have "nothing to do with what games are authorized, whether criminals are playing the games, whether the games are being played fairly, and whether the Tribe is receiving the revenues from the playing of the games." Doc. 33 at 7. The McDonald Faction offers no authority that remotely suggests the grant of jurisdiction in § 2710(d)(7)(A)(ii) is so limited. The plain language of § 2710(d)(7)(A)(ii) provides a federal forum in which either party to a

Tribal-State compact may challenge operation of class III gaming conducted in violation of a compact. Such a violation is alleged here.

15. The McDonald Faction asserts that to find jurisdiction exists in this case would require this Court to assume jurisdiction over "a full array of minor breach of contract actions; such as minor violations regarding the preparation of food, fire code violations regarding the number of overhead sprinklers, and uniform building code violations pertaining to public health and safety." Doc. 33 at 7. The Court expresses no opinion as to whether 25 U.S.C. § 2710(d)(7)(A)(ii) would provide a federal forum for such public health and safety violations. But, this Court does not hesitate to hold that where a Tribal-State compact provides that the tribe "will not conduct Class III gaming in a manner that endangers the public health, safety, or welfare...., " 25 U.S.C. § 2710(d)(7)(A)(ii) provides a district court with jurisdiction to address circumstances that present imminent public health and safety dangers

16. Alternatively, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. As the Ninth Circuit held in *Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1056 (9th Cir. 1997), Tribal-State compacts are "creation[s] of federal law." Therefore, one party's claim to enforce a compact arises under federal law and is cognizable under 28 U.S.C. § 1331. *See id*. The McDonald Faction's arguments regarding *Cabazon* amount to an attempt to re-write the Ninth Circuit's decision. Specifically, the McDonald Faction argues that the issue in *Cabazon* was whether or not the IGRA prohibited the State from imposing in the *Cabazon* Tribal-State compact a tax in the form of a license fee on the plaintiff tribes' off-reservation, off-track betting facilities. Therefore, their argument continues, *Cabazon* should not control here because it concerned a claim arising directly under the IGRA, not one arising out of the compact. Doc. 33 at 3. The text of *Cabazon* explicitly holds otherwise, explaining that the IGRA issue had been resolved in favor of the tribe in a prior decision and that the remaining issue concerned enforcement of the State's agreement in the compact to turn over the collected fees if the fees were found impermissible. 124 F.3d at 1053. *Cabazon* is analogous to the present circumstances.

17. Jurisdiction exists under both 25 U.S.C. § 2710(d)(7)(A)(ii) and 28 U.S.C. § 1331.

6

### 2. Violation of Class III Gaming Compact/ Need for Continued Injunctive Relief.

18. As mentioned above, Section 10.1 of the Compact provides that the "Tribe will not conduct Class III gaming in a manner that endangers the public health, safety, or welfare...." The armed conflict on October 9, 2014 created a significant danger to public health and safety in breach of Section 10.1 of the Compact.

19. Moreover, the parties' inability to resolve their ongoing intra-tribal dispute over Tribal governance indicates that the underlying impetus for the armed conflict has yet to dissipate. If ever there were irrefutable proof of the need for an injunction to continue, it would be the opposition documents received from the McDonald Faction. The McDonald Faction argues that its armed incursion was a lawful effort to evict "trespassers" from the Casino, namely members of the Lewis/Ayala Faction and their "mercenary" private security service. *See* Doc. 33 at 18. This twisted statement of facts, coupled with the statement of position, belies any semblance of truth or reasonableness. It is simply an admission that the emotional and explosive keg that existed the day before the armed and illegal takeover that occurred on October 9, 2014 still exists. With that understanding and determination, the public safety issue that has injected a Federal Court into business generally delegated by law to the Indian Tribes still exists. As such, the Court finds that the public health and safety danger would continue to exist if the Casino were to be reopened at this time.

20. It is clear to this Court that, while there has been a multi-year disagreement between the Factions concerning the right and legitimacy of existence and power, on October 9, 2014, a group of individuals attempted an armed take over of the Casino through the use of violence and intimidation. This act was illegal in the eyes of any lawful body, and constituted the worst sort of street injustice. It was dangerous to everyone present, including participants, other tribal members, customers and patrons, and general members of the public within the vicinity. In spite of the passage of some time, the illegal aggressors continue to claim that their misbehavior was both legal and responsible. It is that faction, the McDonald faction, that continues to be the threat to public safety, and it is with that focus and finding that this Injunction must issue.

21. It could be argued that since there has been neither armed activity nor violence since the TRO issued, there is no need for a continued injunction. Yet, it is clear to this Court that this simply means the TRO was needed and is working, and that the need for a preliminary injunction is obvious.

**B.     Irreparable Harm/Balance of the Equities/Public Interest.**

22. In evaluating the appropriate form of a continued injunction, the Court acknowledges that the TRO has prohibited certain payments to tribal governmental bodies, because the various Factions are unable to agree upon the appropriate body to administer such payments. This is unfortunate, but the Court is without jurisdiction to adjudicate the underlying Tribal governance dispute. In contrast, at the request of the State, this Court does have jurisdiction to enforce the public safety provision of the Compact. The State maintains and the Court finds that the escalating provocations, including the armed incident led by the McDonald Faction, create the risk of imminent physical injury to the State's residents and visitors to the Casino. The Court further finds that the potential for violence creates a need for injunctive relief that far outweighs any evidence of temporary financial hardship caused to members of the Tribe. For the same reason, the issuance of a preliminary injunction is in the public interest.

**C.     Bond.**

23. Federal Rule of Civil Procedure 65(c) provides that a Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Court has discretion to waive this requirement, *Diaz v. Brewer*, 656 F.3d 1008, 1014 (9th Cir. 2011), and may dispense with it entirely where there is "no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Here, the NIGC's overlapping closure order is the primary reason why the Casino itself remains closed. This Court's injunction only adds additional security provisions to protect against further violence. Therefore, any harm to defendants caused by continued closure is traceable to the NIGC's order, not this Court's TRO or preliminary injunction. There is no realistic likelihood that any defendant will be harmed by this Court's imposition of a weapons-free buffer around the Casino. As a result, the bond requirement is

waived.

## V. **PRELIMINARY INJUNCTION ORDER**

Based upon the forgoing findings of fact and conclusions of law, and good cause appearing, the Court grants the State's request for a preliminary injunction.

The Court orders that the Tribe, and all if its officers, agents, servants, employees and attorneys, and all persons acting under the Tribe's direction and control, including all groups currently claiming to constitute the tribal government, are hereby enjoined and restrained from:

1. Attempting to disturb, modify or otherwise change the circumstances that were in effect at the Casino as of the afternoon of October 8, 2014. This prohibition includes, without limitation, attempting to repossess, or take control of the Casino in whole or in part. Payments in the ordinary course of business, including mandatory fees to the gaming commission actually supervising the Casino's operations on October 8, 2014, and per capita tribal distributions based upon the Tribe's membership list as of December 1, 2010, that are made in equal amounts, are not violative of this Injunction. No discretionary payments shall be made to any group claiming to be the duly constituted tribal council or claiming control over tribal matters.

2. Deploying tribal police or other armed personnel of any nature within 1,000 yards from the Casino, the property on which the Casino is located, and tribal properties surrounding the Casino, including the adjacent hotel and nearby tribal offices (collectively, "Tribal Properties"). This prohibition includes weapons of any nature or sort such as, by way of example but not limited to, firearms, tasers, knives, clubs, and batons. The only armed personnel allowed within the Tribal Properties are members of federal, state, and local law enforcement agencies who are acting within the scope of their official duties.

3. Possessing, carrying, displaying, or otherwise having firearms on the Tribal Properties.

4. Removing documents or other property from the Casino, or continuing to possess, or possessing, documents or other property removed from the Casino during and after the morning of October 9, 2014. All such documents or other property that were removed and have not been returned

shall be returned immediately.

5. Operating the Casino unless and until it is established before this Court that the public health and safety of Casino patrons, employees, and tribal members can be adequately protected from the violent confrontations and threats of violent confrontation among the tribal groups disputing leadership of the Tribe and control of the Casino. This prohibition shall have no further force and effect if the NIGC issues an order lifting its Closure Order and, within one-half court day thereof, the State does not object to reopening the Casino.

This preliminary injunction will remain in effect until resolution of the case by settlement or judgment or the Court's further order.

IT IS SO ORDERED.

Dated: **October 29, 2014**          /s/ Lawrence J. O'Neill
                                                            UNITED STATES DISTRICT JUDGE