1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL


STATE OF CALIFORNIA,            )
                                )   1:14-cv-01593 LJO
            Plaintiff,          )
                                )   MOTION FOR PRELIMINARY
      vs.                       )   INJUNCTION
                                )
PICAYUNE RANCHERIA OF           )
CHUKCHANSI INDIANS OF           )
CALIFORNIA, A FEDERALLY         )
RECOGNIZED INDIAN               )
TRIBE,                          )
                                )
            Defendant.          )
_____)

Fresno, California                Wednesday, October 29, 2014



REPORTER'S TRANSCRIPT OF PROCEEDINGS











REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

APPEARANCES OF COUNSEL:

For the Plaintiff:

                OFFICE OF THE ATTORNEY GENERAL
                1300 I Street, Suite 125
                P.O. Box 944255
                Sacramento, CA  94244-2550
                BY:  **WILLIAM P. TORNGREN,**
                    **Deputy Attorney General**

For the Defendant:

                ROSETTE, LLP
                193 Blue Ravine Rd., Suite 255
                Folsom, California 95630
                BY:  **ROBERT A. ROSETTE**
                     **GEOFFREY M. HASH**

For:  Reid Tribal Council, et al.:

                FREDERICKS PEEBLES & MORGAN LLP
                2020 L Street, Suite 250
                Sacramento, CA 95811
                BY:  **JAMES J. QAQUNDAH**

For:  McDonald Tribal Council:

                RAPPORT AND MARSTON
                405 West Perkins Street
                Ukiah, California 95482
                BY:  **LESTER J. MARSTON**

For Picayune Rancheria Tribal Gaming Commission, Chaired by
Dyann Eckstein:

                TILDEN, MCCOY & DILWEG, LLP
                4151 Redwood Avenue, Unit 307
                Los Angeles, CA  90066
                BY:  **RORY E. DILWEG**

For Picayune Rancheria Tribal Gaming Commission, Chaired by
Andrew Hofstetter:

                Vasquez Estrada & Conway LLP
                Courthouse Square
                1000 Fourth Street, Suite 700
                San Rafael, CA 94901
                BY:  **THOMAS WEATHERS**

3

APPEARANCES CONTINUED:

For the Distributees:            LAW OFFICES OF GARY J. MONTANA
                                 N 12923 N. Prairie Road
                                 Osseo, WI 54758
                                 BY:  **GARY J. MONTANA**

4

1  Wednesday, October 29, 2014        Fresno, California
2  9:00 a.m.
3          (The following proceedings were had in open court, to
4  wit.)
5          THE COURT:  Thank you, everyone.  Please be seated.
6          Let us call the case of State of California versus
7  Picayune, et al., Action Number 14-CV-1593.
8          Counsel, could I have your appearances, please.
9          MR. TORNGREN:  Bill Torngren, Deputy Attorney
10  General, on behalf of the State of California, your Honor.
11          MR. MARSTON:  Good morning, your Honor.  Lester
12  Marston with the law firm of Rapport and Marston, on behalf of
13  the Tex McDonald Council.
14          MR. WEATHERS:  Good morning, your Honor.  Tom
15  Weathers, attorney for one of the two Tribal Gaming
16  Commissions, the one chaired by Andrew Hofstetter.
17          THE COURT:  All right.
18          MR. DILWEG:  Good morning, your Honor.  Rory Dilweg
19  on behalf of the Gaming Commission chaired by Dyann Eckstein.
20          MR. QAQUNDAH:  Good morning, your Honor.  James
21  Qaqundah on behalf of the Tribe through the Reid Council, the
22  Reid Group.
23          MR. HASH:  Good morning, your Honor.  Geoff Hash with
24  Rosette, LLP, on behalf of the Tribe through the 2014
25  Unification Council.

1        MR. ROSETTE:  Good morning, your Honor.  My name is

2   Rob Rosette, with Rosette, LLP, on behalf of the United States

3   recognized 2010 Council, the 2011 Council, the United States

4   recognized 2012 Council, the General Council sanctioned 2013

5   Council, and the 2014 Unification Council.

6        THE COURT:  All right.  Anybody on the phone?  All

7   right.

8        MR. MONTANA:  Your Honor, Gary Montana on behalf of

9   the Distributees.  I just entered an appearance this morning

10  and filed a motion pro hac.

11       THE COURT:  Yes, I signed that order, thank you.

12       My understanding of the settlement conference that

13  took place on October 24th, while a great deal was not

14  conveyed to me substantively, the result was, and that is that

15  there was no progress.

16       Does anybody wish to correct that statement?  Okay.

17       All right.  We are here, of course, today pursuant to

18  the State of California's request for an injunction as an

19  alternative and aftermath to the issuance of the TRO, the TRO

20  that was amended at the last hearing that occurred in this

21  courtroom on October 15.

22       The Court has received and reviewed approximately --

23  well, hundreds and hundreds of pages of argument, declarations

24  and documentation since then, and I, if it was filed, I read

25  it, even that which was filed last evening.

1          I note that you, Mr. Rosette, you have requested that

2     seven witnesses testify.  In looking at the scope of testimony

3     that you are proffering, it appears to me as though Witnesses

4     Stanley, Ayala and Lewis are not of help to what my function

5     is today.

6          I do have a question of the government on the issue

7     of Witnesses McLoughlin and Rosson.  Have you seen the scope

8     of testimony?

9          MR. TORNGREN:  Yes, your Honor, I have.  I don't know

10    that they are competent to testify, in that I believe neither

11    Ms. Rosson or the other proffered witness was on site on the

12    night of the events.

13         However, I have no objection to their appearing

14    subject to that and my cross-examination, your Honor.

15         THE COURT:  Well, the real question is I note that in

16    the Document 30, which was the Defendant's Response to the

17    Plaintiff's Request For Preliminary Injunction, signed by

18    Mr. Rosette, on page 2, sub A of the argument and going on to

19    page 3, he is basically objecting, indicating that "There is

20    no evidence before this Court that the Elected Leadership's

21    Security or Casino Security ever possessed any firearms."

22         What information do you have that they did?

23         MR. TORNGREN:  Your Honor, that was covered in the

24    reply brief.  Specifically, with respect to firearms, we have

25    the evidence from I believe it is Mr. Flores.

1          His declaration states, in effect, that he was

2     carrying a firearm that night; that the McDonald Group police

3     or security force did not take that firearm away from him and

4     that was how he knew that they were not truly law enforcement

5     officers.  So we have that testimony from him.

6          We also had testimony from or another declaration

7     filed by another witness, referred to, again, in our reply

8     brief, who stated that Rudy Flores had a firearm.

9          We also have the Oliveira declaration provided by the

10    McDonald Group that says there were firearms on campus and

11    that those were in the possession of SCT.

12          THE COURT:  Mr. Rosette, do you agree or disagree

13    that there is at least a conflict of testimony or evidence to

14    indicate whether your objection is correct or the Attorney

15    General's position is correct?

16          MR. ROSETTE:  Your Honor, I believe that the Attorney

17    General's position is correct, but upon further investigation

18    by myself, there were no -- there was a particular security

19    guard that controlled the perimeter of the property.  And I

20    felt as though those specific issues could be clarified to the

21    Court.

22          Secondly, they could offer testimony with regard to

23    whether or not firearms are being carried now.

24          THE COURT:  Okay.  On the issue one, I think that for

25    the purposes of this Court, all I need to know is that there

1    is a dispute.  I'm not sure I need to resolve that dispute on

2    who was carrying what, one.

3          Two, on the issue of what is going on now and who is

4    carrying what, what is your proffer?

5          MR. ROSETTE:  Well, it is that they are complying

6    with the Tribal Resolution that was passed, as well as the

7    restraining order, and that there are no weapons now

8    currently.

9          THE COURT:  Does anybody have information to dispute

10   that proffer?

11         MR. TORNGREN:  Your Honor, to the best of the State's

12   knowledge, as stated in the supplemental declaration of

13   Mr. Dhillon, the TRO appears to be complied with with respect

14   to weapons.

15         THE COURT:  So the answer is no?

16         MR. TORNGREN:  Yes.  The answer is no, your Honor.

17         THE COURT:  Then it would appear as though it is

18   moot.

19         MR. ROSETTE:  Okay, your Honor.  I thank you for that

20   consideration.

21         We had one other witness that we listed, Jennifer

22   Stanley, who is a former Councilwoman -- current Councilwoman

23   on the 2010 United States recognized Council, who was willing

24   to testify with regard to the PowerPoint presentation that I

25   provided to you that sort of explains in a simplified fashion

1    the makeup of the various Tribal Councils.

2            I think that the PowerPoint really speaks for itself,

3    but to the extent you would like to be walked through that, we

4    offer up 2010 Councilwoman Jennifer Stanley.

5            THE COURT:  I did read it; it was not difficult for

6    me to follow.  There was no confusion, as far as I was

7    concerned, on the PowerPoint.

8            MR. ROSETTE:  Okay.  I think that suffices for me,

9    your Honor.  Thank you.

10           THE COURT:  All right.  Does anybody have, based on

11   the scope of testimony proffered, does anybody have any

12   objection to hearing from Witnesses Tan and -- spelling is

13   C-h-h-o-m?

14           MR. TORNGREN:  Your Honor, the State has no

15   objection.

16           THE COURT:  Does anybody have an objection?  All

17   right.

18           Is there any reason we should not now call the

19   witnesses?

20           Mr. Rosette?

21           MR. ROSETTE:  Yes.

22           Is Khammy Chhom present?

23           Your Honor, my witnesses are not here, so I apologize

24   for that.

25           THE COURT:  Neither one?

1          MR. ROSETTE:  I don't see them.

2          THE COURT:  Okay.  That takes care of the witnesses.

3          All right.  Now, the real question to me is based on

4   everything that has been received and reviewed by the Court,

5   and I assume, of course, received and reviewed by counsel,

6   does anybody need to be heard on a matter of response that has

7   not been dealt with that is new?

8          MR. TORNGREN:  Your Honor, I would, on behalf of the

9   State.  We were not provided with Exhibit A to the Declaration

10  of John Oliveira.

11         That Exhibit A purported to be a video.  I requested

12  that on Monday.  I re-requested it on Tuesday.  I still have

13  not received it.

14         I guess the question I have is, is that something

15  that was really presented to the Court and did the Court have

16  an opportunity to review that video?

17         THE COURT:  I don't remember receiving a video.  I

18  will tell you that I have dealt with about 200 cases this week

19  and several of them have had videos.  What is --

20         MR. MARSTON:  This is Les Marston.  The exhibit was

21  not submitted to the Court nor was it served on the parties.

22  I have yet to get the video.

23         As soon as I get it, I intend to file it with the

24  Court.

25         THE COURT:  So it is not something I have considered,

1   so apparently it is not anything anybody has considered at

2   this point.

3           MR. TORNGREN:  Thank you, your Honor.

4           THE COURT:  Any other issues from anybody else,

5   something that needs to be clarified that's new?

6           MR. QAQUNDAH:  Yes, your Honor.

7           THE COURT:  Yes.

8           MR. QAQUNDAH:  Regarding the TRO and the preliminary

9   injunction, if it does issue, it is our understanding that per

10  capita payments were made to some tribal members, but not all

11  of the tribal members on the 2010 Enrollment List, as was

12  ordered in the Court's TRO, per the transcript.

13          THE COURT:  You are talking about an order to show

14  cause.

15          MR. QAQUNDAH:  And we just learned of this, so I

16  wanted to bring it to the Court's attention.

17          THE COURT:  Well, I can't do anything about or act on

18  an issue of an order to show cause without a formal filing.

19          MR. QAQUNDAH:  Sure.  The other point, that leads

20  into the second point, however, your Honor, which is regarding

21  the preliminary injunction, if the Court enters one, we would

22  request that the order -- that the Court issue a clear order

23  that's public so that --

24          THE COURT:  Just so -- I can probably cut through

25  this.  It is my intention that when we are through here today

1    with today's hearing, that I will take it under submission and

2    I will issue a written order that does not have to refer back

3    or incorporate by reference the TRO and/or the record here

4    today.

5         It will be issued and it will be issued this

6    afternoon before I leave work sometime.  Whether it is in the

7    evening, it will be issued today.

8         MR. QAQUNDAH:  Thank you very much, your Honor.

9         MR. MARSTON:  Your Honor, if I may.  You know, we

10   don't know whether the Court is going to issue a preliminary

11   injunction.

12        I'm assuming that what the Court was going to do was

13   allow argument on the preliminary injunction, and if the Court

14   determined it was going to issue a preliminary injunction,

15   then allow -- because if the Court is going to issue a

16   preliminary injunction, there is a number of points that I

17   would like to discuss with the Court regarding what should go

18   into the preliminary injunction.

19        THE COURT:  Well, I understand what you are saying.

20   I am waiting to make sure I have all the information from

21   everybody before I'm going to say I am or I am not.

22        But either way, I'm going to issue a written order

23   today saying yes or no, and it will be clear and it will be

24   thorough.

25        As far as the argument is concerned, I don't want a

1   rehash.  I didn't spend the hours I have spent in the last

2   week reading hundreds and hundreds and hundreds of pages of

3   submissions from everyone to have simply people get up and

4   tell me again what I just read.

5          So I don't want rehash.  If that's --

6          MR. MARSTON:  Well, I have no additional argument to

7   make that wasn't in my briefs, unless the Court has questions

8   about the legal arguments that we advanced in our brief.

9          THE COURT:  No, I don't.  I don't think that anybody

10  was unclear.  The positions were forceful and they were clear

11  in the documents that were submitted.

12         MR. ROSETTE:  Your Honor, my witness, Khammy Chhom,

13  just showed up.  Is it too late to call her?

14         THE COURT:  Well, tell me what is the importance at

15  this point of the testimony.

16         MR. ROSETTE:  Mostly with regard to the fact that

17  they serve as an unbiased sort of political entity, have

18  served faithfully for every single one of these Factions,

19  every single one of these Tribal Councils, and have taken,

20  through their own analysis, a direction that the Unification

21  Council is the proper interim governing body of the Tribe

22  until you get to a Clean Slate Election, and that the casino

23  can be operated in a safe environment during that interim

24  period.

25         THE COURT:  Well, I don't think that -- frankly, I

1    don't think that that's the real issue for me on the safety

2    matter.  The safety matter is not whether or not one faction

3    or another thinks that they can, with help from other people,

4    run the casino.

5          I think that the real issue for me is whether or not

6    the casino can be run in a safe manner.  Specifically, I will

7    get more blunt here.

8          I have not seen one piece of evidence, nor have I

9    heard what I consider to be legitimate argument, to indicate

10   that anybody's position has changed from the day before the

11   incident that brought this Court into this case.

12         In other words, obviously, my hope was that a

13   settlement conference would help, would perhaps distill, if

14   you will, some issues where there was some clarity and perhaps

15   some road where people could come together and have some type

16   of a legitimate, specific plan to move forward.

17         I am not seeing that.  What I am seeing is everybody

18   who had a position the day before the incident still has the

19   same position.  In other words, the explosive keg that was

20   present emotionally the day before the incident is present

21   now.

22         What have I missed?

23         MR. DILWEG:  If I might just interject, your Honor.

24   I represent Ms. Chhom and the Tribal Gaming Commission, and I

25   would proffer that she cannot testify as to who the governing

1   council is or anything like that.  She is a professional

2   employee of the Gaming Commission.

3        So I would object to her being asked questions about

4   who the governing council of the Tribe is.

5        THE COURT:  Well, to take your stress away, it

6   wouldn't make any difference to me, because this Court does

7   have limited jurisdiction.

8        I have not heard, nor have I received a stipulation

9   from anybody, indicating that everybody is waiving the Tribal

10  Commission's authority and they are giving it all to me.  And

11  I don't expect that, frankly.

12       So without that type of an agreement, I don't have

13  that sort of jurisdiction.

14       MR. ROSETTE:  Your Honor -- and I recognize that the

15  Court has a very deep reservoir of respect for sovereignty.

16       THE COURT:  I do.

17       MR. ROSETTE:  But what good is sovereignty if nobody

18  can recognize it?  And there is a Supreme Court case, *Williams*

19  *v. Lee*, that is a cornerstone of Federal Indian law, in every

20  Indian lawbook, textbook, et cetera, that says that the

21  definition of sovereignty really is the ability of Tribes to

22  enact their own laws and be governed by them.

23       And we put before you those General Council

24  Resolutions of 2013, which are pursuant to the Tribe's

25  Constitution, pursuant to the Tribe's laws.

1   None of these other groups come to you and state that

2 they have put together the effort to draw the entire

3 membership together.  It is only the second time in history

4 that they did it.

5   The first time was to close a $270 million loan and

6 authorize Chairman Lewis to sign those documents, and

7 Chairwoman Ayala.

8   And in those Resolutions, they granted the New York

9 Court jurisdiction to enforce them.

10   The Tribe followed the same process when it ran into

11 this problem with regard to calling the people together and

12 passing a General Council Resolution, and specifically giving

13 your court jurisdiction not to step into the fray, not to

14 favor one side over another, but to just simply defer that the

15 Tribe has passed its legislation pursuant to its own laws as

16 an expression of law as to who its leadership is.

17   For us to go down this road -- and see, we are not

18 asking you to step into a Tribal matter or favor one side over

19 the other.

20   In fact, by not recognizing the Tribe's expression of

21 legislation, ironically, it is exactly what you are doing, by

22 allowing other people to appear and hold themselves out as a

23 tribal government without that same legislation or that

24 deference.

25   You asked me a question last time that I just can't

1    stop thinking about, when I was asking you to acknowledge and

2    look to the things that I'm bringing forward as to why you

3    should recognize the 2014 Unification Council, and you asked

4    me, "Well, what if that's wrong?"

5          And I kept thinking about that, and that's why we put

6    together the PowerPoint.  First of all, we have got those

7    General Council Resolutions, and if they were good enough to

8    enforce -- to create the loan obligation, they ought to be

9    good enough for this Court to look to to make sure that that

10   collateral stays open and operative, because they are the

11   exact same Resolutions.

12         But I started thinking about that further.  And the

13   fact that we have done what the United States has asked the

14   Tribe to do, which is fix itself, and reached out to the

15   bodies that the United States in the past has recognized,

16   whether it be the 2012 Council or the 2010 Council, and pulled

17   them to the table, it gives the Court, really, the cover from

18   really every imaginable angle, whether it is a General Council

19   Sanction pursuant to Tribal legislation or the United States

20   recognition, the grant that has been delayed because of the

21   factions that appealed those decisions, eventually if we got

22   all of those bodies working together, we have got both Tribal

23   sanction and we have got United States sanction.

24         I'm the only attorney and the only attorney that's

25   representing these clients that's providing United States

1  letterhead and Tribal Government legislation to you.

2        And I ask you, I beg you to please consider that when

3  making a determination as to whether this casino can open.

4        THE COURT:  Mr. Dilweg, what is your position with

5  that argument?

6        MR. DILWEG:  My client fully supports the 2014

7  Unification Council and the Delegation that's been made from

8  the 2010 Council, the 2011 Council, the 2012 Council, and

9  the -- at least a portion of the 2013 Council.

10       Ms. Chhom, however, is not a political appointee.

11  She is not -- you know, she is an employee of the Tribal

12  Gaming Commission.  She is the Executive Director of the

13  Tribal Gaming Commission.

14       And so I would, you know, object to her being

15  questioned about political politics of the Tribe.

16       THE COURT:  I think that more directly, my question

17  is this.  We have a lot of people, many of whom are here, many

18  of whom were here for the hearing on the temporary restraining

19  order, and many people beyond those people who are terribly

20  affected by what's going on at the casino.  And their

21  livelihoods, frankly, are at stake.

22       MR. DILWEG:  Understood, your Honor.

23       THE COURT:  And they are sitting on the sidelines,

24  desperately wanting something to go forward, some definitive

25  statement to be made.

1          And, frankly, even though there is a great deal of

2    law on the issue of jurisdiction, on the issue of sovereignty,

3    on the issue of Compact with the State of California, I don't

4    think most of these people care a hoot about all that.

5          What they care about is their livelihood.

6          (Applause from the audience.)

7          THE COURT:  And they are saying -- just, please.

8          And they are saying, "Would somebody please step

9    forward and lead," because there are plenty of people who

10   would like to follow the leader.

11         They are looking to this Court.  And unfortunately, I

12   have to continue to remind everyone just how limited

13   jurisdiction this Court has.  And, of course, with

14   jurisdiction, limit of jurisdiction, comes a limit of power.

15         I would like nothing more than to have some

16   authority, have the authority to be able to say, "This is what

17   is going to happen, and whether everybody likes it or not, you

18   are to do this.  You are to get the business running again.

19   People are to stop thinking that guns are going to solve a

20   business problem or an agreement among Tribes or Factions."

21         But they keep looking to either the Commission, the

22   Gaming Commission, or to this Court.

23         Who should they be looking at and what is it that we

24   are supposed to do?

25         MR. MARSTON:  Your Honor, I would like to address the

1 Court.

2          THE COURT:  Just a second.

3          I'm asking you.

4          MR. DILWEG:  Your Honor, since I was first brought

5 into the dispute in 2013, March 1st, 2013, I have been trying

6 to make sure that my client continues to regulate the casino

7 and keep it open and keep it regulated.

8          Obviously, something happened on October the 8th, I

9 believe it was October the 8th, that caused that not to

10 happen.

11          And so my client really has no say in who the Tribal

12 government is, who the, you know, the governing body of the

13 Tribe is.

14          You know, we look to the Unification Council, and the

15 makeup of it makes sense to my client, and so that's why they

16 decided to work with the Unification Council.

17          I have -- throughout this whole process, it has

18 frustrated me throughout that there is no way to get these

19 issues, these governance issues heard because the Department

20 of Interior won't step in.

21          You have got the IBIA appeals that are going on.

22          But Assistant Secretary Washburn has basically washed

23 his hands of this whole thing.

24          The NIGC won't do anything unless the Bureau of

25 Indian Affairs does something, and now they are saying that

1    they won't enter into a reopening agreement with the Tribe

2    unless there is a governing body in place.

3            So, really, what happens is it is up to these

4    Factions to reach an agreement in order to reopen the casino.

5    Until that happens, I don't see the casino reopening.

6            MR. ROSETTE:  Your Honor --

7            THE COURT:  Just a minute.

8            So your position is as much as these people are

9    relying on the Federal Court, as much as they are relying on

10   the Gaming Commission, and it may not go beyond that for many,

11   your position is unless and until the Factions can reach their

12   own agreement, there is nothing that can be done.  The safety

13   factor still exists.

14           And people -- the casino is losing its ability to

15   bring in funds, and people, therefore, cannot be paid.

16           Is that what your position is?

17           MR. DILWEG:  Your Honor, my position is that prior to

18   October 8th, the casino was operating under the direction of

19   the General Manager and under the direction of the -- under

20   the regulation of the Gaming Commission.  And it was

21   regulating safely and consistent with the law, other than

22   certain audit issues which were caused by the various

23   Factions.

24           The attempted armed takeover of the casino changed

25   all that and dramatically changed the situation.

1          And it is very unfortunate for everyone involved.

2    The Gaming Commission has had to lay off employees, and the

3    casino has had to lay off employees.  And all of those people

4    are affected and all of those people are hurting.

5          And unfortunately, the situation that we had

6    previously, previous to the armed takeover, where the casino

7    was operating, it was being regulated properly, payments were

8    being made to the bond holders, payments were being made to

9    the tribal members, payments were being made to all the

10   vendors, changed dramatically when there was an armed takeover

11   attempt.

12         And I think that the Bureau of Indian Affairs could

13   do something.  Assistant Secretary Washburn could implement

14   Ms. Dutschke's letter immediately.  The IBIA could do

15   something, but they just won't.  And I don't know why they

16   won't.  You know, I have talked to them about it, but they

17   won't.

18         So I have been urging, in the limited capacity I have

19   as Tribal Gaming Commission Attorney, to all the parties to

20   sit down and try to work out at least a temporary solution

21   until we can get to an election where the Department of

22   Interior and the NIGC can recognize someone.

23         MR. ROSETTE:  Your Honor, that is the significant

24   importance of those General Council Resolutions, particularly

25   when you look at the folks sitting at the table.

1      The General Council Resolutions were voted upon by

2  the Reid faction.  They participated in the entire General

3  Council process.  In fact, Morris Reid was elected pursuant to

4  the sanctioned election by the General Council as one of the

5  Tribal Council members.

6      And after that election took place, the General

7  Council again assembled for a third time in the Tribe's

8  history to affirm that election.

9      Now, just because that occurred didn't mean that

10 these Tribal leaders stopped working to reach out to Ayala and

11 the Ayala Faction, and they did so.  That's the agreements

12 with the Unification Council to pull them in in hopes that

13 they could have one Clean Slate Election.

14     We worked hard.  You see the evidence.  We continued

15 to work hard to bring Tex McDonald into that fold.  The goal

16 is to treat the Tex McDonald Faction with the same dignity and

17 respect as every one of those other Tribal Councils.

18     The problem is, is they didn't like the makeup of

19 that for whatever reason, so they used arms to close the

20 casino.

21     And, again, they come here now with unclean hands to

22 force their way into a negotiating table that the Tribe simply

23 shouldn't have to sit down and negotiate with.

24     They are a government.  They submitted the legal

25 governing documents to you.

1          And what we are asking you to do is not get involved

2    or to wade into those waters by allowing these people this

3    sort of standing when they don't have tribal --

4          THE COURT:  But --

5          MR. ROSETTE:  Sovereignty does not mean whack-a-mole.

6    You appease this Faction and another one pops up.  I see today

7    another lawyer and another Faction.  We could have 400

8    factions and 500 lawyers if we are not too careful, if we wade

9    into this water.

10         You have to look at the Tribe's Constitution, those

11   General Council Resolutions.  They state who the governing

12   body of the Tribe is.

13         They give you specific direction and grant you

14   jurisdiction not to recognize anybody, not to play favorites,

15   but to only provide deference to the will of the Democratic

16   people and the Constitution.

17         THE COURT:  Giving deference has its own issues,

18   because if you are on the side you are arguing, giving

19   deference means that I simply say, "What was should be now.

20   Open up the casino and let's move on."

21         The other side, of course, or the other sides, when

22   the Court does that, says, "By doing that, issuing that type

23   of an order, you are showing deference, you are making a

24   decision, you are wading in neck deep."

25         So getting right down to the distilled issue, I

1  certainly understand, and I feel deeply the frustration that
2  these people who want to go back to work feel.

3      I understand their frustration, because what they are
4  doing, most of them, most of them are not getting armed and
5  trying to get their way.  We know that.  Nobody is saying that
6  most of the people who are severely affected are trying to go
7  do that.

8      What they are trying to do is they are trying to
9  respect authority, both Tribal and this Court's authority, and
10 they are trying to get something done.  They want an answer.
11 They want a resolution.

12     And instead of getting a resolution, they keep coming
13 to the -- who they believe are the authorities.  And the
14 authorities are basically saying what we all seem to be
15 saying, and that is, "I can't do anything about this.  It's
16 somebody else's issue."

17     And as a result, we are basically turning away good
18 people and telling them, "Your reliance on the authority is
19 misguided."

20     And what statement are we making to these people?  We
21 are making a statement of, "You are on your own."

22     And when governmental authorities, Tribal authorities
23 make that type of a statement to people, that you are on your
24 own, that's called "street justice."  And we are basically
25 telling them, "Go ahead and take care of business."

1            MR. ROSETTE:  Your Honor, that's what it is, is

2     street justice.

3            And that's not what we have here.  We have

4     sovereignty.  We have the enactment of law and the ability for

5     those Tribes to govern themselves pursuant to that law.

6            THE COURT:  Then let me ask you --

7            MR. ROSETTE:  I read the record as well.  They don't

8     submit any -- they submit self-serving declarations as to what

9     they did to feel that they came into power.

10           I offered two objective third parties, the most

11    important of which is the people, the Tribal government, the

12    General Council, the same government --

13           THE COURT:  Your position is that your folks have

14    done everything right according to tribal law and that the

15    other people simply disagree with the process and with the

16    result.

17           MR. ROSETTE:  Your Honor, there is no infallible

18    party in this courtroom.

19           What I'm telling you is that that 2013 Council was

20    sanctioned by the General Council.  And that 2013 -- that's

21    why it is a hard swallow to look at this Unification Council.

22    I'm telling you, it is a far reach.

23           But they recognized, as leaders, that they needed to

24    reach out to these other Factions that were out there and act

25    consistent to decisions that the United States was making,

27

1  both with regard to that 2012 letter and the 2010 letter.

2          And now what I heard at the last hearing, was, well,

3  the 2010 letter, the 2010 Council has been appealed, so we

4  can't look at that.

5          They succeeded convincing the IBIA judge, in order to

6  not let that go into effect immediately, three things:  One,

7  there were no guns or threat of violence -- this is the

8  McDonald Faction that made these cases -- two, that we are not

9  in default with our casino, and closure of a casino is

10  default; and, three, that we could provide government programs

11  through a casino and we did not need government money.

12          All three of those are off the table.

13          So I will argue, well, the 2012 Council, then, is

14  also recognized by the United States.

15          And, of course, they very eloquently point out to you

16  that the 2010 Council vacates that decision.

17          Well, if we can't make the 2010 Council effective

18  immediately in its state, then the 2012 Council is effective

19  still.

20          So that's what I'm trying to point out to you, is

21  this is a vicious abuse of the administrative legal process to

22  not bring closure to these legal issues.

23          But in both those letters, the BIA says one thing:

24  The Tribe can fix these problems internally.

25          And that's why I come to you not only encompassing

1   both of those Decisions, but I'm bringing real General Council

2   Resolutions to you of quorums of this body to secure $270

3   million of notes.

4          And if New York accepted jurisdiction on the basis of

5   those Resolutions because the General Council was clear, they

6   were equally clear that this Court and you also have

7   jurisdiction to make sure we that are able to keep that casino

8   open.

9          The other side simply has not put that evidence in

10  front of you.  They have not been able to assemble a General

11  Council.

12         THE COURT:  You aren't suggesting that this Court has

13  authority to open up the casino, are you, by itself?

14         MR. ROSETTE:  Oh, no.  We still have to address the

15  NIGC issues, which the audits have been submitted and we are

16  working on that.

17         But what we are asking this Court to do is make sure

18  with regard to the preliminary injunction that the status quo

19  is maintained and that there was a government in place and

20  that it was functioning properly and that that can continue to

21  stay in place.

22         And I understand what you are saying about the powder

23  keg, but I think the powder keg has been diffused in two ways.

24         First of all, the TRO itself is extremely critically

25  important, but secondly, and I notice the Sheriff is here, but

1   there was a recent announcement with regard to his

2   recommendations by the Madera County Sheriff's Office for

3   indictments to come down on 11 of those McDonald Faction

4   officers, which is another diffusion of that powder keg that I

5   think helps with regard to making sure that this casino is

6   operated safely.

7           THE COURT:  I don't know whether that's so or not.

8   Sometimes indictments, which, as you know, are only

9   accusations --

10          MR. ROSETTE:  They are not actually indictments, your

11  Honor.  They were recommendations to the District Attorney.  I

12  apologize for that.

13          THE COURT:  Well, let's assume that the charges are

14  brought.  Even so, those are charges.  It is not up to me to

15  determine, first of all, whether they are going to be brought;

16  secondly, whether or not the accusations are accurate; or

17  thirdly, what effect accusations and, frankly, and/or

18  convictions, if there are any, will have in the safety issue,

19  which is my issue.

20          MR. ROSETTE:  Got it.

21          MR. WEATHERS:  May I be heard, your Honor?

22          THE COURT:  Yes.

23          But as soon as you are.  Yes, sir, you have been

24  waiting.

25          MR. MONTANA:  May I approach, your Honor?

1          THE COURT:  You can.

2          MR. MONTANA:  Your Honor, I am Gary Montana.  I'm a

3     Native American attorney who has been practicing about 30

4     years.

5          And I apologize for getting involved in this case at

6     a late date, but I see all this misinformation being given to

7     the Court, and I can't stand by and listen to it.

8          You know, everybody would agree that we have to

9     follow the Tribal Constitution.  The Constitution requires

10    certain things to be elected to office.  It also requires or

11    has provisions in it where people can be removed and/or

12    provisions where people can be disenrolled.

13         You know, if you want to talk about the 2010 Council,

14    that Council was recognized by Amy Dutschke in February --

15         THE COURT:  Okay.  Wait a minute.  I don't need to

16    get into all of this.  What I really do need to get into,

17    however, is for me to make decisions on the issue of the

18    safety --

19         MR. MONTANA:  Yes, I'm going to get to that issue.

20    My issue is --

21         THE COURT:  You are going to get to it a little

22    faster than you want.

23         MR. MONTANA:  Okay.  I'm sorry, your Honor.

24         The issue is that I have a problem with the

25    standing --

1          THE COURT:  Sir, hang on.  What I'm trying to focus

2     in on here, because it is my issue --

3          MR. MONTANA:  Yes, your Honor.

4          THE COURT:  -- if you are representing to me that

5     people must follow the Tribal Constitution --

6          MR. MONTANA:  Yes.

7          THE COURT:  -- and that there are procedures that

8     must be followed, and once they are followed and decisions

9     made, they must then be abided by by everyone --

10         MR. MONTANA:  Yes, your Honor.

11         THE COURT:  -- then where are the teeth in that

12    statement?  In other words, if it is so defined by procedure

13    within the Tribal Constitution, where are the teeth to enforce

14    it?

15         MR. MONTANA:  Well, the Constitution allows for the

16    Tribe to create a tribal court system, and if you look at all

17    of the --

18         THE COURT:  Let's assume they do.

19         MR. MONTANA:  They did.

20         THE COURT:  Okay.  Just a minute.  Let's assume that

21    that's true, that that's what happened.

22         Then where are the teeth in that Constitution to

23    enforce the decisions and the findings that occur when the

24    proper procedure is followed?

25         MR. MONTANA:  Well, that decision of November 2013,

1   which delineated substantively who was on Council and who was

2   not on Council, which many of Mr. Rosette's clients were not

3   on Council.

4           THE COURT:  Let's deal with the bigger picture

5   instead of the inner fighting.

6           MR. MONTANA:  Okay.  So that would then go to Federal

7   Court under comity.

8           And I'm trying to figure out why counsel for the

9   McDonald Faction has not filed that with the Federal Court to

10  give comity to that order, because that would resolve

11  everything.

12          Federal courts, state courts do not have jurisdiction

13  to resolve these issues.  Only Indian --

14          THE COURT:  Let's assume what you just said is

15  correct.

16          MR. MONTANA:  Correct.

17          MR. MARSTON:  We filed that action, by the way, your

18  Honor, and you dismissed it because they weren't the Tribal

19  Court.

20          THE COURT:  I was going to say it's the wrong

21  jurisdiction.  You are the one who keeps telling me that.

22          MR. MARSTON:  Well, no, no.  We brought an action in

23  Tribal Court to resolve the inter-Tribal governmental dispute,

24  to have an independent Tribal Court determine under Tribal

25  law, do the Tribe's Constitution, Election Ordinance and

1   Enrollment Ordinance, who the lawful governing body of the

2   Tribe was.

3           The action was brought.  All the parties were served.

4   All the parties were before the Tribal Court.

5           Now, the then Lewis Faction, who were properly

6   served, failed to appear in that court, and a final judgment

7   was entered.  Findings of fact, conclusions of law were

8   entered by the Tribal Court.

9           And just so you know, the Tribal Court judge that was

10  selected in order to ensure the fairness in the process, a

11  Tribal Court judge, who was a retired Solicitor with the

12  United States Department of Interior, who had no connection

13  with the Reservation whatsoever other than a Judicial Services

14  contract to come in and hear, you know, motions for temporary

15  restraining order, preliminary injunction, motion for summary

16  judgment under Tribal Court rules of civil procedure and

17  evidence that were mirrored after the Federal Court's rules of

18  civil procedure and evidence, heard testimony, entered

19  findings of fact, conclusions of law and entered a final

20  non-appealable judgment.  Nobody took an appeal from that

21  judgment.

22          And then we took that action and we filed it.  We

23  filed it, and we brought an action in Federal Court here in

24  the Eastern District, asking the Federal Courts to recognize

25  and enforce that Tribal Court judgment.

1    And the federal -- and the Lewis Faction objected.

2  They intervened and objected on the grounds that in order for

3  this Court to determine whether or not that Tribal Court

4  judgment was valid, you would have to determine who the lawful

5  governing body of the Tribe was that had the authority to

6  appoint the Tribal Court judge.

7    And of course we argued, and I think rightfully so,

8  that if you are going to challenge the jurisdiction of the

9  Tribal Court, then you have got to go back and make that

10 argument in the Tribal Court.

11   And since they never appeared, they were then

12 precluded from raising that issue in the federal court.

13   And we asked this Court to recognize and enforce that

14 judgment.  And I can't remember if it was you, your Honor, or

15 one of the other judges here in Fresno, dismissed the action.

16   THE COURT:  Okay.  You understand, I'm sure, as do

17 all counsel, that jurisdiction is never waived.  Ever.

18   MR. MARSTON:  Understood.  But the recognition and

19 enforcement of a Tribal Court judgment, the Ninth Circuit has

20 made very clear in the *Marchington* case, *Marchington vs.*

21 *United States* -- I can't give you the cite off the top of my

22 head -- has made it very clear that the Court has 1331

23 jurisdiction to recognize and enforce a Tribal Court judgment.

24   THE COURT:  Then let me ask you this.  If what I'm

25 hearing is correct from both of you, that there are processes,

1   there are procedures, they are definite, they are

2   enforceable --

3         MR. MONTANA:  Yes.

4         THE COURT:  -- and you brought the case into the

5   Eastern District of California before whichever judge it was,

6   and that judge dismissed it, did it then go to the Ninth

7   Circuit?

8         MR. MARSTON:  No, it did not.

9         THE COURT:  Well, that is our process, is it not?  If

10   you think that the district judge was wrong, you have to go up

11   to the next level.

12         MR. MARSTON:  Well, I know that, your Honor.  My

13   clients didn't authorize me to take an appeal to the Ninth

14   Circuit.

15         (Parties speaking simultaneously.)

16         THE COURT:  Wait.  One at a time.  I will get to you.

17         MR. MARSTON:  But we did before this Court, in our

18   pleadings before this Court, as an attachment and exhibit to

19   one of the declarations before you, your Honor, and as I'm

20   sure you know, since you read all the pleadings, is a copy of

21   the Tribal Court finding of facts, conclusions of law and

22   final court judgment that was entered in that case.

23         THE COURT:  I do understand, but what I'm trying to

24   get to here is if all of these procedures exist and all of

25   these people who are affected by what we are doing here and

1  what you are doing, if they are correct in giving us the

2  authority and the responsibility to get to a conclusion that

3  is workable, that is enforceable, and that is safe, then the

4  procedures need to be followed.

5          MR. MONTANA:  Yes.

6          THE COURT:  They need to be moved forward vigorously.

7          MR. MONTANA:  Yes.

8          THE COURT:  And if you believe that there is a level

9  that has failed, you are both representing to me that there

10  are remedies.

11          MR. MONTANA:  Yes.

12          THE COURT:  If you don't take the remedy that is

13  available, it is not okay to then arm somebody and go say, "I

14  will take care of it myself."

15          It just doesn't work that way.  And look at what has

16  happened as a result of that.

17          MR. MONTANA:  Can I make one point, your Honor?

18          THE COURT:  Yes, you can.

19          And then I will get back to you.

20          MR. MARSTON:  At some point, I would like to address

21  the Court too.

22          MR. MONTANA:  My point is on August 25th,

23  Mr. Rosette's clients, with their private security, came into

24  the casino armed and took over the 11th floor.

25          THE COURT:  Sir --

1          MR. ROSETTE:  No, that's not --

2          THE REPORTER:  Hang on.

3          THE COURT:  Wait, wait.  Stop.  Listen to me.

4          MR. MONTANA:  Yes, your Honor.  I apologize.

5          THE COURT:  Getting into these specifics of who did

6    what and pointing --

7          MR. MONTANA:  Yes.

8          THE COURT:  -- that is what is frustrating the entire

9    system, including all of these poor people who are wanting to

10   work and can't because of this inner fighting.

11         You all know that.  This is not a news brief to you.

12         What I'm trying to do is I am trying to distill a

13   bigger issue, not the inner -- the pointing back and forth,

14   and so that ultimately somebody, whoever that is, can say,

15   "You are right, and they are wrong."

16         The bottom line here is the people that are being

17   most severely affected by this are not the leaders.  They are

18   the people who have chosen to follow, and they believe they

19   have picked the right leaders, and frankly, they might be

20   wrong.

21         And we don't want, at our level or at your level or

22   at anyone's level, nobody wants tyranny.

23         MR. MONTANA:  Yes, your Honor.

24         THE COURT:  And it has been argued in this courtroom

25   at the last hearing by one of the counsel that that is what we

1  are facing here.  And I think that that is exactly why the

2  Attorney General stepped into this and brought this case to

3  us, because tyranny always causes unsafe conditions for

4  people.

5         The last thing in the world anybody wants is loss of

6  life or terrible injury to somebody physically.

7         MR. MONTANA:  I don't think, your Honor, if I might,

8  in closing just say that my clients are not opposed to a

9  preliminary injunction being issued, but they would like the

10 opportunity to brief the issue of Tribal Court jurisdiction

11 and what has happened factually, because I have been involved

12 off and on for two years since the second takeover occurred in

13 February 2013.

14        THE COURT:  You know, part of the problem in your

15 request and also in much of this argument, almost all of it,

16 at the last hearing and at this hearing, is that nobody wants

17 me to have too much jurisdiction, they just want me to have

18 enough jurisdiction to help them.

19        MR. MARSTON:  That's not true, your Honor.  We don't

20 think you have jurisdiction at all.

21        THE COURT:  Oh, I knew that.

22        MR. MARSTON:  Your Honor --

23        THE COURT:  But just a second.  Let me address that

24 issue, Mr. Marston.

25        When you submit this to me (Holding up a stack of

1   pleadings) and you say, "You have no jurisdiction, but go

2   ahead and read this, consider it, and decide," you have can't

3   have it both ways.

4           MR. MARSTON:  I'm not having it both ways, your

5   Honor.  I'm a lawyer, and you wanted me to give you the law

6   and you want me to tell you what my arguments and my position

7   are, so I have.

8           And I don't think you have jurisdiction.  You have

9   taken the position -- you have looked at 2710, and you have

10  said you think --

11          THE COURT:  I know what --

12          MR. MARSTON:  You --

13          THE COURT:  Counsel, counsel, I know what I have

14  said.

15          MR. MARSTON:  Yeah, you think you are --

16          THE COURT:  Counsel, you stop.  Your demeanor is

17  about ready to put you in jail.

18          MR. MARSTON:  Well --

19          THE COURT:  Do you understand me?

20          MR. MARSTON:  I understand you, your Honor.

21          THE COURT:  That is your last warning about your

22  demeanor, sir.  Stop.

23          MR. ROSETTE:  Your Honor?

24          THE COURT:  Yes.

25          MR. ROSETTE:  With regard to the *Marchington* case and

1   the Tribal Court issues, the distinction there is that in that

2   case, the Tribe's court was not in question.

3         Again, it goes to the underlying issues that you

4   state that you are trying to distill through.

5         Their Tribal Court is not sanctioned by the Tribal

6   Council.  I have provided to you a General Council Resolution

7   under the Tribe's Constitution, second time in their

8   history --

9         THE COURT:  I understand.  I have read it.

10        MR. ROSETTE:  -- sanctioning that Tribal Court.

11        We have the exact same arguments, and we will follow

12   your advice to move that remedy forward.

13        But with regard to distilling the bigger issue, we

14   are not asking that you favor one side over another.  Believe

15   me, I told you last time that this Unification Council does

16   not march in lockstep.  You would have to sit in the room for

17   ten minutes and you would understand that yourself.

18        But what they are doing is trying to figure out to

19   address the issues that you are trying to address based on the

20   legal authority of a third party.  That's the General Council.

21        The one thing that's not being said is that this is a

22   Democratic form of government that belongs to the people, and

23   the people have assembled and they did sanction who their

24   leaders were.

25        And then their leaders, understanding the issues that

1    we are formulating here, that in order to avoid where we are

2    today, reached out to these other Factions that were

3    recognized by the United States, specifically Ms. Ayala, and

4    pulled them in to make sure that everybody could work for a

5    couple of goals:  Clean Slate Elections, forensic audits, and

6    ensuring a safe and peaceful environment.

7              In their minds, the restraining order was welcome

8    because that's a key component, as you put it, to keep the

9    powder keg from blowing.

10             THE COURT:  Okay.

11             MR. QAQUNDAH:  Your Honor, may I speak to your

12    question that you asked earlier regarding --

13             THE COURT:  You may, and then we will wrap this up

14    because I'm not hearing anything new.

15             MR. QAQUNDAH:  Okay.  I want to provide some bit of

16    information.

17             THE COURT:  Give me the new information.

18             MR. QAQUNDAH:  The new information is that, as you

19    have pointed out in the order, that there was not a settlement

20    reached; however, there are ongoing discussions.

21             And hopefully, those will get to progress somewhere.

22    And we think it's important to not grant an advantage to any

23    Faction here, and that would be the fastest way to reach an

24    agreement because that would be a way to give a real shot to

25    getting an agreement.

1          Regarding your question earlier, you know, the Tribe

2    is not an island.  It does have to interact with other

3    government agencies, including the Department of Interior and

4    the NIGC.

5          As Mr. Dilweg pointed out, the NIGC has pointed out

6    it will not allow the casino to open until there is a

7    resolution regarding the government issue.  That's consistent

8    with the NIGC's precedent, which says that gaming activities

9    by an entity that's not recognized by the Department of the

10   Interior is, essentially, unregulated, and unregulated gaming

11   is a threat to public safety.

12         That's cited in our complaint in the Northern

13   District that we filed, which is in the record.

14         As you may be aware, and contrary to Mr. Rosette's

15   statements, the Department of Interior has not recognized any

16   Tribal Council.

17         MR. MONTANA:  Yes.

18         MR. QAQUNDAH:  And there has been no effective

19   decision.  And just within the last few days, Assistant

20   Secretary Kevin Washburn -- I think Mr. Dilweg referred to

21   this -- issued a letter saying that the Department of Interior

22   would not do so.

23         That's the subject of our lawsuit, the Reid Council's

24   lawsuit, in the Northern District.  And we think and we argue

25   that they are required under federal law to recognize the

1  tribal government for government-to-government purposes, on an

2  interim basis, or otherwise, which they have not done since

3  the beginning of this dispute in December 2011.

4          Going towards that, we think, and as I said before,

5  if -- right now, you have Factions that are asking this Court

6  to grant an advantage in one way or another.  People are

7  jockeying for a position.

8          And we think the best way to resolve this, and as

9  fast as possible, is to actually have the Tribal Groups come

10  together and resolve this dispute within themselves, and then

11  they can go to the Department of Interior, and that is the

12  mechanism we can go through.

13          THE COURT:  If I could order it, I would.  If I could

14  order the Factions to meet, confer, and agree, I would.

15          MR. ROSETTE:  Your Honor --

16          THE COURT:  If it were that simple.  It isn't.

17          MR. QAQUNDAH:  Well, if I may just piggyback on that

18  a little, that is why we are asking for a clear order so

19  certain factions cannot spin or attempt to spin the order to

20  try and jockey for a position with the Tribe and other

21  entities.

22          THE COURT:  My orders are not known for being

23  spinnable.

24          MR. ROSETTE:  I agree, your Honor.

25          Your Honor, may I -- can I point out exactly what's

1   being asked here?

2          They are saying that you should not give one side an

3   advantage over the other because that's going to force people

4   to negotiate.  And I just point that out, because if you

5   listen to that statement, who is trying to assert leverage

6   here?

7          THE COURT:  You all are.

8          MR. ROSETTE:  What we are asking to you do, your

9   Honor, is not wade into those waters at all, because by wading

10  into those waters and not recognizing the General Council

11  Resolutions -- and they are consistent through the Unification

12  Council, those past United States actions -- you are providing

13  preference to these groups.

14         One is an anti-majoritarian, two council leaders that

15  sit on a couple of these boards.

16         And then the people are coming to the table with bad

17  faith.  They are seeking your order to give them that equal

18  seat at the table and to give them that advantage.

19         That's what's happening ironically by stepping into

20  that.

21         We are just asking you to look at what the people

22  have said.

23         THE COURT:  Counsel, I understand.

24         MR. WEATHERS:  Your Honor, I --

25         MR. MONTANA:  If I could say one thing, I will sit

1  | down, your Honor.

2  |       The issue that he keeps going back to, those

3  | Resolutions passed by General Council, it is my understanding,

4  | and I'm sure that I have a lot of proof of it, that those

5  | people were paid to go to the meetings to vote, which makes it

6  | completely questionable.

7  |       THE COURT:  I can't get into those details.

8  |       MR. MONTANA:  I want to thank you for allowing my

9  | Distributees to be part of this procedure, and I appreciate

10 | it, your Honor.  And may I be excused?

11 |       THE COURT:  You may.

12 |       MR. MONTANA:  Thank you.

13 |       MR. MARSTON:  Your Honor, may I address the Court?

14 | Mr. Rosette has gotten a considerable amount of time.

15 |       THE COURT:  Hang on a second.

16 |       MR. MARSTON:  I would like to respond.

17 |       MR. WEATHERS:  Thank you, your Honor.  Tom Weathers

18 | for -- while there is one Gaming Commission, there is a

19 | dispute as to who the Gaming Commissioners are.

20 |       I would actually agree with much of what Rory Dilweg

21 | said.  The Gaming Commission doesn't pick the Tribal

22 | leadership.  We just regulate the casino.

23 |       So I'm the attorney for the Commission that's

24 | appointed by the McDonald Tribal Council, chaired by Andrew

25 | Hofstetter.

1        I will just raise two quick points.  One, something

2   new.  You asked could I reopen the casino today.  And the

3   answer would be no.

4        Independent of your action, you have the NIGC issue,

5   but also the Gaming Commission chaired by Andrew Hofstetter

6   issued a closure order in light of the public safety concerns.

7   And so I have the order here if the Court would like to see

8   it.

9        And the second broader issue, what about all these

10  people, these employees, they are looking for leadership, for

11  guidance, for someone to do something.

12       And what popped into my head was sovereignty.  That's

13  the essence of sovereignty for this Tribal government.  This

14  Tribe has to figure it out.

15       And the analogy is the United States Congress.  The

16  United States Congress shut itself down and they had to

17  furlough Park employees and concessionaires.  And those people

18  were out of jobs for a while until the United States Congress

19  could figure out its business and reopen.  And I think that's

20  the essence of sovereignty.

21       And so there is no agreed-upon Gaming Commission

22  here, and so there is no regulatory body, and so the casino

23  can't be reopened until that gets resolved.

24       I think the parties have to sit down and figure it

25  out amongst themselves as an expression of the Tribe's

1   sovereignty.

2         THE COURT:  And my biggest concern about that, if

3   that be true, is that if the factions meet and confer and

4   cannot figure it out, then what happens is the casino goes

5   broke.  There is no money coming in.  People will not be paid.

6   People will not be working.

7         And everybody can, I suppose, leave the meeting

8   saying, "Well, we couldn't agree because we are principled

9   people," as everybody else dives and burns.

10         Doesn't seem like a very good solution to me.

11         MR. WEATHERS:  Understood.

12         MR. MARSTON:  Well, as much as it doesn't seem like a

13   good solution, and it is not, just as you have said, your

14   Honor, you are a court of limited jurisdiction.

15         And I'm not going to -- I don't think -- you,

16   obviously, know my position on jurisdiction, but assuming you

17   have jurisdiction, the one thing that is clear in this

18   Circuit, the Ninth Circuit has made very clear, you don't have

19   the authority to do what Mr. Rosette is asking you to do.

20         You don't have the authority to examine the Tribal

21   Constitution or look at these General Council Resolutions and

22   interpret Tribal law and determine who the lawful governing

23   body of the Tribe is.

24         As frustrating as that is and as much as you want to

25   do it, the law in the Ninth Circuit is clear that Federal

1  District Courts do not have jurisdiction to determine who the

2  lawful governing body of the Tribe is.

3        THE COURT:  You are incorrect when you say as much as

4  I want to do it.

5        MR. MARSTON:  Okay.

6        THE COURT:  I don't want to do it.  And I agree with

7  you, you and I are in agreement, total agreement, that it is

8  not up to this Court to do that and I don't have jurisdiction

9  and I don't have power to do it.

10       What I was simply saying was how frustrating it is to

11 people who don't understand the complexities of Tribal law and

12 federal law, to come into a court, whether it be tribal or

13 federal, and have people say, "It's somebody else's issue, it

14 is somebody else's problem.  I cannot give you a definitive

15 answer.  I can't even tell you that you win or that you lose."

16       And that is the frustration that people are feeling,

17 and I understand exactly why they are feeling that way.

18       And what I am trying to convey here is for people to

19 focus more from the standpoint of people who don't understand

20 why they can't get an answer, and recognize and focus in on

21 the responsibility of all counsel to attempt to come up with

22 an answer for them.  That's all I'm saying.

23       MR. ROSETTE:  Your Honor --

24       MR. MARSTON:  Your Honor --

25       THE COURT:  Wait just a second.

1          MR. MARSTON:  The one thing that is before you,

2    assuming you have jurisdiction, and I think you believe you

3    do.

4          THE COURT:  You know I believe I do or I wouldn't be

5    sitting here.

6          MR. MARSTON:  So what is before you, you know, we

7    kind of, I think, got off track.  That we are here on the

8    State's motion for a preliminary injunction.

9          THE COURT:  Exactly.

10          MR. MARSTON:  So on the motion for a preliminary

11    injunction, the issues that are before you is:  Can the State

12    show probable success on the merits?  Is there going to be

13    irreparable harm?  And is this an appropriate case for posting

14    a bond?  Those are the issues that are before you.

15          And our position, obviously, is that at this point,

16    there is still the NIGC order that's in effect.  And of

17    course, you know our position is that really moots out this

18    Court's jurisdiction.

19          I understand that the Court believes that your order

20    is broader than the NIGC order.  And of course, my position is

21    that's true, but if the casino at this point is shut down and

22    if there is the need for further orders, the appropriate place

23    to bring that is back to the NIGC and let them modify their

24    order, not for this Court to go into an area that the NIGC --

25    clearly, Congress has given the NIGC exclusive jurisdiction

1   over casinos and the authority to issue temporary closure

2   orders and permanent closure orders.

3           THE COURT:  Well, you did, I'm sure, catch the hint

4   of this Court when it amended the TRO on the issue of

5   indicating that if the Commission removed their prohibition,

6   that this Court was most likely going to remove its giving the

7   government; specifically, the State of California, one-half of

8   one day to indicate to this Court why it should not go in

9   lockstep with the reopening of the casino.

10          So I don't think we are very far off on that.

11          MR. MARSTON:  A lot has been said about why the

12  Reunification Council is the valid Tribal Council.  And I know

13  that the Court is not going to get involved in the

14  inter-Tribal governmental dispute.  And I know the Court

15  believes, as it should, that it doesn't have jurisdiction on

16  that issue.

17          I just want to say one thing, and it is in our

18  briefs, and I know the Court has read it.  Everybody has been

19  talking about Tribal sovereignty, but everybody wants to sweep

20  Tribal law under the table.

21          The one thing you can say about the Reunification

22  Council is they have never been elected either through an

23  election of the people, or the Tex McDonald Council has never

24  been recalled through an election.

25          And the one thing you can say about the Tex McDonald

1   Council is it has held an election every time under the

2   Tribe's Constitution.  Whether people are willing to

3   participate in that election or vote in that election or run

4   for office, that's a separate issue, but they have always held

5   elections and the people that are on the Tex McDonald Council

6   were elected.

7          And of course, we believe they are the lawful

8   governing body of the Tribe and so do the other Factions, and

9   that's an inter-Tribal governmental dispute, and you don't

10  have jurisdiction to resolve it.

11         What you do have the jurisdiction to do, assuming you

12  believe you have got 1331 or 2710 jurisdiction, is to take

13  action to determine whether or not the State is going to

14  suffer any irreparable harm, whether or not they have a

15  likelihood of success on the merits, and whether a bond should

16  be issued.

17         And that's all that's before this Court.

18         THE COURT:  I understand that.

19         MR. ROSETTE:  Your Honor, can I make one comment?

20         THE COURT:  You can make it, but brief.

21         MR. ROSETTE:  If we pull you out of this tit-for-tat

22  on the election and not even look at sovereignty or governance

23  issues, what you do have jurisdiction and what you do have in

24  front of you is the ability to restore the status quo.

25         While a Court has broad discretion to grant or deny a

1   request for injunctive relief, permitting an overbroad

2   injunction constitutes an abuse of that discretion, and this

3   Court must narrowly tailor that injunctive relief to remedy

4   that specific legal harm.  The harm was the violence that

5   occurred at the casino.  The TRO addresses that harm.

6          So by restoring the status quo and keeping the TRO in

7   effect, you don't even have to address these governance or

8   sovereignty issues.

9          And that's the way that the -- your colleague in the

10  *Paskenta* matter addressed the issue as well.  And the State

11  was okay with that because the casino stayed open and it was

12  safe, but they didn't even have to wade into the

13  inter-governmental issues.

14         By keeping the status quo and having the restraining

15  order in place, we don't have to go down this other roads.

16         MR. QAQUNDAH:  Your Honor, very briefly?

17         THE COURT:  Lastly.

18         MR. QAQUNDAH:  I assume you don't need us to discuss

19  responding to the status quo arguments, the Tribal disputes.

20         THE COURT:  I understand the issue.

21         MR. QAQUNDAH:  I just wanted to mention that the --

22  while discussions are happening, and I believe all of the

23  Tribal groups want the casino open as soon as possible,

24  certainly the Reid Council does, the other -- there is another

25  mechanism, which is what the Reid Council is pursuing, the

1   Department of Interior.  We are attempting to compel them to

2   make a decision, and that will be moving forward at the same

3   time just for your information.

4           THE COURT:  All right.

5           MR. ROSETTE:  Your Honor, I misspoke on one thing, if

6   I could correct the record.  It was actually Nancy Ayala who

7   also reached out on behalf of the 2012 Council to Reggie Lewis

8   and the Morris Reid Council of 2013 to build that bridge and

9   unite the Tribe.  She has demonstrated leadership as well.  I

10  wanted to make that clear.

11          THE COURT:  All right.  We are still midmorning.

12  This Court will issue an order no later than 2:30 today.  We

13  will be in recess.

14          MR. TORNGREN:  Thank you, your Honor.

15          (The proceedings were concluded at 10:08 a.m.)

16          I, PEGGY J. CRAWFORD, Official Reporter, do hereby

17          certify the foregoing transcript as true and correct.

18

19  Dated:  5th of November, 2014      /s/ Peggy J. Crawford
                                       PEGGY J. CRAWFORD, RDR-CRR
20

21

22

23

24

25