1

2

3      **IN THE UNITED STATES DISTRICT COURT**

4      **FOR THE EASTERN DISTRICT OF CALIFORNIA**

5      **(FRESNO DIVISION)**

6

7   **STATE OF CALIFORNIA,**                Case No. 1:14-CV-01593 LJO SAB

8                          Plaintiff,       **JUDGMENT AND PERMANENT**
                                            **INJUNCTION**
9           v.

10

11  **PICAYUNE RANCHERIA OF**
    **CHUKCHANSI INDIANS OF**
12  **CALIFORNIA, A FEDERALLY**
    **RECOGNIZED INDIAN TRIBE,**
13
                           Defendant.
14

15          Pursuant to the joint request of Plaintiff, the State of California ("State"), and the Tribal

16  Council of the Picayune Rancheria of Chukchansi Indians of California elected on October 3,

17  2015 ("New Tribal Council") (ECF No. 98), and in light of the response filed by a dissenting

18  Tribal faction (the "Distributees") (ECF No. 101), the Court enters the following findings of fact,

19  conclusions of law, order, and judgment.[1]

20          In this action, the State alleges that the Picayune Rancheria of Chukchansi Indians of

21  California ("Tribe") breached the tribal-state class III gaming compact ("Compact") executed by

22  the State and the Tribe. Specifically, the Tribe operates the Chukchansi Gold Resort and Casino

23  ("Casino") on Indian lands in Madera County, California. An intra-tribal dispute existed among

24  various Tribal members, which led to multiple groups claiming leadership rights over the Tribe

25  and the rights to control the Casino. On October 9, 2014, this intra-tribal dispute led to an armed

26  conflict on the Casino grounds. The Compact includes, among other things, provisions to protect

27  ─────────────
    [1] This matter was heard on shortened time pursuant to Local Rule 144(e) because movants
28  demonstrated good cause for an expedited decision. *See* Minute Order at ECF No. 100.

1   public health and safety. The Court concludes that the Compact was breached and that a

2   permanent injunction as ordered herein is just and proper.

3   **FINDINGS OF FACT**

4        1.     The Tribe and the State entered into the Compact, which was ratified by the

5   California Legislature and approved by the United States Secretary of the Interior. The Compact

6   is a valid and enforceable agreement between the Tribe and the State. (*See* ECF No. 70 at 8

7   (uncontested factual statement).)

8        2.     The Compact defines Gaming Facility to include any building in which class III

9   gaming activities or gaming operations occur, or in which the business records, receipts, or other

10   funds of the gaming operation are maintained, as well as "all rooms, buildings, and areas,

11   including parking lots and walkways, a principal purpose of which is to serve the activities of the

12   Gaming Operation . . . ." (*Id.*)

13        3.     The Compact defines Gaming Operation to mean the business enterprise that

14   offers and operates class III gaming activities. (*Id.*)

15        4.     The Compact provides that the Tribe, through its gaming agency, shall promulgate

16   and enforce rules and regulations that ensure the physical safety of gaming operation patrons and

17   employees, and any other person while in the Gaming Facility. (*Id.*)

18        5.     The Compact provides that the Tribe will not conduct class III gaming in a manner

19   that endangers the public health, safety, or welfare. (*Id.*)

20        6.     The Compact provides a waiver of sovereign immunity for suit if (a) the dispute is

21   limited to issues arising under the Compact, (b) neither side makes a claim for monetary damages,

22   and (c) no person or entity other than the Tribe and the State is a party to the action. (*Id.*)

23        7.     The Compact allows for injunctive and declaratory relief, and expressly does not

24   allow monetary damages. (*Id.*)

25        8.     The Compact requires that all gaming operations under the Compact be owned by

26   the Tribe. (*Id.*)

27

28

2

9.       The Gaming Facility's purpose is to promote tribal economic development, self-sufficiency, self-determination, strong tribal government, and the ability to provide services and benefits to tribal members. (Compact, 1, Preamble (ECF No. 1-2, 5).)

10.       An intra-tribal dispute existed among the Tribe's members. The intra-tribal dispute began following tribal elections in 2011. At least three groups claimed to be the Tribe's duly empowered leadership. Each group claimed to speak exclusively for the Tribe. Each group defined the Tribe's membership differently. None of the three groups recognized, or acknowledged, the authority of the other groups to speak for the Tribe.[2] (ECF No. 70, 9.)

11.       Since the intra-tribal dispute began, allegiances and alignments had changed from time-to-time. At one time, Reggie Lewis and Morris Reid were aligned in a group, and Nancy Ayala and Tex McDonald were aligned in another. Reggie Lewis and Nancy Ayala had aligned and separated on various occasions. Since the dispute began in December 2011 and until February 9, 2015, the Department of the Interior had not finally recognized a tribal government on an interim basis or otherwise. (*Id.*)

12.       On February 11, 2014, the United States Department of the Interior, Bureau of Indian Affairs ("BIA"), Pacific Regional Office, issued a decision concluding that "it has not been possible to ascertain which faction[']s actions are consistent with Tribal Law" and that "the BIA does not have authority to determine the Tribe's permanent leadership." That decision vacated the BIA Superintendent's determination to recognize the results of the December 1, 2012 election. The February 11, 2014, decision further concluded that "the Bureau of Indian Affairs, Pacific Region, will conduct business, on an interim basis, with the last uncontested Tribal Council elected December 2010 . . . , until such time as the issue is resolved in accordance with the Tribe's laws." (ECF No. 70, 10.)

13.       The February 11, 2014 decision was appealed on February 13, 2014, by the McDonald Group, followed by appeals by several other interested parties. On April 15, 2014, the Interior Board of Indian Appeals ("IBIA") denied the BIA Regional Director's motion to make

---

[2] At the time the complaint was filed, the three groups were the Lewis/Ayala Group, the McDonald Group, and the Reid Group.

the February 11, 2014 decision effective immediately. The result was that no group was recognized as the Tribe's duly empowered leadership. The IBIA "strongly encourage[d] the tribal factions to commit themselves to good faith efforts that will lead to the voluntary, and hopefully, lasting, resolution of this dispute." (*Id.*)

14.     As of October 9, 2014, the United States Department of the Interior did not recognize any of the three groups, or any other group, as the duly empowered leadership of the Tribe. As of October 9, 2014, no other federal agency recognized any of the three groups, or any other group, as the duly empowered leadership of the Tribe. (ECF No. 70, 11.)

15.     As of noon on October 9, 2014, the Lewis/Ayala Group occupied the ninth and eleventh floors of the hotel adjacent to the Casino. That group's gaming commission's offices were located on the first floor of the hotel. That group also controlled the Butler Building, which is near, but not physically connected to, the Casino. The Butler Building housed, among other things, computer servers and records for the gaming operation. (*See id.*) The Butler Building is part of the Tribe's Gaming Facility within the meaning of the Compact. (*See* ECF No. 70, 8.)

16.     As of noon on October 9, 2014, the Gaming Facility's operation was under the oversight of a tribal gaming commission appointed by the Lewis/Ayala Group. Security was provided by private security personnel under contract with the Lewis/Ayala Group's tribal gaming commission. (*See* ECF No. 70, 11.)

17.     As of noon on October 9, 2014, the hotel's operation was under the oversight of the Lewis/Ayala Group. (*See id.*)

18.     As of noon on October 9, 2014, the McDonald Group controlled the Tribe's Government Operations Complex ("Government Complex"), which is near, but not physically connected to, the Casino. The Tribe's Government Complex houses the tribal government offices and is located between the Butler Building and the Casino. (*See id.*)

19.     As of noon on October 9, 2014, the McDonald Group and the Lewis/Ayala Group each had a tribal council, tribal gaming commission, security forces, and other tribal agencies. As of noon on October 9, 2014, the Reid Group also had a tribal council. None of these tribal

4

councils was recognized by the United States Department of Interior or any other federal agency as the Tribe's tribal council. (*See* ECF No. 70, 11-12.)

20.     In the evening of October 9, 2014, security forces hired by the McDonald Group arrived at the valet and patron-loading area of the hotel-casino. They emerged from multiple vehicles. All of the security forces were armed with a variety of weapons, including handcuffs, mace or pepper spray, tasers, and firearms. The security forces were accompanied, or later joined, by members, and agents, of the McDonald Group. Some of the McDonald Group security forces had firearms drawn as they approached the Casino. (*See* ECF No. 70, 12; *see, e.g.*, ECF Nos. 10-6 & 10-9.)

21.     The McDonald Group's security force was not approved by, or registered with, any federal agency. The McDonald Group had prepared an operation plan, entitled "Sovereign Return," for its security force. That plan's stated object was to secure tribal gaming commission offices located in the Casino. One secondary object of the plan was to assist in providing audits necessary to comply with the National Indian Gaming Commission (NIGC) requests. The operation plan included a deadly force policy, which provided in part that, "officers do not draw or exhibit their firearms unless circumstances create strong reasonable cause to believe that it may be necessary to lawfully use the weapon . . . ." The operation plan also required security forces to be armed. (ECF No. 70, 12.)

22.     During the evening of October 9, 2014, the McDonald Group's security force handcuffed and detained members of the casino security force. At least one member of the casino security force had a firearm. The two security forces engaged in pushing and shoving. Tasers were fired. Firearms were drawn and pointed among the protagonists. Threats of violence were made. At least one member of the Lewis/Ayala Group's casino security force went to the floor and appeared to be attacked by a McDonald Group member. (*See* ECF No. 70, 13.)

23.     During the evening of October 9, 2014, the McDonald Group's and the Lewis/Ayala Group's security forces had confrontations in, among other places, the valet and patron-loading area of the Casino and the hotel lobby. These areas were open to, and accessible

by, members of the public, including employees and patrons of the gaming operation, as well as other persons in the Gaming Facility. (*See id.*)

24.     On October 10, 2014, the NIGC issued a Notice of Violation and Temporary Closure Order to the Tribe directing immediate closure of the Casino (Closure Order). (*Id.*) The Closure Order found, among other things, that imminent jeopardy existed because of the real and immediate threat to human health and well-being, which if uncorrected could result in serious harm or death. (ECF No. 10-4, 8.)

25.     On October 10, 2014, the State filed this action. (ECF No. 1-1.) The State alleged that the actions taken by the armed individuals and the takeover attempt breached the Compact. The State further alleged that those actions posed an imminent threat to the public health and safety. The Court entered a temporary restraining order ("TRO") to protect public safety. (ECF No. 5.) The TRO enjoined any further attempts to repossess or take control of the Casino. The TRO imposed a 1,000-yard weapons-free buffer zone around the Casino and nearby properties. The TRO prohibited the Casino's operation unless and until the Court was satisfied that the public health and safety of Casino patrons and employees, and tribal members could be adequately protected from the violent confrontations and threats of violent confrontation among tribal groups disputing tribal leadership and the Casino's control. (*Id.*)

26.     On October 15, 2014, the Court modified the TRO at the parties' request following a hearing on the TRO. (ECF No. 48, 4 (citing ECF Nos. 16 & 21).)

27.     On October 29, 2014, the Court entered a preliminary injunction ("Preliminary Injunction"), ordering that the Tribe and all of its officers, agents, servants, employees and attorneys, and all persons acting under the Tribe's direction and control were enjoined and restrained from, among other things, deploying armed personnel within 1,000 yards of the Casino and the tribal properties surrounding the Casino, including the hotel and nearby tribal offices. The Preliminary Injunction also enjoined possessing, carrying displaying, or otherwise having firearms in that area. The Preliminary Injunction directed the return of certain documents. Finally, the Preliminary Injunction enjoined operating the Casino unless and until the Court was satisfied that the public health and safety of Casino patrons and employees, and tribal members can be

adequately protected. The Preliminary Injunction is to remain in effect until the Case's resolution by settlement or judgment or the Court's further order. (ECF No. 48.)

28.     The Preliminary Injunction provided that the prohibition on operating the Casino "shall have no further force and effect if the NIGC issues an order lifting its Closure Order and, within one-half court day thereof, the State does not object to reopening the Casino." (ECF No. 48, 10.)

29.     On February 9, 2015, the IBIA issued an Order Making Decision Effective Immediately. That order made the Regional Director's February 11, 2014 decision effective immediately. That had the effect of recognizing the Tribal Council elected in 2010 ("2010 Interim Tribal Council") on an interim basis. (*See* ECF No. 70, 14.)

30.     On March 18, 2015, the BIA granted the 2010 Interim Tribal Council's application for federal grant funds under Public Law 93-638 (Contract Number A15AV0039 for Fiscal Year 2014/2015) (638 Contract). (*See id.*)

31.     On March 24, 2015, in deference to both the IBIA's and the BIA's immediate recognition of the 2010 Interim Tribal Council, the NIGC affirmed it was actively working with the 2010 Interim Tribal Council alone to resolve all matters that led to the NIGC's notices of violation and the related Closure Order, so that the Casino might reopen in a safe, controlled, and regulated manner. (*See* ECF No. 70, 14; *see also* ECF 87, 4-5.)

32.     On July 9, 2015, the Tribe, through the 2010 Interim Tribal Council, adopted Resolution # 2015-41 ("Public Safety Protocol") regarding public safety matters related to reopening the Casino. A copy of the Public Safety Protocol is Exhibit 1 to this Judgment and Permanent Injunction. The Public Safety Protocol provides, among other things:

a.     The Tribe, through the Picayune Rancheria Tribal Gaming Commission ("PRTGC"), will employ sufficient security personnel to maintain public health and safety at the Gaming Facility in accordance with the Compact.

b.     The only armed personnel allowed within 1,000 yards of the Gaming Facility will be members of duly recognized federal, state, and local law enforcement agency or armored transport personnel acting within the scope of their official duties.

7

1        c.      The individuals who participated in the October 9, 2014 invasion are

2 permanently excluded from the Gaming Facility.

3        d.      The Tribe will not conduct activities related to its governance including

4 general membership or Tribal Council meetings, elections, or election-related events at or

5 near the Gaming Facility for at least 24 months from reopening the Casino.

6        e.      The Tribe directed that all persons located in and around the Tribe's

7 Government Complex clear the Government Complex. For six months after it is cleared,

8 the Government Complex will remain secured and unoccupied.

9 (Declaration of Claudia Gonzales ("Gonzales Declaration"), ECF No. 98-1,¶ 3.)

10     33.     In August and September 2015, the Tribe constructed a fence along the road that

11 separates the Government Complex and the Casino, its parking facilities, and walkways.

12 (Gonzales Declaration, 4.)

13     34.     The 2010 Interim Tribal Council called for an election to be held on October 3,

14 2015, for all seven Tribal Council seats, and arranged for the election to be conducted by Indian

15 Dispute Resolution Services ("IDRS"), an independent organization with extensive experience in

16 successfully conducting elections in similar disputes within Indian country. (Gonzales

17 Declaration, ¶ 5.)

18     35.     IDRS conducted the election on October 3, 2015. The voter turnout was larger

19 than at any time since the leadership dispute began. While some losing candidates filed appeals,

20 IDRS dismissed all of the appeals in a final decision pursuant to Tribal law. (Gonzales

21 Declaration, ¶ 6; *see* ECF No. 87, 11-14.)

22     36.     On October 26, 2015, the 2010 Interim Tribal Council took its last official act,

23 which was to dissolve itself and formally abdicate all of its authority in favor of the Tribal

24 Council elected on October 3, 2015, the "New Tribal Council." Shortly thereafter, on the same

25 day, the New Tribal Council was sworn and seated. The New Tribal Council took over

26 administering the 638 Contract on behalf of the Tribe, as well as all other Tribal operations, and

27 ratified the Public Safety Protocol previously adopted by the 2010 Interim Tribal Council.

28 (Gonzales Declaration, ¶ 7.)

37.     On November 25, 2015, the New Tribal Council and the County of Madera entered into a First Addendum to the 2007 Memorandum of Understanding (Addendum), which provides, in part, that the Madera County Sheriff's Office will provide a deputy onsite at the Gaming Facility full-time (seven days a week, 24 hours per day) for a period of six months. This is in addition to the Madera County Sheriff's Office having a deputy in the Gaming Facility's vicinity with a 20-minute or less response time pursuant to a Memorandum of Understanding, dated February 14, 2007 ("MOU"). (Gonzales Declaration, ¶ 8.)

38.     The NIGC and the New Tribal Council negotiated a settlement agreement, SA-15-01, which will provide for lifting the Closure Order. A copy of that settlement agreement is Exhibit 2 to this Judgment and Permanent Injunction. Under that agreement, the New Tribal Council admitted that the attempted forcible takeover of the Casino on October 9, 2014, resulted in operating in a manner that threatened public health and safety. Under that agreement, the New Tribal Council agreed to operate the Casino in a manner that maintains and preserves public health and safety, and to not deviate from or modify the Public Safety Protocol's terms without first consulting with the NIGC. (Gonzales Declaration, ¶ 9.)

39.     The State and the New Tribal Council also have negotiated a settlement agreement. A copy of that settlement agreement is Exhibit 3 to this Judgment and Permanent Injunction. Under that agreement, the New Tribal Council agreed to comply strictly with the NIGC settlement agreement SA 15-01, the MOU and the Addendum, and the Public Safety Protocol. The New Tribal Council further agreed to this Court entering an injunction and judgment that includes the prohibitions and directions set forth below. (Gonzales Declaration, ¶ 10.)

40.     Many of the participants in the events of the evening of October 9, 2014, were prosecuted by the Madera County District Attorney; several pleaded guilty to criminal trespassing and were ordered by the Madera County Superior Court to stay away from the Tribal properties. Tex McDonald was prosecuted and pleaded guilty to felony false imprisonment in Madera County Superior Court.

Judgment and Permanent Injunction

41.     The events of the evening of October 9, 2014, endangered the public health, safety, and welfare. As a result of the October 9, 2014 events, class III gaming was being conducted in a manner that endangered the public health, safety, and welfare.

42.     The Casino has been closed since October 10, 2014, and no incident has occurred since then at the Gaming Facility that has endangered, or threatened, public health, safety, or welfare. (Gonzales Declaration, ¶ 11.)

43.     The New Tribal Council has taken actions that, along with this Judgment and Permanent Injunction, establish before this Court that the public health and safety of Casino patrons and employees, and tribal members can be adequately protected upon the re-opening, and operation of, the Casino.

## CONCLUSIONS OF LAW

1.     This Court has subject matter jurisdiction under 25 U.S.C. § 2710(d)(7)(A)(ii), which provides in pertinent part that the "United States district courts shall have jurisdiction over . . . any cause of action initiated by a State or Indian tribe to enjoin class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact . . . ." Here, the State alleged that the Tribe was operating class III gaming activities in the Casino in violation of the Compact. (ECF No. 1-1, 4.) The Compact provides that the Tribe will not conduct class III gaming in a manner that endangers the public health, safety, and welfare. (Compact, 29, § 10.1 (ECF No. 1-2, 33).)

2.     This Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331. *Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1055-56 (9th Cir. 1997) (*Cabazon*). Tribal-state compacts are created under federal law; therefore, a claim to enforce a compact arises under federal law. *See id*.

3.     The Tribe has waived its sovereign immunity under the Compact. (Compact, 29, § 9.4 (ECF No. 1-2, 33).) Additionally, Congress has abrogated the Tribe's sovereign immunity by 25 U.S.C. § 2710(d)(7)(A)(ii).

4.      Venue is proper in this Court as all of the acts and omissions alleged in the complaint occurred in Coarsegold, Madera County, or elsewhere in the Eastern District of California. 28 U.S.C. § 1391(b)(2); (*see also* ECF No. 70, 16).

5.      The Compact is a contract between the Tribe and the State. *Cachil Dehe Band of Wintun Indians of the Colusa Indian Comm. v. California Gambling Control Com'n*, 618 F.3d 1066, 1073 (9th Cir. 2010); (*see also* ECF No. 70, 16). It is governed by general federal law principles. Federal law looks to, and relies upon, California contract law. *Cachil*, 618 F.3d at 1073. The elements for a breach of contract claim are the contract, plaintiff's performance or excuse for nonperformance, defendant's breach, and resulting damages to plaintiff. *Reichert v. General Ins. Co. of America*, 68 Cal. 2d 822, 830 (1968); *see also Tecza v. Univ. of San Francisco*, 532 F.App'x 667, 668 (9th Cir. 2013) (citing *Walsh v. W. Valley Mission Cmty. Coll. Dist.*, 66 Cal. App. 4th 1532, 1545 (1998)).

6.      The Tribe agreed to ensure the physical safety of employees and patrons at the Casino (Compact, 24, § 8.1.2 (ECF No. 1-2, 28)), and to not conduct gaming in a manner that endangers the public health, safety, or welfare (*id.* at 29, § 10.1 (ECF No. 1-2, 33)). The facts establish an armed confrontation took place at the Gaming Facility by groups holding themselves out as plausibly constituting legitimate tribal authority at the time. The circumstances endangered the public health, safety, or welfare. That constituted a breach of the Compact.

7.      The decision to grant or deny a permanent injunction is an act of equitable discretion by a district court. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2012). A permanent injunction may be entered when a plaintiff shows that: (a) it has suffered irreparable injury; (b) remedies at law are inadequate to compensate for that injury; (c) considering balance of hardships between plaintiff and defendant, remedy in equity is warranted; and (d) public interest would not be disserved by the permanent injunction. *Id.* (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-13 (1982); *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987)). In balancing the conveniences and possible injuries to the parties, a court has the power to do equity and mold a decree to the necessities of the particular case. *Weinberger*, 456 U.S. at 312 (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).

11

8.      The State has made a showing for a permanent injunction.

a.      Irreparable Injury. The evidence establishes that the State has suffered irreparable injury in the form of conduct that endangered the safety and welfare of its residents and breaches the Compact. During the course of this case, the McDonald Group asserted that its armed incursion was a lawful effort, and that its security force, members, and agents had the right to use physical force, display and point firearms, and threaten to use deadly force. (ECF No. 33, 18; ECF No. 70, 16-17.) The Distributees have stated that "the public safety and welfare will certainly be in danger" if the Casino reopens (ECF No. 83-5, 6) and the "issues that caused the T.R.O. have been magnified to a more volatile and far more dangerous situation" (ECF No. 83-6, 4). Physical injury to the State's residents is irreparable injury to the State. Therefore, the State potentially will suffer more, and irreparable, injury without an injunction.

b.      Inadequate Remedies at Law. The evidence establishes that no adequate remedy is available at law to compensate the State for its injuries. Under the Compact, the State cannot recover damages. (Compact, 33, § 9.4(2) (ECF No. 1-2, 33).) The Compact remedies are limited to injunctive, specific performance, or declaratory relief. (*Id*.) None of the remedies can compensate the State for injuries to its residents and threats to the public health and safety.

c.      Balance of the Hardships. The balance of the hardships establishes that permanent injunction is warranted. The potential for violence and threats to the public safety and welfare, which breach the Compact, outweigh the economic benefits that the Tribe and others receive from the Casino. (*See* ECF No. 48, 8.) The Tribe and the State, along with the NIGC and Madera County, have worked towards solutions that balance the Tribe's and others' interests in the Casino reopening and the protection of the public health and safety. The Court can do equity and mold the injunction to meet the needs presented now. *See Weinberger v. Romero-Barcello*, 456 U.S. at 312.

d.      Public Interest. The public interest will not be disserved by a permanent injunction. Rather, it will be served, as will the Tribe's interests. The State's interest is the

12

public interest. Protecting public health and safety is clearly in the public interest. The
State and the Tribe share an interest in ensuring that the Compact duty to protect public
safety is met. Additionally, by molding the injunction to allow the Casino to reopen, the
Court serves the public interest in having a major contributor to the local and tribal
economies.

9.      The moving parties (the State and the New Tribal Council) request that the Court
enter the following provisions as part of a Judgment and Permanent Injunction:

> 2.      The Tribe, and all of its officers, agents, servants, employees
> and attorneys, and all persons acting under the Tribe's direction and
> control, including any group claiming to constitute the tribal
> government, shall be enjoined from deploying tribal police or other
> armed personnel of any nature within 1,000 yards of the Gaming
> Facility. This prohibition includes weapons of any nature or sort such
> as, by way of example but not limited to, firearms, tasers, knives,
> clubs, and batons. The only armed personnel allowed in that area will
> be members of federal, state, and local law enforcement agencies, and
> armored transport personnel, acting within the scope of their official
> duties.

> 3.      The Tribe, and all of its officers, agents, servants, employees
> and attorneys, and all persons acting under the Tribe's direction and
> control, including any group claiming to constitute the tribal
> government, shall be enjoined from possessing, carrying, displaying,
> or otherwise having firearms within 1,000 yards of the Gaming
> Facility or in the Government Complex.

(*See* ECF No. 98-2, 13.)

10.      The Distributees object to the language quoted above on the ground that it is
overbroad. (ECF No. 101, 5.) According to the Distributees, 1000 yards encompasses the whole
of the Government Complex and includes individually owned parcels of trust land. (ECF No. 101,
5-6.) This is roughly consistent with the undisputed fact that the Government Complex lies
between the Casino and the Butler Building. (*See supra*, Findings of Fact ¶¶ 15, 18.) The
Distributees point out that the Compact defines gaming facility as follows:

> Sec. 2.9 "Gaming Facility" or "Facility" means any building in which
> Class III gaming activities or gaming operations occur, or in which
> the business records, receipts, or other funds of the gaming operation
> are maintained (but excluding offsite facilities primarily dedicated to

13

storage of those records, and financial institutions), and all rooms, buildings, and areas, including parking lots and walkways, a principal purpose of which is to serve the activities of the Gaming Operation, provided that nothing herein prevents the conduct of Class II gaming (as defined under IGRA) therein.

(Compact, Sec 2.9 (ECF No. 1-2, 4).) The Distributees argue there is no basis for the Court to exercise subject matter jurisdiction over lands that do not fall within the scope of the Gaming Facility.

11.     The Court agrees with Distributees, at least on the current record. As explained above, this Court has subject matter jurisdiction under 25 U.S.C. § 2710(d)(7)(A)(ii), which provides in pertinent part that the "United States district courts shall have jurisdiction over . . . any cause of action initiated by a State or Indian tribe to enjoin class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact . . . ." This Court repeatedly has ruled that its jurisdiction in this case is limited to actions taken to address any breach of the Compact's public safety provision, which provides that "[t]he Tribe will not conduct Class III gaming in a manner that endangers the public health, safety, or welfare. . . ." (Compact, Sec 10.1 (ECF No. 1-2, 29).) Nothing in the Compact or 25 U.S.C. § 2710(d)(7)(A)(ii) suggests that the Court may exercise jurisdiction over sovereign Tribal territory that does not fall within the scope of the Compact itself. Accordingly, the Court will modify the proposed form of Judgment and Permanent Injunction to reflect this more limited jurisdictional reach.[3]

## JUDGMENT AND PERMANENT INJUNCTION

Based upon the foregoing findings of fact and conclusions of law, the Court orders and adjudges:

1.     Upon the NIGC's lifting the Closure Order, the Tribe may operate the Casino.

---

[3] In so finding, the Court is not ruling out the possibility that some form of jurisdiction may be exercised over other property or lands. However, no such authority has been provided to the Court as of this date. If the moving parties find the modified form of Judgment/Permanent Injunction insufficient, they may move to modify the language, provided they can identify sufficient authority to support such a modification. Unless further justification for shortening time is provided, any such motion must be filed pursuant to normal notice procedures.

2.      The Tribe, and all of its officers, agents, servants, employees and attorneys, and all persons acting under the Tribe's direction and control, including any group claiming to constitute the tribal government, shall be enjoined from deploying tribal police or other armed personnel of any nature within the area defined by Section 2.9 of the Compact. This prohibition includes weapons of any nature or sort such as, by way of example but not limited to, firearms, tasers, knives, clubs, and batons. The only armed personnel allowed in that area will be members of federal, state, and local law enforcement agencies, and armored transport personnel, acting within the scope of their official duties.

3.      The Tribe, and all of its officers, agents, servants, employees and attorneys, and all persons acting under the Tribe's direction and control, including any group claiming to constitute the tribal government, shall be enjoined from possessing, carrying, displaying, or otherwise having firearms within the area defined by Section 2.9 of the Compact.

4.      The Tribe, and all of its officers, agents, servants, employees and attorneys, and all persons acting under the Tribe's direction and control, including any group claiming to constitute the tribal government, shall return to the PRTGC all business records, including those that are stored electronically, relating to the gaming operation, including without limitation personal and other information necessary for, or related to, licensing and other compliance with the Compact. Any person who is not authorized to possess business records removed from the Gaming Facility is enjoined from possessing, disposing of, or destroying such records. Such persons are enjoined from disposing of those records in any manner other than returning them to the PRTGC.

5.      Unless earlier modified by the Court following application by the Parties, the prohibitions and directions set forth in paragraphs 2 through 4 above shall remain in effect for two yearly Tribal Council election cycles that are conducted without significant incident that threatens or endangers public safety.

6.      The State's request that the Court declare that the Tribe has materially breached the Compact and that the State may exercise all rights, powers, and privileges accorded it including, without limitation, the right to terminate the Compact is deemed abandoned without prejudice to the State's right to seek such relief in the future.

15

1       7.     The State and the Tribe will bear its own costs and attorney fees with respect to

2 bringing, defending, and settling this action. In the event that either the Monica Davis Group

3 (formerly the McDonald Group) or the Distributees Group appeals this Judgment and Permanent

4 Injunction, the State or the Tribe may seek their costs from those groups.[4]

5       8.     Without affecting the finality of this Judgment and Permanent Injunction, the

6 Court retains jurisdiction to enforce or modify this Judgment and Permanent Injunction.

7       9.     The Clerk of Court is directed to enter final judgment accordingly.

8

9 **IT IS SO ORDERED**
**Dated: December 22, 2015**

10                                 **/s/ Lawrence J. O'Neill**
                            **United States District Judge**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

26 [4] The Court is not persuaded by Distributee's objections to the language in this paragraph. Distributees argue that this amounts to a restraint upon Distributee's rights to litigate this case. (ECF No. 101, 7.) This paragraph embodies an agreement between the moving parties not to seek attorney's fees from one another while clarifying that any such agreement does not preclude either moving party from seeking costs allowable by law from any other litigant in this case.

27

28